Sarah R. Gonski (# 032567)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: 602.351.8000
Facsimile: 602.648.7000
SGonski@perkinscoie.com
DocketPHX@perkinscoie.com

Elisabeth C. Frost (WDC# 1007632)*
Uzoma N. Nkwonta (WDC# 975323)*
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 600
Washington, D.C. 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211
EFrost@perkinscoie.com
UNkwonta@perkinscoie.com

*Pro hac vice application to be filed

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Jessica Miracle; Rose Smallcanyon; Czaria Lord; Lonnie Arrington; Mendon Dornbrook; Mary Katz; NextGen Climate Action; and Arizonans for Fair Lending (Our Voice, Our Vote Arizona, LUCHA); <br><br> Plaintiffs, <br><br> v. <br><br> Katie Hobbs, in her official capacity as Arizona Secretary of State, <br><br> Defendant. | No. _____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs file this Complaint for Declaratory and Injunctive Relief against Defendant KATIE HOBBS, in her official capacity as the Arizona Secretary of State (the "Secretary") and allege as follows:

### NATURE OF THE ACTION

1. Since the inception of statehood in 1912, Arizona's citizens have been guaranteed the right to directly pass legislation and constitutional amendments by initiative, a right that has been recognized as "[a] fundamental component of the legislative process in Arizona." *League of Ariz. Cities & Towns v. Brewer*, 213 Ariz. 557, 559, ¶ 9 (2006). That right is now in peril. At issue in this litigation is A.R.S § 19-118(C) (the "Strikeout Law"),[1] which requires the Secretary of State to strike all signatures gathered by an initiative petition circulator if the circulator is subpoenaed as a witness during an initiative challenge but cannot appear in court. The Strikeout Law abridges and denies core constitutional rights of political speech and association, along with the right to vote or participate meaningfully in the initiative process—a right guaranteed to all Arizona citizens—and thus violates the First and Fourteenth Amendments of the U.S. Constitution, both facially and as applied. Without this Court's intervention, the law will continue to restrict the fundamental constitutional rights of initiative circulators, signers, sponsors and those who associate with them to support and promote initiatives in advancement of common political goals (together, "initiative proponents" or "proponents").

2. The right to initiative is ingrained in the very core of Arizonans' political rights. For well over a hundred years, the people of Arizona have enjoyed "[a]s great as the power of the Legislature to legislate." *State v. Osborn*, 16 Ariz. 247, 250 ( 1914). They exercise this right through the initiative power, guaranteed to them by Article IV of the Arizona Constitution, which empowers its citizens to propose legislation or constitutional amendments and, if they can gather enough signatures from their fellow Arizonans to

---

[1] The Arizona Legislature recently passed S.B. 1451, which will amend portions of A.R.S § 19-118 effective August 27, 2019 and will renumber the Strikeout Law from subsection (C) to subsection (E).

qualify the measure, to have such proposed legislation or constitutional amendments placed on the general election ballot for an up-or-down vote. Ariz. Const., art. IV.

3.    Although the initiative power is not one that all states chose to reserve to the citizenry, in those that have the movement arose because "many of our American Legislatures were suspected, more or less justly, of being guided rather by the selfish wishes of the few than the true good of the many." *McBride v. Kerby*, 32 Ariz. 515, 525 (1927). In reserving the power of the initiative, Arizona made a conscious choice to ensure that the right to legislate did not reside exclusively with the Legislature, but was also vested directly in the people. Where that right is abridged or denied by later legislative enactments, courts have not hesitated to strike down the offending law. *E.g.*, *Meyer v. Grant*, 486 U.S. 414, 428 (1988) (striking down as unconstitutional state law that unduly restricted the right to participate in initiative process); *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 195 (1999) (same); *Krislov v. Rednour*, 226 F.3d 851, 866 (7th Cir. 2000) (same); *Idaho Coal. United for Bears v. Cenarrusa*, 342 F.3d 1073, 1073 (9th Cir. 2003) (same); *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1031 (10th Cir. 2008) (same).

4.    The Strikeout Law has been increasingly used to burden and deny Arizonans' First and Fourteenth Amendment rights to meaningfully participate in the State's initiative process. The law requires the Secretary to invalidate, *en masse*, all signatures collected by certain types of circulators if they are subpoenaed during an initiative challenge and cannot appear in court. The Strikeout Law does not apply evenly to all circulators, but targets arbitrary categories of circulators based on residency, employment status, and subject matter of the petition circulated. Petitions that serve to nominate candidates to the ballot (rather than promote legislation by initiative) are exempt from the law, as are unpaid circulators of initiative petitions who are Arizona residents. If a circulator falls into a targeted category, however, the blanket signature invalidation is required even if there is no legitimate question that the signatures were collected lawfully and are otherwise valid, even if the circulator can provide whatever information the challenger legitimately needs in a

manner less burdensome than an in-person court appearance, and even if the circulator has good reason for their inability to appear.

5.    The Strikeout Law thus conditions the ability of signers, circulators, sponsors, and initiative proponents to exercise their constitutional right to initiative on each individual circulator's ability to comply with a subpoena, often issued with little advance warning, even where there is no reason to believe that there is anything improper about the manner in which the petition was circulated or the signatures that appear upon it.

6.    This indiscriminate rejection of voter signatures effectively silences hundreds of thousands of Arizona citizens who sponsor, circulate, or sign petitions, as well as those who associate with them to promote or fund initiatives in Arizona. The Strikeout Law thwarts the will of these signers whose signatures can be stricken without notice, and without a shred of evidence to suggest that they were invalid. To qualify for the 2020 ballot, a proponent must gather 237,645 signatures for statewide statutory initiatives, and 356,467 signatures for constitutional initiatives. Initiative proponents must expend significant resources to mount a successful initiative that meets these already steep requirements, and all of their efforts may be rendered meaningless under the Strikeout Law by virtue of a circulator's inability to appear in court on a given day, for reasons entirely unrelated to the validity of the petition signatures. The law further multiplies the cost of the initiative process exponentially. Circulators, often numbering upward of a thousand for a successful initiative campaign, are especially vulnerable to the burdens imposed by the Strikeout Law, and may choose to sit out the next signature gathering effort rather than face a choice between sitting in court for days on end or having all their signatures invalidated and their work undone. In each case, the Strikeout Law burdens the core First Amendment speech and political association of all stakeholders in the initiative process.

7.    Plaintiffs are petition signers, circulators, sponsors, and initiative proponents, each of whom have had their ability to meaningfully participate in the initiative process abridged or denied because of the Strikeout Law.

8.      Plaintiffs JESSICA MIRACLE, ROSE SMALLCANYON and CZARIA LORD (together, "Circulator Plaintiffs") each circulated petitions for the Clean Energy for a Healthy Arizona Initiative ("Clean Energy Initiative") in 2018. When opponents of the measure brought a court challenge to keep that initiative off the ballot, they issued a blanket subpoena to nearly every single circulator who had collected signatures in support of the measure—approximately 1,180 in total—including each of the Circulator Plaintiffs. SMALLCANYON and LORD were able to appear in court only at enormous personal burden, and thus saved the signatures they collected from invalidation. The approximately 300 circulators who could not appear included MIRACLE, who had a sick baby and toddler at home in Tucson; the Strikeout Law required that all 2,604 signatures that MIRACLE had collected be stricken. The Circulator Plaintiffs are hesitant to circulate initiative petitions again if the Strikeout Law is still in effect due to the burdens imposed on them by the law in connection with their work on the Clean Energy Initiative.

9.      The Strikeout Law also harmed Plaintiffs LONNIE ARRINGTON, MENDON DORNBROOK, and MARY KATZ (together the "Voter Plaintiffs"), each of whom are Arizona voters who signed petitions for the Clean Energy Initiative and whose signatures were summarily invalidated when the circulators whose petitions sheets they signed were later unable to comply with the subpoenas. No showing was ever made that there was anything improper about their signatures or the petition sheets that they signed. The Voter Plaintiffs signed the petitions because they strongly supported the Clean Energy Initiative and intended to exercise their federal constitutional rights of speech and association. Their political and associational activity, however, was rendered meaningless by the arbitrary and unconstitutional application of the Strikeout Law. The Voter Plaintiffs intend to sign initiative petitions in the future, and are deeply concerned that their right to support initiatives will be thwarted in similar fashion if the Strikeout Law is still in effect.

10.      The Strikeout Law also severely burdens organizational Plaintiffs NEXTGEN CLIMATE ACTION ("NEXTGEN") and Arizonans for Fair Lending (Our Voice, Our Vote Arizona, LUCHA) ("ARIZONANS FOR FAIR LENDING") (together, "Organizational

Plaintiffs"), and the circulators and voters with whom they associate in a collective effort to obtain ballot access for initiative petitions, each of whom have had to drastically re-organize operational plans and scale up already significant budgets to accommodate the Strikeout Law.

11.    NEXTGEN was a proponent of and the main financial backer of the Clean Energy Initiative, and was only able to save the initiative's presence on the ballot by undertaking herculean (and extraordinarily costly) efforts to coordinate the personal appearances of over 900 circulators during the court challenge.

12.    ARIZONANS FOR FAIR LENDING is sponsoring an initiative for the 2020 ballot and has begun gathering signatures, but is increasingly concerned that gathering enough signatures to qualify for the ballot—an already extremely expensive and time-consuming process—will be a wasted effort if it cannot also marshal additional significant resources to ensure the personal appearance of enough circulators to survive the Strikeout Law.

13.    Both Organizational Plaintiffs face organized opposition from industry groups, and are thus nearly certain that any initiatives they support in the future will draw a court challenge, where the Strikeout Law will be wielded against them as an offensive weapon with the purpose and effect of severely burdening—and potentially denying—them, the circulators who participate in the efforts, and the voters who sign the petitions, their rights to effectively participate in the initiative process. In anticipation, they must take immediate steps to re-organize operational plans and divert resources to ensure that the Strikeout Law does not prove fatal to their efforts.

14.    The Strikeout Law violates the First and Fourteenth Amendments of the U.S. Constitution. It violates the First Amendment because it limits the number of voices who can convey a political message, makes it less likely that initiative proponents can gather the number of signatures necessary to place an initiative on the ballot, and impermissibly regulates speech based on the content of the speech and the identity of the speaker. The Strikeout Law also violates the Voter and Organizational Plaintiffs' Fourteenth Amendment

rights by unduly burdening their right (and in the case of the Organizational Plaintiffs, the rights of the circulators and voters with whom they associate for the common purpose of working together to legislate by initiative, including specifically to obtain ballot access for initiative petitions so that they may be considered by the Arizona electorate) to participate meaningfully in the initiative process.

## JURISDICTION AND VENUE

15. Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the U.S. Constitution.

16. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.

17. This Court has personal jurisdiction over the Secretary, who is sued in her official capacity only.

18. Venue is proper in this district under 28 U.S.C. § 1391(b) because the Secretary resides in Arizona and the events that gave rise to Plaintiffs' claims occurred in this judicial district. Venue is proper in the Phoenix division because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Maricopa County, Arizona.

19. This Court has the authority to enter declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rule 65 of the Federal Rules of Civil Procedure.

## PARTIES

20. Plaintiff JESSICA MIRACLE is a registered voter in and resident of Pima County, Arizona. MIRACLE was a paid petition circulator for the Clean Energy Initiative for which she circulated petitions from March 5 to July 5, 2018. Overall, she collected 2,604 signatures in support of placing the Clean Energy Initiative on the 2018 ballot. She circulated the petition because she supported the measure politically and because she appreciated the flexible working hours, since she had a toddler and a small baby at home to care for. Weeks later, MIRACLE received a subpoena commanding her to appear in court

at a trial challenging the sufficiency of the petitions submitted in support of the Clean Energy Initiative, *Leach v. Reagan*, CV 2018-009919 (Maricopa County Superior Court 2018). MIRACLE was unable to appear because her children were sick, she did not have her own transportation from her home in Tucson to Phoenix, and she was unable to get any clarity on how long she would need to be in Phoenix away from her family. The initiative proponents were providing a bus to take circulators to and from Tucson, but it was only going to bring circulators back to Tucson after their court obligations were over, and she was told by the initiative proponents that she would have to stay in Phoenix "as long as it takes" for the court to release her from her subpoena. Because MIRACLE was unable to travel to Phoenix and appear in court, all of the 2,604 signatures that she had gathered in support of the initiative were invalidated. She is frustrated that the Strikeout Law silenced not only her, but each and every voter who signed her petitions, many of whom communicated to her when they signed the petition that they eagerly supported the measure. MIRACLE would like to circulate petitions again in the future, but is reluctant to do so if the Strikeout Law is still in effect given the significant burdens that it imposed on her in connection with her work as a circulator in 2018. MIRACLE was recently offered a job circulating nomination petitions for a mayoral candidate that she supports, but she declined the offer, because she did not want to work hard collecting signatures only to later have that work undone if she is again subpoenaed and unable to travel to Phoenix and appear in court. She only learned recently that the Strikeout Law does not apply to circulators for candidate nomination petitions, and feels frustrated that the State favors speech in support of candidates for public office, while implicitly discouraging the same type of speech in favor of an initiative.

21.    Plaintiff ROSE SMALLCANYON is a registered voter in and resident of Tempe, Arizona. SMALLCANYON worked as a paid petition circulator for the Clean Energy Initiative in 2018. She was only able to circulate petitions for a single day before severe back pain prevented her from continuing. Nevertheless, she managed to collect 43 signatures from voters, many of whom were college students at Arizona State University

who were passionate about clean energy and eager to sign the petition. When the Clean Energy Initiative was challenged in court in the summer of 2018, SMALLCANYON was staying with her family in Navajo Mountain on the Navajo Nation in southern Utah. She received notice via text, email, and physical mail from proponents of the initiative that she had been issued a subpoena by challengers to the initiative commanding her to appear on August 20, 2018 in Maricopa Superior Court in Phoenix. SMALLCANYON does not have a car and did not have transportation to travel the over 300 miles to the courthouse in Phoenix, but was worried that she would be in trouble if she did not appear. In the end, she took the trip in two stages. First, a family member drove her the three and a half hours from Navajo Mountain and dropped her off in Flagstaff, Arizona. Once in Flagstaff, SMALLCANYON boarded a bus the rest of the way to Phoenix. The entire journey took her most of the day. Once in Phoenix, she stayed at a hotel that NEXTGEN arranged and paid for. She spent three days at the hotel and lived on the $20 per diem that she received from NEXTGEN. Every morning she boarded a bus to the courthouse, which she could only do with great difficulty because of ongoing back pain. On the first day of trial, around 900 circulators arrived at the courthouse at the same time and the security line took hours. She spent two full days in court and spent most of that time sitting in waiting rooms with other circulators who had been subpoenaed. Each day, she was required to respond to frequent roll-call check-ins. Circulators who did not respond when their name was called had all their signatures invalidated, even if they had been at the courthouse earlier that day. SMALLCANYON was scared and nervous when in court, and feared missing a check-in or committing some other small technical mistake that might result in her signatures being stricken or in her getting in trouble with the court. Despite all of this, SMALLCANYON was never called to testify at the trial challenging the initiative, and was released without questioning after being held at the courthouse for two full days. SMALLCANYON would consider circulating petitions in future elections, but is not willing to do so if the Strikeout Law is still in effect, given the severe burdens that it imposed on her in connection with her work as a circulator in 2018.

22. Plaintiff CZARIA LORD is a registered voter in and resident of Mesa, Arizona. LORD was a paid petition circulator for the Clean Energy Initiative and circulated petitions from May 31 until July 5, 2018. Overall, she collected 579 signatures in support of placing the Clean Energy Initiative on the 2018 ballot and became a team leader. During the court challenge to the sufficiency of the petitions supporting the Clean Energy Initiative, LORD received a subpoena commanding her appearance in court in Phoenix on August 20, 2018—the very day that she was due to begin classes at Scottsdale Community College. She attempted to call the court to have her subpoena quashed or amended, but no one answered the phone at the courthouse despite repeated attempts to call. In the end, LORD missed her first two days of college to go to the courthouse to comply with the subpoena. She felt like she owed it to the voters who signed her petitions and to her fellow circulators, given the work they had all put in to ensure that the measure was placed on the ballot. After waiting in the courthouse for two entire days and responding to the frequent daily roll-call check-ins, LORD was released without ever being called to the stand to testify by the opponents of the initiative who had issued her the subpoena. LORD would like to circulate petitions in the future, but given her experience in 2018, she cannot commit to doing so if the Strikeout Law is still in effect. LORD is concerned that she will suffer similar severe burdens as a result of the law, but if the Strikeout Law is enjoined, LORD will likely resume circulating petitions.

23. Plaintiff MARY KATZ is a registered voter in and a resident of Phoenix, Arizona. KATZ is politically active, frequently serves as a pollworker, and regularly signs initiative petitions that she agrees with. She strongly supports clean energy and environmental conservation policies, and the Clean Energy Initiative was particularly important to her. KATZ signed the Clean Energy Initiative petition in the summer of 2018, but her signature was later invalidated when the circulator who witnessed it was unable to appear in court when subpoenaed. She did not personally know the circulator who witnessed her signature, and whether the circulator complied with a subpoena was entirely beyond her influence or control. She is upset that her signature was invalidated because of the Strikeout

Law, and feels that the law unfairly pushes voters like her out of the political process for reasons entirely outside of her control. She had no notice that her signature would be invalidated, and no opportunity to seek redress, and only discovered long after the election had passed that it had been invalidated. KATZ believes it is likely that she will sign an initiative petition again in the future, and fears that her signature will again be invalidated due to the circulator's inability to appear in court.

24. Plaintiff LONNIE ARRINGTON is a registered voter in and a resident of Tucson, Arizona. ARRINGTON signed the Clean Energy Initiative petition in the summer of 2018, but his signature was later invalidated when the circulator who witnessed it was unable to appear in court when subpoenaed. ARRINGTON supported the ballot measure, and intended his signature to communicate as much and to help secure a place on the 2018 ballot for the Clean Energy Initiative. ARRINGTON was frustrated that his signature was invalidated without his input or knowledge and for reasons outside his control, and feels that the Strikeout Law silenced his political speech. He did not personally know the circulator who witnessed his signature, and whether the circulator could comply with a subpoena was entirely beyond his knowledge or influence. He had no notice that his signature was invalidated, no opportunity to seek redress, and only discovered long after the election had passed that it had been invalidated. ARRINGTON believes it is likely that he will sign an initiative petition again in the future, and fears that his signature will again be invalidated due to the circulator's inability to appear in court.

25. Plaintiff MENDON DORNBROOK is a registered voter in and a resident of Phoenix, Arizona. DORNBROOK signed a petition for the Clean Energy Initiative in the summer of 2018, but his signature was later invalidated when the circulator who witnessed it was unable to appear in court when subpoenaed. DORNBROOK is an active supporter of environmental causes, and considers himself politically engaged. He was frustrated that the Strikeout Law stripped him of his ability to express political support for the Clean Energy Initiative's appearance on the ballot. He did not personally know the circulator who witnessed his signature, and whether the circulator could comply with a subpoena was

entirely beyond his knowledge or influence. He had no notice that his signature was invalidated, no opportunity to seek redress, and only discovered long after the election had passed that his signature was not counted. DORNBROOK believes that he will likely sign an initiative petition again in the future, and fears that his signature will again be invalidated due to the circulator's inability to appear in court.

26.     Plaintiff NEXTGEN CLIMATE ACTION ("NEXTGEN") acts politically to prevent climate disaster, promote prosperity, and protect the fundamental rights of every American. In 2018, NEXTGEN formed the Clean Energy for a Healthy Arizona Committee ("CEHA") to sponsor the Clean Energy Initiative for inclusion on Arizona's 2018 general election ballot. NEXTGEN was the main source of funding for CEHA, which—with NEXTGEN's financial assistance—eventually gathered 480,707 signatures in support of the measure's inclusion on the ballot. Nonetheless, the Clean Energy Initiative was almost removed from the ballot after opponents of the law filed suit and promptly subpoenaed nearly every single circulator of the petition—approximately 1,180 in all—in the apparent hopes that enough signatures would be invalidated under the Strikeout Law to keep the Initiative off the ballot. NEXTGEN was only able to save the initiative by engaging in a logistically complex and exceedingly expensive effort to coordinate the personal appearance of as many circulators as possible. As a direct result of NEXTGEN's efforts, 913 circulators appeared in court in compliance with their subpoenas, which was enough to ensure that the Initiative had a sufficient number of signatures to achieve ballot access, despite losing all signatures collected by the nearly 300 circulators who could not appear. The fact that the Clean Energy Initiative was ultimately able to achieve ballot access does not mean that NEXTGEN was not harmed by the Strikeout Law. If it were not for the law, NEXTGEN would not have had to coordinate in-person court appearances of hundreds of circulators, which consumed time and money that otherwise would have been spent elsewhere achieving other organizational goals, including directly engaging with Arizona voters regarding the ballot measure once ballot access was secured. NEXTGEN intends to fund, support, or promote other ballot measures in the future. If the Strikeout Law is still in

effect, it anticipates that it will face a restricted pool of circulators because it must ensure that circulators are willing and able to comply with a subpoena. Thus, it likely will not re-hire circulators who circulated the Clean Energy Initiative but were unable to comply with subpoenas issued in *Leach v. Reagan*. It further fears that hiring circulators outside the Phoenix metro area will increase operational costs because it must anticipate needing to transport and lodge those circulators in the event that the Strikeout Law is wielded against initiative efforts that NEXTGEN funds and promotes again. NEXTGEN will also have to set aside additional resources to fund litigation and logistical expenses well in advance of any potential challenge, to ensure that it is able to mount an effective response. If the Strikeout Law is still in effect, NEXTGEN will again be forced to divert significant additional resources to ensure access to the ballot, or risk not achieving it at all—even if the sponsors NEXTGEN works with otherwise gathered enough valid signatures from Arizona voters. It is thus highly likely that it will again suffer the same injuries in the future if the Strikeout Law is not enjoined.

27.     Plaintiff ARIZONANS FOR FAIR LENDING is sponsoring an initiative for inclusion on the 2020 ballot. The initiative, entitled "Arizona Fair Lending Act" (hereinafter, "Fair Lending Initiative"), would restrict predatory lending on car title loans. ARIZONANS FOR FAIR LENDING filed the Fair Lending Initiative with the Secretary on May 15, 2019 and received a serial number of I-14-2020. The text of the Fair Lending Initiative was reviewed by Legislative Council, which suggested several minor revisions. After those changes were made, ARIZONANS FOR FAIR LENDING re-filed the Fair Lending Initiative on June 18, 2019 and received a new serial number of I-16-2020. On July 2, 2019, ARIZONANS FOR FAIR LENDING began circulating petitions to gather signatures in support of the Fair Lending Initiative. As a direct result of the Strikeout Law, ARIZONANS FOR FAIR LENDING has already faced a restricted pool of available petition circulators and has been forced to budget significant additional financial resources for potential litigation costs. ARIZONANS FOR FAIR LENDING believes it is highly likely that the initiative will be challenged in court because the Fair Lending Initiative likely

will face organized opposition from industry groups, and consequently must plan for the possibility that the Strikeout Law will be wielded against them. To prepare for that scenario, ARIZONANS FOR FAIR LENDING must divert resources that would otherwise be dedicated to achieving other operational goals, including engaging with voters regarding the initiative, to ensure that they have enough resources to weather the challenge. They must spend additional money, gather additional signatures, change hiring and recruitment plans for circulators, and otherwise shift organizational priorities. These injuries are accruing now, and do not depend on whether the Strikeout Law is actually fatal to their initiative efforts.

28.     Defendant KATIE HOBBS is Arizona's Secretary of State and Chief Elections. A.R.S. § 16-142. As Arizona's Chief Elections Officer, the Secretary is responsible for overseeing the voting process in Arizona and is empowered with broad authority to carry out that responsibility. The Secretary is also responsible for enforcing requirements for registered circulators. A.R.S. § 19-118. If a registered circulator fails to respond to a subpoena, it is the Secretary who is ultimately responsible for removing signatures collected by the circulator. A.R.S. § 19-118(C). The Secretary is sued in her official capacity for actions taken under color of law.

## GENERAL ALLEGATIONS

### The Initiative Power in Arizona

29.     Article IV of the Arizona Constitution provides, in relevant part:

The legislative authority of the state shall be vested in the legislature…
but the people reserve the power to propose laws and amendments to the
constitution and to enact or reject such laws and amendments at the polls,
independently of the legislature. The first of these reserved powers is the
initiative. Under this power ten per centum of the qualified electors shall
have the right to propose any measure, and fifteen per centum shall have
the right to propose any amendment to the constitution.

Ariz. Const., art. 4, pt. 1, § 1-2.

30.     Simply put, the people of Arizona have a constitutional right to make their own laws without consulting the Legislature. Arizona's citizens first exercised that right

just months after Arizona gained statehood in 1912, when they voted by a two to one margin to extend the right to vote to women. Since then, Arizona citizens have freely exercised the right of initiative, with hundreds of initiatives appearing on the ballot since 1912.

31. From Arizona's earliest days, the Legislature has viewed the initiative as a usurpation of its power and has fought to restrict the initiative. As early as 1914, Arizona voters responded to these efforts by attempting to restrict elected officials from amending or repealing initiatives. Arizona, *Initiative & Referendum Veto* (1914). In response, the Legislature attempted to pass a constitutional amendment that would have made it more difficult to pass initiatives, but Arizona voters rejected the measure when it appeared on the ballot as a referendum in 1916. Arizona, *Initiative & Referendum* (1916).

32. In 1998, after the Legislature gutted several high-profile initiative measures passed by voters just months prior, the people of Arizona took action and amended the Arizona Constitution—by initiative—to ensure that their will was carried out. As a result of the voter-initiated Voter Protection Act, Arizona's Constitution now ensures that (1) the Governor cannot veto any measure approved by voters, (2) the Legislature cannot repeal the measure, and (3) the Legislature may amend a measure approved by voters only if the legislative amendment "furthers the purpose" of the initiative *and* is passed by three-quarters of the members of each legislative chamber. Ariz. Const. art. 4, pt. 1, § 1(6)(C)-(D).

33. After the Voter Protection Act prevented the Legislature from tinkering with citizen-passed laws, the Legislature shifted its focus toward making it more difficult to qualify an initiative to appear on the ballot in the first instance. In recent years, it has imposed increasingly onerous restrictions on petition circulators, banned pay-per-signature compensation, raised the standard of compliance required from "substantial compliance" to "strict compliance," and imposed a plethora of statutory requirements on initiative circulators.

34. The Legislature, however, shares their legislative power co-equally with the people of Arizona, and may not unduly burden that power through over-regulation. No less

than the U.S. Supreme Court has observed about Arizona's right to initiative that, "[t]he Framers may not have imagined the modern initiative process in which the people's legislative power is coextensive with the state legislature's authority, but the invention of the initiative was in full harmony with the Constitution's conception of the people as the font of governmental power." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2657 (2015). Consistent with this observation, courts regularly find that laws restricting state initiative rights violate the federal constitution. *E.g.*, *Am. Civil Liberties Union of Nevada v. Lomax*, 471 F.3d 1010, 1013 (9th Cir. 2006); *Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 139 (2d Cir. 2000).

### Qualifying an Initiative for the Ballot

35.     Qualifying an initiative for the ballot in Arizona is a lengthy, time intensive, and expensive process, even under the best circumstances. It is not unusual for it to cost well over two million dollars to mount and pursue an initiative, even for initiatives that do not ultimately obtain enough signatures to qualify for the ballot. A successful initiative effort often costs significantly more.

36.     To legislate by initiative in Arizona, a campaign must both successfully obtain access to the ballot, and then garner a majority of votes from the electorate. To accomplish the first task, initiative proponents must engage in a multi-step process.

37.     To begin, a proponent must file the proposed initiative, a 100-word summary, and an application for a serial number with the Secretary at least four months prior to the general election. A.R.S. § 19-111(A); Ariz. Const. Art. IV, pt. 1, § 1.

38.     Once the Secretary processes the application and issues the proponents a serial number, signature gathering can begin.

39.     If an initiative creates or amends a statute, proponents must collect signatures equal to at least 10% of the number of votes cast in the most recent gubernatorial election; if an initiative seeks to amend the Arizona Constitution, the requirement rises to 15%. Ariz. Const. Art. IV, pt. 1, § 1; Ariz. Const. Art IV, pt. 1 §§ 2 & 7.

40.     For the 2020 election cycle, statutory initiatives must gather 237,645 valid

signatures, and constitutional initiatives must gather 356,467 valid signatures before they may appear on the ballot. ARIZONA SEC'Y OF STATE, https://azsos.gov/elections/initiative-referendum-and-recall (last accessed July 10, 2019).

41. Because the number of required signatures is so high, most successful initiative proponents rely at least in part on paid petition circulators. Using paid circulators enables campaigns to track data more efficiently to calculate progress toward signature goals, imposes accountability on the circulators, and allows campaigns to allocate resources efficiently.

42. Paid petition circulators are typically hired on a short-term basis, and are paid an hourly wage. For a statewide initiative, proponents will often hire upwards of one thousand circulators. Turnover among circulators is very high; many cite the long hours and extended time spent outside in the Arizona heat as reasons to resign. Many circulators only serve for a day or two, although a smaller percentage work for several months on a campaign.

43. State law has numerous safeguards against petition fraud that apply equally to both initiative and candidate nomination petitions. Circulators must sign an affidavit attesting that they have personally witnessed each signature. A.R.S. § 19-115; A.R.S. § 16-321. Petition circulators need not be Arizona residents, but they must meet all other qualifications to register to vote in Arizona—i.e., American citizens of at least eighteen years of age, with no felony convictions (unless they have had their voting rights restored). A.R.S. § 16-321(D); A.R.S. § 16-341(G)-(H); A.R.S. § 19-112(D); A.R.S. § 19-114(A); A.R.S. § 19-118(A). If a qualified voter thinks either a candidate or an initiative was erroneously qualified for the ballot, they may challenge the certification in court. A.R.S. § 16-351 (nomination petitions); A.R.S. § 19-118 (initiative petitions). All non-resident circulators must register with the Secretary, and as part of that process must agree to be subject to the State's jurisdiction in the event of a later court challenge. A.R.S. § 19-118(B)(1) (initiative petitions); A.R.S. § 16-315(B)(2) (nomination petitions).

44.    In recent years, the Arizona Legislature has increasingly imposed additional requirements on initiative petitions that do not apply to candidate nomination petitions. A.R.S. § 19-101(C); A.R.S. § 19-102(C)-(D) (circulators for initiatives must disclose whether they are paid or volunteer); *but see* ARIZONA SEC'Y OF STATE, *Petition Circulation Training Guide*, at 2, available at https://azsos.gov/sites/default/files/Petition%20Circulator%20Training%20Guide%20May%2001%202018.pdf (last accessed July 10, 2019) ("A circulator need not make any similar disclosure on a candidate nomination petition form."); A.R.S. § 19-102.01(A) (initiatives are evaluated under a strict compliance standard); *but see* A.R.S. § 16-315(A) (candidate nomination petitions must only "substantially" comply); A.R.S. § 16-316 (providing secure online signature portal for voters "to sign a nomination petition" but not for initiative petitions); *compare* A.R.S. § 19-112(A) (signer of initiative petition must personally complete signature, printed first and last name, residence address, and date signed); *with* Training Guide at 4 ("The signer of a candidate nomination petition is only required to personally complete the signature portion of the petition"); *compare* A.R.S. § 19-121.01(A) (stating, to be valid, a signature on an initiative petition must contain printed name, signature, residence address, and date, must be from a voter in the correct county, must be in blue or black ink, must not be obtained after the date of organizational statement, and entire sheets may be rejected if attachments or serial numbers are missing, notary stamps are expired, or paid circulator was unregistered), *with* A.R.S. § 16-315(A)(4); A.R.S. § 16-321(D)-(E) (stating signatures on candidate nomination petitions must only contain a residence address and a printed name or signature; no statutory grounds for full petition sheets to be rejected); *compare* A.R.S. § 19-121.01(A) (stating, to be valid, a signature on an initiative petition must contain printed name, signature, residence address, and date, must be from a voter in the correct county, must not be obtained after the date of organizational statement, and entire sheets may be rejected if attachments or serial numbers are missing, notary stamps are expired, or paid circulator was unregistered), *with* A.R.S. § 16-315(A)(4); A.R.S. § 16-321(D)-(E) (stating signatures on candidate nomination petitions must only

contain a residence address and a printed name *or* signature; no statutory grounds for full petition sheets to be rejected).[2]

45.    Additionally, circulators of initiative petitions must register with the Secretary if they are paid for their work (even if they are residents of Arizona). A.R.S. § 19-118. The same is not true for Arizona residents who circulate candidate nomination petitions.

46.    Once initiative proponents have gathered the requisite number of signatures, they must turn in the petition sheets to the Secretary no later than four months prior to the general election. The Secretary reviews the petitions and removes any petition sheets that do not comport with certain statutory requirements, although some statutory deficiencies can only be resolved by a court in the course of a challenge. *See, e.g.*, ARIZONA SEC'Y OF STATE, *Initiative and Referendum Guide*, at 29 n.111, available at https://azsos.gov/sites/default/files/Initiative%20and%20Referendum%20Guide%20INT.pdf (last accessed July 10, 2019) (describing certain statutory requirements and stating "the foregoing legal deficiencies are not explicitly or implicitly referenced in … the statute that governs the Secretary of State's duty to invalidate petition sheets and signatures" and "therefore, these legal deficiencies must be reviewed by an Arizona court").

47.    The Secretary also randomly selects a 5% sample of signatures and sends them to county recorders for further verification. *See id.* at 36. If, after conducting these multiple reviews, there appear to be enough valid signatures to exceed the constitutional minimum, the Secretary certifies the measure for inclusion on the ballot. A.R.S. § 19-121.04(B).

48.    Most statutory initiatives do not make it past the signature-gathering stage. From 1980 to 2010, only one-quarter of initiatives that received a serial number from the Secretary eventually collected enough signatures to appear on the ballot. Toni McClory,

---

[2] The Arizona Legislature did nothing to change the application of the more lenient standard of substantial compliance to candidate nominating petitions, which remain subject to review under substantial compliance.

*Understanding the Arizona Constitution* at 84-85, Second Edition 2010. That number has dropped precipitously in recent years. Since 2010, the share of initiatives that successfully gained ballot access dropped from twenty-five percent to just ten percent.

**Initiative Challenges and the Strikeout Law**

49. Arizona law empowers "any person" who wishes to bring a challenge to a proposed initiative petition to "seek to enjoin the secretary of state or other officer from certifying or printing the official ballot … that will include the proposed initiative." A.R.S. § 19-122(C).

50. All challenges to statewide initiatives are heard in Maricopa County Superior Court, which is located in Phoenix. *Id.*

51. Lawsuits must be filed within just five days of the Secretary's certification, and litigation proceeds at a breathtaking pace. A.R.S. § 19-122(A).[3]

52. Because the timeline to file and try initiative challenges is so compressed, subpoenas to potential witnesses are issued on short notice and require that the recipient comply very quickly—sometimes in as little as a few days.

53. The Strikeout Law was enacted in 2014, and provides the following penalty for failing to comply with the subpoena:

> If a registered circulator is properly served with a subpoena to provide evidence in an action regarding circulation of petitions and fails to appear or produce documents as provided for in the subpoena, all signatures collected by that circulator are deemed invalid. The party serving the subpoena may request an order from the court directing the secretary of state to remove any signatures collected by the circulator as provided for in § 19-121.01, subsection A.

A.R.S. § 19-122(C).

---

[3] Although there is no express statutory deadline by which litigation must conclude, a constellation of practical deadlines quickens the pace of initiative challenges. Early voting begins 27 days in advance of election day for civilian voters and 45 days in advance for military personnel serving overseas, and Arizona law requires that publicity pamphlets must be printed and arrive by the time voters receive their early ballot. A.R.S. § 19-123(B).

54.    The Strikeout Law thus requires the court presiding over the initiative challenge to issue an order to the Secretary, pursuant to which the Secretary is required to summarily invalidate *all* signatures that the absent circulator collected—regardless of whether there is any actual evidence of invalidity, regardless of the reason that the circulator was not able to comply with the subpoena, and regardless of whether the initiative challenger had any intention at all of actually putting the circulator on the stand to elicit testimony.

55.    The Strikeout Law does not apply equally to all initiative circulators. By its plain text, the Strikeout Law only applies to *registered* circulators. A.R.S. § 19-118(C). This language is significant, because the only initiative circulators that have to register by law are circulators who are either paid or who live out of state. A.R.S. § 19-118. Volunteer, in-state circulators do not have to register as circulators under Arizona law, and thus are not subject to the Strikeout Law. The statute offers no reason or explanation for this disparate treatment.

56.    The Strikeout Law also does not apply to circulators of candidate nomination petitions. Title 19 of the Arizona Statutes, which contains the Strikeout Law, governs only initiative, referendum, and recall petitions. Nomination petitions are separately governed by Title 16, Chapter 3, which contains no corollary provision.

### The Strikeout Law in Practice

57.    The constitutional issues raised by the Strikeout Law are aptly illustrated by the challenge brought against the Clean Energy Initiative in 2018, *Leach v. Reagan*, CV 2018-009919 (Maricopa County Superior Court 2018).

58.    In that case, opponents of the Clean Energy Initiative filed a lawsuit in Maricopa County Superior Court challenging the Secretary's certification of the measure for the 2018 ballot.

59.    The challengers immediately issued approximately 1,180 subpoenas—to nearly every single circulator—commanding them to appear in court just weeks later. Each circulator was also commanded to bring a variety of documents along with them, including

pay stubs, criminal records, proof of residential address, documents relating to their employment, copies of each of their petition sheets, and copies of their registration with the Secretary.

60.     On August 20, 2018, a total of 913 circulators appeared in court in compliance with their subpoenas—including Plaintiffs SMALLCANYON and LORD.

61.     To enable this remarkable response Plaintiff NEXTGEN had to subcontract with a separate company to contact the circulators and arrange the logistics of their appearance. It extended enormous financial resources in the effort, including paying for lodging and meals, transportation, lost wage reimbursement, per diems, preparing witnesses for what to expect in court, providing temporary day care, hiring additional staff, and other myriad expenses.

62.     The subpoenaed circulators came from all over Arizona and outside the state. They were forced to choose between complying with the subpoenas and meeting their personal and occupational obligations. Circulators missed school, work, medical appointments, and vacations to respond. Many expressed fear that not complying would subject them to arrest or other legal penalties, including contempt of court.

63.     On the first day of the Clean Energy Initiative trial, all 913 circulator witnesses needed to be processed and checked in. The line for the metal detectors was several hours long and wrapped around the block.

64.     The courthouse was not designed to hold so many witnesses at one time, so circulators were split into groups and held in three separate rooms. They were required to stay at the courthouse all day, with frequent roll-call check-ins. Any circulator that failed to appear at any one of the roll-call check-ins had all of the signatures that they had worked to collect immediately and irrevocably invalidated.

65.     At the end of the day, hundreds of circulators were released without ever having testified, while others were divided into groups with each group being given a date to return again to the courthouse later that week.

66.     Approximately 300 circulators had their signatures stricken when they did not appear on the first day of trial. A further forty-six circulators who initially appeared at trial had their signatures stricken after they failed to return during a subsequent check-in.

67.     The vast majority of the circulators who were subpoenaed in the challenge to the Clean Energy Initiative were never called to testify at all. Of the 1,180 circulators who were subpoenaed, and of the 913 who appeared in court, only **41** were actually called to the stand to testify.

68.     The remainder were sent home, often after several days of sitting and waiting, and after never having been asked a single question about their work by the challengers who had issued the subpoenas en masse.

69.     The Clean Energy Initiative was not the only initiative campaign targeted by the Strikeout Law in 2018—another 2018 initiative, Outlaw Dirty Money, also experienced the devastating effects of the law.

70.     In that case, *Stanwitz v. Reagan*, CV 2018-009789, the Outlaw Dirty Money Initiative was stricken from the ballot altogether because of the Strikeout Law. During an initiative challenge in Maricopa County Superior Court, opponents of the initiative subpoenaed the fifteen circulators, each of whom were among the most prolific out-of-state petition circulators. None of the fifteen circulators received actual notice of their subpoenas, at least partially because of service issues.

71.     The Strikeout Law does not require that the circulators receive actual notice of their subpoena. Instead, service is effected even if the subpoena is left "at the address designated by the circulator"—which must be a physical address within Arizona—"with a person of suitable age." A.R.S. § 19-118(B)(2); *compare with* Ariz. R. Civ. P. 4.1(d)(1)-(3) (service is proper if an individual is served personally, if a copy of the served document is left *at their dwelling or usual place of abode* with a person of suitable age, or if service is performed on an authorized agent) (emphasis added).

72.     The service requirements will be even more challenger-friendly as of August 27, 2019, when S.B. 1451 (2019) will go into effect and amend A.R.S. § 19-118(B). Under

-23-

the new law as amended, subpoenas can be served for purposes of the Strikeout Law by simply leaving a copy with a "person of suitable age" at the address of the sponsoring committee, or by mailing a copy to the committee by certified mail. 2019 Ariz. Legis. Serv. Ch. 315 (S.B. 1451).

73.    In *Stanwitz*, because service had been effectuated under the plain terms of A.R.S. § 19-118(B)(2), the Strikeout Law required the court to grant the challengers' request, and the Secretary invalidated all signatures gathered for the Outlaw Dirty Money Initiative by the absent circulators.

74.    Pursuant to the Strikeout Law, the Secretary invalidated all 8,824 signatures that the absent circulators had collected. Without those signatures, the Outlaw Dirty Money Initiative did not meet the constitutional minimum and did not qualify for inclusion on the ballot.

75.    In 2016, another initiative, "Arizonans for Fair Wage and Healthy Families," ("Minimum Wage Initiative") was nearly stricken from the ballot due to the Strikeout Law. During an initiative challenge in Maricopa County Superior Court, *Hitzeman v. Reagan*, CV 2016-009704, opponents of the measure issued subpoenas to 170 circulators. The initiative campaign was forced to suspend campaign operations for a month to divert all staff and other resources to coordinating the appearance of the circulators. As a consequence, they lost critical opportunities for direct voter engagement because they were unable to canvass, conduct town halls, engage with voters on social media and digital platforms, communicate with the media, or otherwise seek public support for their mission. Because no staff members were available to oversee and manage volunteer efforts, the campaign was forced to turn volunteers away—some of whom never returned after campaign operations later resumed. Additionally, during that month the campaign was also forced to divert staff time and other resources that would have normally been spent fundraising and connecting with donors, which doubled the financial impact of the Strikeout Law; not only did the campaign have to dedicate money toward ensuring the appearance of the circulators, but they also lost out on donations that would have otherwise been given.

76.    In the end, the campaign was able to secure the appearance of approximately 130 out of 170 circulators. They did this by renting vans to drive circulators in from Tucson, coordinating lodging in supporters' homes for circulators who needed to stay overnight, and paying for hotel rooms where no supporter lodging was available. They did not have enough resources to compensate circulators for lost wages or offer per diem, and several circulators were unable to appear as a result because they could not afford to take the time away from work.

77.    Only a handful of the subpoenaed circulators were actually called to testify at trial. The vast majority were never asked a single question under oath by the challengers.

78.    The forty circulators who were unable to appear at trial had all the signatures they collected stricken under the Strikeout Law. Without those signatures, the Minimum Wage Initiative did not meet the constitutional signature requirement. The Strikeout Law would have prevented the initiative from appearing on the ballot altogether if the Arizona Supreme Court had not later ruled that the initiative challenge was invalid for jurisdictional reasons. While the initiative eventually achieved ballot access, it did so at the expense of the campaign's ability to allocate resources efficiently to effectively communicate with voters and donors and advocate toward shared public policy goals.

## CLAIMS FOR RELIEF

### COUNT I

**First Amendment**
**U.S. Const. Amend. I, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202**
**Freedom of Speech and Association**

79.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

80.    The Strikeout Law violates the First Amendment rights of all Plaintiffs on at least three independent grounds: (1) it unreasonably constricts the pool of available circulators, thus limiting the overall quantum of political speech; (2) it makes it less likely that an initiative will garner enough signatures to achieve access to the ballot, and (3) it

impermissibly regulates speech based on the content of the speech and the identity of the speaker.

81. On each of these grounds, the Strikeout Law may only survive if the Secretary can demonstrate that the law is narrowly tailored to serve a compelling state interest. She cannot do so.

82. Among its other constitutionally fatal characteristics, the Strikeout Law reduces the quantity of political speech by restricting the pool of available petition circulators.

83. Both the U.S. Supreme Court and the Ninth Circuit have held that laws reducing the pool of available petition circulators implicate the right of speech and association and should be evaluated under strict scrutiny. *Buckley v. Am. Constitutional Law Foundation*, 525 U.S. 182, 193 (1999); *see also Nader v. Brewer*, 531 F.3d 1028, 1036 (9th Cir. 2008) (endorsing the view that strict scrutiny applies to laws reducing the number of potential circulators).

84. Here, the Strikeout Law premises an ability to circulate petitions to only those potential circulators who are able and willing to personally appear in court on exceedingly short notice. In practice, it imposes an additional, extra-statutory requirement that a circulator must not circulate petitions unless they are reasonably certain they can travel to and spend several days in a Phoenix courthouse at an unknown future date.

85. Because many circulators are understandably unwilling or unable to make such a guarantee, the Strikeout Law hampers the efforts of initiative proponents to hire and retain paid circulators, and makes recruitment efforts more complicated and difficult. By necessarily reducing the ranks of potential circulators, the Strikeout Law restricts the ability of initiative proponents to engage meaningfully in the initiative process—political speech that lies at the heart of the First Amendment's protections.

86. Additionally, most successful initiative campaigns depend on a wide geographic distribution of circulators throughout Arizona. The Strikeout Law impedes initiative proponents' ability to achieve geographic diversity by making it more risky and

expensive to hire circulators from outside the Phoenix metropolitan area. In the event that circulators are subpoenaed, circulators distant from the courthouse incur the additional burden and inconvenience of traveling to Phoenix, and the initiative proponents must allocate additional funds to transport and lodge the circulator during trial.

87. The Strikeout Law also violates the First Amendment on independent grounds because it significantly reduces the chance that an initiative can obtain the number of signatures necessary to achieve ballot access. Both the United States Supreme Court and the Ninth Circuit have repeatedly held that laws that make it less likely that an initiative can obtain a sufficient number of signatures to achieve access to the ballot implicate the First Amendment. *Meyer v. Grant*, 486 U.S. 414, 422-23 (1988); *see also Buckley*, 525 U.S. at 194; *Nader*, 531 F.3d at 1036.

88. Because of the Strikeout Law, initiative proponents and sponsors—including Plaintiffs NEXTGEN and ARIZONANS FOR FAIR LENDING—must gather additional signatures, well in excess of the minimum constitutional threshold, to ensure that any signatures lost as a result of the Strikeout Law are not outcome-determinative. Without having to account for the law's mass signature invalidation, initiative efforts could gather far fewer signatures and still well exceed the constitutional minimum. The restricted pool of circulators, extended signature-gathering efforts, and exponentially increased expenses (including litigation expenses) all significantly increase the chance that initiative proponents will ultimately fail in their quest to place their measure on the ballot, for reasons completely unrelated to intensity of support from Arizona voters or the validity of the signatures they submitted in support of the measure.

89. The Strikeout Law also violates the First Amendment on other independent grounds because it impermissibly regulates speech based on the content of the speech and the identity of the speaker. Under the First Amendment, the state "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). Speech restrictions are content-based if a law applies to particular speech because of the message conveyed, which includes "subtle"

distinctions that "defin[e] regulated speech by its function or purpose." *Id.* (citations omitted). "[A] speech regulation targeted at specific subject matter is content-based even if it does not discriminate among viewpoints within that subject matter." *Id.* at 2230. Likewise, the First Amendment protects against "restrictions distinguishing among different speakers, allowing speech by some but not others," which are "prohibited." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 341 (2010). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, *Ariz.*, 135 S. Ct. 2218, 2226–27 (2015).

90.     Here, the Strikeout Law applies only to speakers circulating petitions for the purpose of engaging in citizen-initiated lawmaking. Speakers who are circulating petitions for the purpose of a candidate's nomination to public office are exempt from the law.

91.     The signature-gathering process for candidate nomination petitions and initiatives are identical in meaningful respects and serve the same purpose: ensuring that a candidate or initiative has a certain minimal threshold of political support to justify appearing on the ballot. In both instances, that political support is expressed through a voter's signature on a petition, a circulator's decision to gather signatures, and a proponent or candidate's decision to fund the effort. Under all circumstances, the parties are engaging in core First Amendment activities of political persuasion and engagement. Yet, despite these nearly identical purposes and mechanisms, the Strikeout Law does not apply to candidate nomination petitions.

92.     Thus, if SMALLCANYON or LORD had been circulating petitions in support of a candidate's nomination, rather than an initiative, they would not have had to incur the extraordinary burden of spending several days in court complying with a subpoena on the threat that their work would be entirely invalidated and their political speech (as well as the speech of the voters who signed their petitions) silenced.

93.     If MIRACLE had been circulating petitions in support of a candidate's nomination rather than an initiative, none of the 2,604 signatures that she collected would

have been summarily invalidated when she could not appear in court and her political speech (as well as the speech of the voters who signed her petitions) would not have been silenced.

94. If ARRINGTON, KATZ, or DORNBROOK had signed petitions in support of a candidate's nomination rather than an initiative, their signatures would not have been invalidated and their political speech silenced by the Strikeout Law.

95. If initiative proponents were advocating in support of a candidate's nomination to public office, rather than an initiative, the Strikeout Law would not impose additional hurdles and steeply increased costs—in time, employees, effort, and money—to qualify for the ballot.

96. Further, the Strikeout Law impermissibly regulates speech based on the identity of the speaker. Because it only applies to paid and out-of-state initiative circulators it "distinguish[es] among different speakers, allowing speech by some but not others" which the Supreme Court has made clear is "prohibited." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 341 (2010).

**Arizona's Interests Cannot Withstand Scrutiny**

97. Under all three grounds discussed above, the Strikeout Law is invalid unless the State can show that the law is narrowly tailored to serve a compelling state interest. It cannot. The law does not serve any compelling state interest, and—even if it did—is not narrowly tailored. The Secretary cannot demonstrate why it must automatically discard all signatures collected by circulators who cannot comply with a subpoena, even where there is no evidence that the signatures were invalid or collected unlawfully. *See Chandler v. City of Arvada, Colorado*, 233 F. Supp. 2d 1304, 1311 (D. Colo. 2001), *aff'd in part*, *rev'd in part*, 292 F.3d 1236 (10th Cir. 2002). No other state in the nation imposes such a draconian penalty.

98. That the Strikeout Law does not actually serve a compelling state interest is evident by the fact that Arizona does not apply the Strikeout Law evenly to all circulators.

99.    Arizona has an equally strong interest in guarding all types of petitions—whether in support of a citizen's initiative effort or to nominate a candidate—against fraud. Yet, the State does not find it necessary to apply the Strikeout Law (or any similar wholesale invalidation mechanism) to candidate nomination petitions or to in-state volunteer initiative circulators, demonstrating that the law is not actually necessary to combat petition fraud.

100.    There is no evidence to suggest that initiative petitions are more susceptible to fraud than candidate nomination petitions, nor that paid or out-of-state circulators are in need of special punishments above and beyond other circulators to compel their attendance in court. Thus, any interest that the State can articulate about signature fraud would apply with equal force to circulators unaffected by the Strikeout Law.

101.    Additionally, the Strikeout Law does not serve the State's interest in ensuring that circulators, if questions later arise about their work, are obligated to make themselves available for questioning under oath. Arizona already separately requires all non-resident circulators, regardless of the type of petition, to agree to the State's jurisdiction in the event of a court challenge. A.R.S. § 19-118(B)(1) (initiative petitions); A.R.S. § 16-315(B)(1) (nomination petitions).

102.    Further, the State cannot demonstrate that the normal civil penalties associated with subpoena non-compliance are insufficient to compel the attendance of paid or out-of-state initiative circulators if there is in fact a legitimate basis for issuing a subpoena in a particular case. There is no evidence to suggest that volunteer in-state circulators or nomination petition circulators (who are not subject to the Strikeout Law) are any more likely to comply with a subpoena than the groups targeted by the Strikeout Law. Nor is there any evidence to suggest that before the implementation of the Strikeout Law, paid and out-of-state initiative circulators were more likely than others to disregard a subpoena and thus merited the addition of special penalties designed to amplify the punishment for non-compliance.

103.    The Strikeout Law is not merely overbroad; it is *substantially* overbroad. Striking each and every signature collected by a circulator who fails to appear in person

-30-

penalizes and silences initiative proponents and signers just as much as the circulator, and there is no evidence to suggest that this result is actually necessary to serve some compelling state interest. *C.f.*, *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1030 (10th Cir. 2008) (noting that Oklahoma found it "unacceptable" to punish absent circulators by striking signatures because it would "punish and disenfranchise . . . voters who had the misfortune of signing a non-resident circulator's petition").

104. The amount of political speech chilled and outright silenced by the law is far out of proportion to the minimal (if any) amount of protection against fraud that the Strikeout Law provides. As starkly demonstrated in the *Leach* trial, over 1,180 subpoenas were issued in order to elicit testimony from just 41 circulators. Of the 913 circulators who appeared at trial, 872 were sent home without ever being asked a single question about their work.

105. Each of those 872 circulators, including SMALLCANYON and LORD, had to undergo enormous personal burdens in order to appear in court (despite NEXTGEN's costly efforts to ease these burdens as best it could), but their presence was ultimately pointless. No fraud prevention interest could have plausibly been served by their multi-day ordeal. The same is true for the hundreds and thousands of circulators in other initiative challenges discussed above, who were forced to disrupt their lives to appear in court but were never ultimately asked a single question about their work.

106. Moreover, there are a number of far less constitutionally troubling ways that the State can ensure that petition circulators are available to answer questions about their work in a court of law if the need arises. For example, it could require an initiative opponent demonstrate a legitimate need or basis for a circulator's in-person testimony before issuing a subpoena, or permit appearances by remote means when justified by good cause. No other state has a provision like the Strikeout Law, and for good reason: it chills and outright silences core First Amendment activity far out of proportion to what is necessary to achieve any legitimate goal.

107. Because it targets and silences political speech by restricting the pool of circulators, makes it less likely that an initiative will achieve access to the ballot, and restricts speech based on content and identity of the speaker, the Strikeout Law can only survive if it can satisfy strict scrutiny. Because the law is not narrowly tailored to serve a compelling state interest, the Strikeout Law violates the First Amendment.

## COUNT II

### First and Fourteenth Amendments
### U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202
### Equal Protection Clause

108. Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

109. Because it treats similarly-situated circulators differently on an arbitrary basis, the Strikeout Law is also unconstitutional on independent grounds because it violates the Circulator Plaintiffs' right (and the Organizational Plaintiffs, both in their own right and on the behalf of the circulators with whom they associate to promote initiative petitions) to equal protection of the laws.

110. Because the arbitrary burden is placed on speech rights, however, the Equal Protection claim "rise[s] and fall[s] with the First Amendment claim" and is analyzed under the same framework discussed in Count I. *OSU Student All. v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012).

## COUNT III

### First and Fourteenth Amendments
### U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202
### Undue Burden on the Right to Vote of Voter and Organizational Plaintiffs

111. Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

112. Ballot initiatives implicate the fundamental right to vote and are therefore subject to the guarantees of the Fourteenth Amendment. *Idaho Coalition United for Bears v. Cenarrusa*, 342 F.3d 1073, 1077 (9th Cir. 2003).

113. To determine whether a state law imposes an undue burden on the right to vote in violation of the Fourteenth Amendment, federal courts apply the *Anderson-Burdick* balancing test, which "weigh[s] 'the character and magnitude of the asserted injury to the rights … that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)); *see also Lemons v. Bradbury*, 538 F.3d 1098, 1105 (9th Cir. 2008) (applying balancing test to claim challenging rejection of petition signatures).

114. The Strikeout Law violates the First and Fourteenth Amendments by severely burdening Voter and Organizational Plaintiffs' right (both in their own right and on the behalf of the voters that associate with them and voice their support for initiatives they promote by signing petitions in support) to meaningfully participate in the initiative process.

115. The Voter Plaintiffs each placed their signatures on initiative petitions as an expression of political support, and later had their otherwise valid signature rejected under the Strikeout Law. None had knowledge that their signatures may be invalidated if the circulator was subpoenaed in a challenge but could not appear, and none were given any notice before or even when their signatures were invalidated. None personally knew the circulator such that they could have attempted to influence the circulator to appear. Because their right to meaningfully participate in the initiative process was solely pinned to a factor outside their knowledge or control and completely unconnected to any indication that their signature was not valid, these burdens are severe.

116. The same is true of voters who sign petitions circulated by the Organizational Plaintiffs, but then have their signatures invalidated by operation of the Strikeout Law. In addition, the Organizational Plaintiffs each expended or are currently expending

considerable time, resources, money, and staff time to achieve ballot access. The Strikeout Law impedes their ability to qualify an initiative for the ballot even if they otherwise gather enough valid signatures to meet the constitutional requirements for ballot access. Consequently, the Strikeout Law requires Organizational Plaintiffs to retool operational strategies, increase budgets, and divert resources that could have been expended elsewhere in service of other operational goals.

117. The State can offer no countervailing interests that outweigh these burdens, and cannot show that the Strikeout Law actually serves those interests. The across-the-board rejection of signatures from absent circulators, even where there is not a scintilla of evidence that the circulator's signatures are invalid or were collected unlawfully, bears no rational relationship to the integrity of the initiative process. It results in the arbitrary rejection of valid signatures from qualified signers, without any compelling reason and is therefore invalid. *See, e.g.*, *Molinari v. Powers*, 82 F. Supp. 2d 57, 62, 72 (E.D.N.Y. 2000) (holding that disqualification of petitions for listing the signer's village, rather than the town or city of residence is "absurd," and imposed an undue burden on "access to the ballot" that is not supported by any compelling or rational reason).

118. Moreover, Arizona's decision to apply the Strikeout Law unevenly among circulators based on residency, employment status, and content of the petition again demonstrates that the law is not necessary to protect the integrity of the signature-gathering process. The State can and does serve its fraud-prevention goals through less burdensome means. Instead of serving legitimate state interests, the Strikeout Law discourages the people of Arizona, including Voter and Organizational Plaintiffs, from exercising their fundamental right to make law without consulting the Legislature. This is not a cognizable state interest and cannot justify the burden to Voter and Organizational Plaintiffs' fundamental rights.

119. Because the Strikeout Law unduly burdens the rights of signers and proponents to participate meaningfully in the initiative process, and is not outweighed by

any countervailing state interest, it violates the First and Fourteenth Amendments to the U.S. Constitution.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

A.  Declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that the Strikeout Law violates the First and Fourteenth Amendments to the U.S. Constitution;

B.  Preliminarily and permanently enjoining the Secretary, and her agents, officers, employees, successors, and all persons acting in concert with each or any of them from enforcing the Strikeout Law;

C.  Awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

D.  Granting such other and further relief as the Court deems just and proper.

Dated: July 11, 2019

s/ *Sarah R. Gonski*

Sarah R. Gonski (# 032567)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788

Elisabeth C. Frost (WDC# 1007632)*
Uzoma N. Nkwonta (WDC# 975323)*
Perkins Coie LLP
700 Thirteenth Street NW, Suite 600
Washington, D.C. 20005-3960

*Pro hac vice* applications to be filed

*Attorneys for Plaintiffs*

-35-

**CERTIFICATE OF SERVICE**

I hereby certify that on July 11, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing.


                                    s/ *Daniel R. Graziano*