Sarah R. Gonski (# 032567)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: (602) 351-8170
Facsimile: (602) 648-7000
SGonski@perkinscoie.com

Elisabeth C. Frost (WDC# 1007632)*
Uzoma N. Nkwonta (WDC# 975323)*
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 600
Washington, D.C. 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211
EFrost@perkinscoie.com
UNkwonta@perkinscoie.com

*Admitted pro hac vice

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Jessica Miracle, et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>Katie Hobbs, in her official capacity as<br>Arizona Secretary of State,<br><br>                    Defendant. | No. CV-19-04694-SRB<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT**<br><br>**(Oral Argument Requested)** |

# TABLE OF CONTENTS

**PAGE**

Background ........................................................................................................... 1
    A.  Ballot Initiatives in Arizona ................................................................ 1
    B.  Arizona's Strikeout Law ...................................................................... 2
    C.  Past and Projected Impact on Initiative Proponents .......................... 4

Legal Standard .................................................................................................... 7

Argument ............................................................................................................. 8
I.    Plaintiffs Are Likely to Succeed on the Merits. .......................................... 8
    A.  The Strikeout Law Violates the First Amendment. ........................... 8
    B.  The Strikeout Law Violates the Fourteenth Amendment. .............. 15
II.   Plaintiffs Will Suffer Irreparable Harm Absent an Injunction. ............... 16
III.  The Equities and Public Interest Tip Sharply in Plaintiffs' Favor. ......... 17

Conclusion ........................................................................................................ 17

# TABLE OF AUTHORITIES

**CASES**                    **PAGE**

*Ariz. Green Party v. Bennett*,
   No. CV 09-2412-PHX-SRB, 2010 WL 11681436 (D. Ariz. Jan. 15, 2010) ........................................................................................... 8, 13

*Buckley v. Am. Const. Law Found., Inc.*,
   525 U.S. 182 (1999) (Thomas, J., concurring) ..................................... passim

*Burdick v. Takushi*,
   504 U.S. 428 (1992) ......................................................................... 15

*Bush v. Gore*,
   531 U.S. 98 (2000) ........................................................................... 12

*Chandler v. City of Arvada, Colo.*,
   292 F.3d 1236 (10th Cir. 2002) ........................................................ 9, 14

*Citizens United v. Fed. Election Comm'n*,
   558 U.S. 310 (2010) ..................................................................... 11, 14

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014) ............................................................. 7

*Gallivan v. Walker*,
   54 P.3d 1069 (Utah 2002) ................................................................. 11

*Goodall v. Williams*,
   324 F.Supp.3d 1184 (D. Colo. 2018) .................................................. 11

*Hitzeman v. Reagan*,
   CV 2016-009704 ............................................................................. 6

*Idaho Coal. United for Bears v. Cenarrusa*,
   342 F.3d 1073 (9th Cir. 2003) ........................................................ 9, 15

*Independence Institute v. Gessler*
   869 F. Supp. 2d 1289, 1304 (D. Colo. 2012) ...................................... 13

*Klein v. City of San Clemente*,
   584 F.3d 1196 (9th Cir. 2009) ........................................................... 17

*Krislov v. Rednour*,
   226 F.3d 851 (7th Cir. 2000) ............................................................. 14

*Leach v. Reagan*,
   CV 2018-009919 (Ruling) (Maricopa Cty. Sup. Ct. Aug. 23, 2018) ........................ 4, 5

*Lemons v. Bradbury*,
   538 F.3d 1098 (9th Cir. 2008) ................................................. 15

*Lerman v. Bd. Of Elections in City of New York*,
   232 F. 3d 135 (2d Cir. 2000) ................................................. 11

*Lux v. Judd*,
   651 F.3d 396 (4th Cir. 2011) ................................................. 11

*McIntyre v. Ohio Elections Comm'n*,
   514 U.S. 334 (1995) ........................................................... 8

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ............................................. 16, 17

*Meyer v. Grant*,
   486 U.S. 414 (1988) ................................................. 8, 9, 10, 13

*Nader v. Brewer*,
   531 F.3d 1028 (9th Cir. 2008) ........................................... 8, 9, 13

*OSU Student All. v. Ray*,
   699 F.3d 1053 (9th Cir. 2012) ............................................... 11

*Police Dept. of Chi. v. Mosley*,
   408 U.S. 92 (1972) ........................................................... 10

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) .......................................................... 14

*Reed v. Town of Gilbert, Ariz.*,
   __ U.S. __, 135 S. Ct. 2218 (2015) .......................................... 10

*Sanders Cty. Republican Cent. Comm. v. Bullock*,
   698 F.3d 741 (9th Cir. 2012) ........................................... passim

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
   709 F.3d 1281 (9th Cir. 2013) ................................................ 7

*Soltysik v. Padilla*,
   910 F.3d 438 (9th Cir. 2018) ............................................. 15, 16

*Stanwitz v. Reagan*,
   245 Ariz. 344, 429 P.3d 1138 (2018), *as amended* (Nov. 27, 2018)............... 5

*Stanwitz v. Reagan*,
   CV 2016-009704 ................................................................................... 6

*United States v. Alvarez*,
   567 U.S. 709 (2012) ............................................................................ 14

*Vill. Of Schaumburg v. Citizens for a Better Env't*,
   444 U.S. 620 (1980) ...................................................................... 12, 13

*Yes On Term Limits, Inc. v. Savage*,
   550 F.3d 1023 (10th Cir. 2008) ......................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................................. 7

STATUTES

A.R.S. § 16-100 *et seq.* ........................................................................... 3

A.R.S. § 16-315(B)(1) ........................................................................... 12

A.R.S. § 19-115 ....................................................................................... 2

A.R.S. § 19-118(B)(1) .................................................................. 2, 12, 13

A.R.S. § 19-118(B)(2) .............................................................................. 3

A.R.S § 19-118(C) ................................................................................... 1

A.R.S. § 19-122(A) .................................................................................. 3

A.R.S. § 19-122(C) .................................................................................. 2

At issue is A.R.S § 19-118(C) (the "Strikeout Law"), which requires the disqualification of every signature gathered by an initiative petition circulator if she cannot appear in response to a subpoena in a pre-election initiative challenge. This blanket invalidation is mandated regardless of the reason the circulator cannot appear, even if the validity of the signatures is not in any doubt, and even if the issuing party does not intend to elicit any testimony from the circulator. The law has become a devastating political tool for initiative opponents, who indiscriminately issue subpoenas *en masse* to hundreds of circulators at a time in the hopes that enough will fail to appear—and all of the signatures they gathered will be summarily invalidated—to prevent the measure from consideration by the electorate. It targets arbitrary categories of circulators based on residency, employment status, and the content of the petition. It also grossly inflates the already extraordinary expense of the initiative process in Arizona, and abridges and denies core constitutional rights of thousands of citizens—circulators, signers, and organizational proponents alike—causing irreparable injury to Plaintiffs. All of the relevant factors favor issuing a preliminary injunction prohibiting Defendant Arizona Secretary of State (the "Secretary") from enforcing the Strikeout Law.[1]

### Background

#### A.    Ballot Initiatives in Arizona

The Arizona Constitution reserves to the people the power to directly enact statutes and constitutional amendments by ballot initiative. ARIZ. CONST. art. 4, pt. 1, § 1-2. For well over a hundred years, Arizona citizens have enthusiastically exercised that right, with hundreds of initiatives appearing on the ballot since gaining statehood in 1912. To obtain ballot access, proponents must gather signatures totaling 10% of the votes cast in the last gubernatorial election for a statutory initiative, or 15% for a constitutional initiative.[2] *Id.*

---

[1] Plaintiffs are referred to individually, and collectively as follows: Miracle, Smallcanyon, and Lord ("Circulator Plaintiffs"); Arrington, Dornbrook, and Katz ("Voter Plaintiffs"), and NextGen Climate Action ("NextGen") and Arizonans for Fair Lending ("Organizational Plaintiffs").

[2] In 2020, a statewide statutory initiative must gather 237,645 signatures, and a constitutional initiative must gather 356,467. Sec'y of State, *Initiative, Referendum, &*

Reliance on paid petition circulators is necessary in all but the rarest cases to reach these thresholds. Ex. 1, Fadeff Decl. ¶ 7; Ex. 2, Robles Decl. ¶¶ 25, 33, Ex. 3, Goddard Decl. ¶ 13.[3]

The Legislature has long been hostile to the initiative power, and in recent years has passed multiple restrictions complicating the people's power to enact direct legislation. Petitions to nominate candidates to the ballot ("nomination petitions"), in contrast, have been largely excused from these increasingly stringent regulations, despite that both are vehicles toward ballot access—one for direct legislation, and the other to elect persons to legislate on the people's behalf. *See* Gonski Decl. Ex. 1 at 5-6 (pamphlet from Secretary discussing differential treatment). These recent restrictions come in addition to extensive safeguards already in Arizona law to guard against petition fraud.[4] And they have had a measurable impact: from 1980 to 2010, an initiative proponent who began signature-gathering had a 25% likelihood of qualifying for the ballot. Since 2010, that number has dropped precipitously to just 10%. *See* Sec'y of State, *Historical Election Data*, available at https://azsos.gov/elections/voter-registration-historical-election-data (last accessed July 16, 2019).

## B.    Arizona's Strikeout Law

The Strikeout Law provides:

> If a registered circulator is properly served with a subpoena to provide evidence in an action regarding circulation of petitions and fails to appear or produce documents as provided for in the subpoena, all signatures collected by that circulator are deemed invalid. The party serving the subpoena may request an order from the court directing the secretary of state to remove any signatures collected by the circulator as provided for in § 19-

---

*Recall*, available at https://azsos.gov/elections/initiative-referendum-and-recall.

[3] Each witness declaration is attached to this motion as an exhibit.

[4] For example, circulators must personally witness all signatures and sign an affidavit under criminal penalty. A.R.S. § 19-115 (initiative petitions); *id*. § 16-321 (nomination petitions). Any qualified citizen can challenge the Secretary's determination that a petition is qualified for the ballot, id. § 19-122 (initiative), *id*. § 16-315(B)(2) (nomination), and non-resident circulators must register and agree to submit to jurisdiction if there is a challenge. *Id*. § 19-118(B)(1) (initiative); *id*. § 16-315(B)(2) (nomination).

1      121.01, subsection A.

2    A.R.S. § 19-122(C).

3        The law accordingly mandates that, if a registered circulator is subpoenaed in an

4    initiative challenge and fails to appear, all signatures she collected are invalidated. By

5    limiting its application to "registered" circulators, the law selectively targets only paid or

6    out-of-state circulators—in-state volunteer circulators are not required to register under

7    Arizona law. A.R.S. § 19-118. The law also does not apply to circulators of nomination

8    petitions of any stripe, including paid or non-resident. *See generally* A.R.S. § 16-100 *et seq.*

9    For those select categories of circulators to whom it applies, the law is ferocious in its

10   consequences. Although trials for initiative challenges are often set (and subpoenas issued)

11   on extraordinarily compressed time frames, the Strikeout Law contains no exception for

12   circulators with good reason for their inability to appear.[5] Nor is any exception made for

13   those who would answer questions by other means, such as a sworn statement, or appear by

14   telephone or videoconference. The law does not even require that there be a good-faith basis

15   for issuing the subpoena (e.g., credible—or *any*—evidence that the circulation of the

16   petition or the signatures on it are suspect). And, because service requirements for the law

17   are incredibly lax, it has even been used to invalidate thousands of signatures based on

18   circulators' failure to appear in response to subpoenas they never actually received. Goddard

19   Decl. ¶ 8; *see also* Robles Decl. ¶¶ 6, 8.[6]

20

21

22        [5] In 2020, signatures must be turned in to the Secretary by July 2, 2020, her
     certification is due a month later, challenges must be filed within five days after
23   certification, and litigation—including appeals—must conclude by mid-September, when
     the state prints and distributes publicity pamphlets. A.R.S. § 19-122(A); § 19-123(B).
24        [6] The Strikeout Law does not require that the circulator receive actual notice of the
     subpoena or even that it be served on an authorized agent; it is sufficient to leave the
25   subpoena at the designated in-state address "with a person of suitable age." A.R.S. § 19-
     118(B)(2). The Legislature recently passed an update to the service provision making
26   service of process even easier and cheaper for challengers by requiring circulators to
     designate the sponsoring committee's address for service, rather than their own personal
27   address, and leaving unchanged the "suitable age" loophole. 2019 Ariz. Legis. Serv. Ch.
     315 (S.B. 1451). In practice, those committee offices often close after signature gathering
28   is completed, making this particularly problematic. Goddard Decl. ¶8.

### C.      Past and Projected Impact on Initiative Proponents

The effects of the Strikeout Law are devastating and have profound repercussions for the right to legislate via initiative in Arizona.

In 2018, Plaintiff NextGen Climate Action supported the Clean Energy for a Healthy Arizona Initiative ("Clean Energy Initiative"). After NextGen turned in petitions with 480,707 signatures—more than double the requirement—the Secretary certified the measure for the ballot. Gonski Decl. Ex. 2 (*Leach v. Reagan*, CV 2018-009919 (Under Advisement Ruling) (Maricopa Cty. Sup. Ct. Aug. 27, 2018)). Opponents immediately filed a challenge and issued subpoenas commanding the personal appearance of virtually every circulator who had gathered signatures in support—nearly 1,180 in total. *Id.* NextGen undertook herculean efforts to secure the in-person appearance of as many circulators as possible. Fadeff Decl. ¶¶ 13-21; *see also* Ex. 4, Gallaway Decl. ¶¶ 9-23 (describing efforts to contact circulators, arrange travel, hotels, meals, and courtroom transportation). Those who appeared did so at great personal burden. *See* Smallcanyon Decl. ¶¶ 7-10 (traveled over 300 miles in great physical pain); Lord Decl. ¶¶ 11-12 (missed first two days of college); Gallaway Decl. ¶ 12 (circulators re-arranged childcare or brought children with them to courthouse). Many traveled great distances, at significant expense. Ex. 5, Smallcanyon Decl. ¶ 8 (traveled from Navajo Mountain, Utah); Gallaway Decl. ¶ 11 (115 circulators needed airplane tickets, and 173 more traveled on chartered buses from Flagstaff, Yuma, and Tucson). For many subpoenaed, it was a frightening experience; they worried they would be held in contempt or subject to arrest if they did not appear. Ex. 6, Lord Decl. ¶ 10, Smallcanyon Decl. ¶ 7.

Those unable to surmount these hurdles, like Plaintiff Jessica Miracle, had every signature they gathered stricken as a result, invalidating all of their efforts in supporting the measure, and rendering meaningless the support of all of the voters who signed their petitions. Ex. 7, Miracle Decl. ¶ 10 (all 2,604 signatures gathered over three-month period invalidated when sick children and transportation issues prevented her from appearing in person); *see also* Gallaway Decl. ¶ 24 (all signatures of approximately 300 circulators who

were unable to appear invalidated); Robles Decl. ¶ 14 (thousands of signatures invalidated after 40 circulators could not appear); Goddard Decl. ¶ 9 (over 8,000 signatures invalidated after 15 circulators did not appear); Ex. 8, Arrington Decl. ¶ 5 (signature stricken when circulator did not appear); Ex. 9, Katz Decl. ¶ 6 (same); Ex. 10, Dornbrook Decl. ¶ 6 (same).

Because of the Strikeout Law, the challenge to the Clean Energy Initiative was a circus. The first day, 913 circulators appeared in response to subpoenas. *Leach*, at 14. Security lines wrapped around the block in scorching heat, and at least one circulator went to the hospital in an ambulance after collapsing from dehydration and sun exposure. Gallaway Decl. ¶¶ 15-16; Fadeff Decl. ¶ 14. Bathrooms overflowed. Fadeff Decl. ¶ 15; Gallaway Decl. ¶ 18. Inside the courthouse, there were multiple daily roll-calls; if a circulator failed to respond to even one, all of her signatures were stricken. *Leach* (signatures of 46 circulators who appeared stricken after failing to respond at subsequent check-in); Fadeff Decl. ¶ 16 (describing round-up efforts to ensure presence). After the first day of trial, approximately 250 circulators were released without being asked a single question or receiving any explanation for their subpoena; the remaining 650 were assigned a day to return later that week. Fadeff Decl. ¶¶ 17-18; Gallaway Decl. ¶¶ 20-21. Circulators from outside Phoenix stayed at a hotel, at NextGen's expense. Gallaway Decl. ¶ 25 (NextGen spent approximately $470,000 on hotels for circulators); Smallcanyon Decl. ¶ 9 (stayed in hotel three nights while waiting to be called to testify or released); *Leach* at 14. Only a small fraction of the 913 circulators who appeared were ever called to the stand— 41 in total—just over 3% of those whose lives were upended by the subpoenas. The remaining 97% were sent home after spending a day or more sitting in the courthouse. *Leach* at 8. The Clean Energy Initiative weathered the challenge and appeared on the ballot, but only due to this enormous infusion of time, money, and staff resources. Fadeff Decl. ¶ 24-26; Robles Decl. ¶¶ 18-19.[7]

---

[7] In 2018, initiative proponents challenged the Strikeout Law in state court as a violation of Article IV of the Arizona Constitution. *Stanwitz v. Reagan*, 245 Ariz. 344, 429 P.3d 1138, 1144 (2018), *as amended* (Nov. 27, 2018). In denying that challenge, the Arizona Supreme Court did not consider whether the Strikeout Law violated the federal

Other campaigns have suffered similar attacks. In 2018, the Outlaw Dirty Money Initiative was stricken from the ballot after the Secretary invalidated over 8,000 signatures pursuant to the Strikeout Law after 15 of their most prolific out-of-state petition circulators were strategically subpoenaed and failed to appear due to service issues. Goddard Decl. ¶¶ 8-10; *see also* Gonski Decl. Ex. 3 (Ruling, *Stanwitz v. Reagan*, CV 2016-009704). In 2016, opponents to the Arizonans for Fair Wage and Healthy Families Initiative subpoenaed 170 circulators, 30 of whom were unable to appear despite the campaign's extraordinary efforts, in which it halted all other operations for a month and diverted all available resources toward coordinating appearances. Robles Decl. ¶¶ 16-17; *see also* Gonski Decl. Ex. 4 (Under Advisement Ruling, *Hitzeman v. Reagan*, CV 2016-009704). Without the signatures collected by those 30 circulators the initiative fell below the minimum, and would have been disqualified but for the Arizona Supreme Court's later ruling that the challenge was untimely and thus invalid. Robles Decl. ¶ 15.

Many experienced initiative circulators are reluctant to circulate petitions as a direct result of their experiences under the Strikeout Law. Miracle Decl. ¶ 14 (turned down subsequent work due to concerns about burdens imposed by Strikeout Law); Lord Decl. ¶ 15 (would "think twice" about circulating again for same reason); *see also* Fadeff Decl. ¶ 19 (many have expressed unwillingness to circulate again due to Strikeout Law). This has made it substantially more difficult to hire circulators for ballot initiatives in Arizona. *See* Gallaway Decl. ¶¶ 30-32; Robles Decl. ¶¶ 29-31. The Voter Plaintiffs—all of whose signatures in support of the Clean Energy Initiative were discarded when the circulator who witnessed them was subpoenaed and did not appear—have lost confidence in a process that has silenced their core political speech without their knowledge, input, or control. Dornbrook Decl. ¶ 7, Arrington Decl. ¶¶ 7, 9, Katz Decl. ¶ 7.

Persons and entities seeking to qualify initiatives in 2020, including Plaintiff Arizonans for Fair Lending, have been dramatically impacted by the Strikeout Law.

Constitution. *See generally id.*

1    Arizonans for Fair Lending has had to hire from a reduced pool of circulators, increase its

2    operational and litigation budget, and increase its signature target to ensure that any

3    signatures that may be lost as a result of the Strikeout Law are not outcome-determinative.

4    Robles Decl. ¶¶ 29-34; Gallaway Decl. ¶¶ 27-32. At least one campaign, the Voters' Right

5    to Know Initiative (whose similar 2018 initiative, Outlaw Dirty Money, was previously

6    knocked off the ballot as a direct result of the Strikeout Law), plans to conduct its 2020

7    signature-gathering efforts with an all-volunteer circulator corps—even though it reduces

8    their chance of being able to collect the threshold number of signatures to obtain ballot

9    access—expressly because the Strikeout Law renders the use of paid circulators too

10   expensive and logistically complicated for citizens' groups to afford or manage, should they

11   again find themselves on the wrong end of a challenge driven by the law's devastating

12   consequences. Goddard Decl. ¶¶ 13-22; *see also* Robles Decl. ¶¶ 21-25 (reliance on

13   volunteers complicates efforts for number of reasons). NextGen would like to support

14   another initiative in Arizona, but likely will not do so in 2020 because of the severe burdens

15   of the Strikeout Law. Fadeff Decl. ¶¶ 28-29.

16   **Legal Standard**

17        In considering a motion for a preliminary injunction the court asks whether: (1) the

18   movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm

19   in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor;

20   and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555

21   U.S. 7, 20 (2008). The court weighs these factors "on a sliding scale, such that where there

22   are only serious questions going to the merits—that is, less than a likelihood of success on

23   the merits—a preliminary injunction may still issue so long as the balance of hardships tips

24   sharply in the plaintiff's favor and the other two factors are satisfied." *Shell Offshore, Inc.*

25   *v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013). When the government is a party,

26   the balance of equities and public interest prongs merge. *Drakes Bay Oyster Co. v. Jewell*,

27   747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

28        Although courts generally evaluate the constitutionality of election laws under the

1   *Anderson-Burdick* test, *see infra* at 14, "[w]hen core political speech is at issue," they

2   "ordinarily appl[y] strict scrutiny without first determining that the State's law severely

3   burdens speech." *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 207 (1999)

4   (Thomas, J., concurring); *see also id*. at 642 n.12 (controlling op.); *McIntyre v. Ohio*

5   *Elections Comm'n*, 514 U.S. 334, 345 (1995) (rejecting *Anderson-Burdick* in favor of strict

6   scrutiny for direct regulation of political speech); *Nader v. Brewer*, 531 F.3d 1028 (9th Cir.

7   2008) (applying strict scrutiny to evaluate constitutionality of petition circulation

8   restriction); *Ariz. Green Party v. Bennett*, No. CV 09-2412-PHX-SRB, 2010 WL 11681436

9   at *3-4 (D. Ariz. Jan. 15, 2010) (same).

10         Thus, "[w]hen seeking a preliminary injunction in the First Amendment context, the

11   moving party bears the initial burden of making a colorable claim that its First Amendment

12   rights have been infringed, or are threatened with infringement, at which point the burden

13   shifts to the government to justify the restriction." *Sanders Cty. Republican Cent. Comm. v.*

14   *Bullock*, 698 F.3d 741, 744–45 (9th Cir. 2012) (citing *Thalheimer v. City of San Diego*, 645

15   F.3d 1109, 1116 (9th Cir. 2011)). To do so, the state must "prove that the restriction furthers

16   a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 746; *see*

17   *also Nader*, 531 F.3d at 1036–38 (applying strict scrutiny to Arizona's ban on non-resident

18   petition circulators).

19                                      **Argument**

20   **I.     Plaintiffs Are Likely to Succeed on the Merits.**

21         Whether evaluated under strict scrutiny (as is appropriate, under the precedent

22   discussed above, given the law's direct infringement of core political speech) or the

23   *Anderson-Burdick* standard, the Strikeout Law cannot survive constitutional challenge.

24         **A.     The Strikeout Law violates the First Amendment.**

25         The Strikeout Law restricts Plaintiffs' core political speech in the same manner the

26   Supreme Court found unconstitutional in *Meyer v. Grant* and *Buckley v. American*

27   *Constitutional Law Foundation*: "(1) by limiting the number of voices who will convey the

28   petitioners' message; and (2) making it less likely that petitioners will garner the number of

signatures necessary to place the matter on the ballot." *Meyer v. Grant*, 486 U.S. 414, 422-23 (1988); *see also Buckley*, 525 U.S. at 194. As a result, Plaintiffs carry their burden of showing that their First Amendment rights have been and are threatened with infringement. Indeed, because the circulation of an initiative petition constitutes "core political speech," First Amendment protection "is at its zenith" here. *Meyer*, 486 U.S. at 414; *see also Idaho Coal. United for Bears v. Cenarrusa*, 342 F.3d 1073, 1076 n.6 (9th Cir. 2003). Because Arizona cannot show that the Strikeout Law satisfies strict scrutiny, Plaintiffs are highly likely to succeed on their First Amendment claim.

*First*, the Strikeout Law directly decreases the pool of potential circulators, limiting the overall quantum of political speech. As a direct result, circulators are harder to recruit and retain because initiative proponents must use either volunteers, who are not subject to the law, or find and hire only those paid circulators who they can be assured will be able to comply with a potential future subpoena, even if thus more he on extremely short notice and regardless of personal circumstance. Fadeff Decl. ¶ 29; Gallaway Decl. ¶¶ 27-32; Robles Decl. ¶¶ 29-31; Goddard Decl. ¶ 20; Miracle Decl. ¶ 14.[8] Initiative proponents are thus more hesitant to hire circulators from outside the Phoenix metropolitan area, because of the increased travel burdens and associated costs that would follow to secure an out-of-town circulator's appearance. Gallaway Decl. ¶ 31; Fadeff Decl. ¶ 29; Robles Decl. ¶ 29. The Strikeout Law thus directly "limits the number of voices who will convey the initiative proponents' message and, consequently, cuts down the size of the audience proponents can reach," diminishing "core political speech." *Chandler v. City of Arvada, Colo.*, 292 F.3d 1236, 1243 (10th Cir. 2002) (quotation marks omitted). Courts have repeatedly found laws with similar consequences unconstitutional. *See id.*; *see also Buckley*, 525 U.S. at 193

---

[8] Miracle declined a job circulating nomination petitions for a mayoral candidate who she personally supports because of the burdens imposed on her by the Strikeout Law in her Clean Energy Initiative work. Miracle Decl. ¶ 14. In doing so, she did not realize that nomination petitions are *not* subject to the Strikeout Law. Thus, the Strikeout Law has had a "chilling" effect, "radiating from the disfavored speaker to untargeted individuals and plainly protected speech," *Sanders Cty. Republican Cent. Comm.*, 698 F.3d at 748, including to speech it does not regulate at all.

1  (striking down restriction that drastically reduced circulator pool); *Nader*, 531 F.3d at 1036

2  (same).

3      *Second*, the Strikeout Law significantly burdens the ability of initiative proponents

4  to gather the number of signatures necessary for ballot access. Because of the law,

5  proponents must gather additional signatures—far above and beyond the already

6  challenging minimum constitutional threshold—to ensure that any lost as a result of the

7  Strikeout Law are not outcome-determinative. Gallaway Decl.¶ 28 (before Strikeout Law

8  signature target was 5% higher than constitutional minimum, now is 30% higher). The

9  restricted pool of circulators, artificially inflated signature-gathering efforts, and

10  exponentially increased litigation expenses all significantly increase the chance that

11  proponents will ultimately fail in their quest to place their measure on the ballot for reasons

12  having nothing to do with voters' actual level of support for the measure. Gallaway Decl.

13  ¶¶ 28-33; Robles Decl. ¶¶ 34-36; Goddard Decl. ¶¶ 20, 22-24; *see also Meyer*, 486 U.S. at

14  423 (petition circulation restriction unconstitutional where "it makes it less likely that

15  appellees will garner the number of signatures necessary to place the matter on the ballot,

16  thus limiting their ability to make the matter the focus of statewide discussion").

17      *Third*, the Strikeout Law violates the First Amendment on the independent ground

18  that it impermissibly regulates speech based on the content of the speech and the identity of

19  the speaker. Under the First Amendment, the state "has no power to restrict expression

20  because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chi. v.*

21  *Mosley*, 408 U.S. 92, 95 (1972). Speech restrictions are content-based if a law applies to

22  speech because of the message conveyed, which includes "subtle" distinctions that "defin[e]

23  regulated speech by its function or purpose." *Reed v. Town of Gilbert, Ariz.*, __ U.S. __,

24  135 S. Ct. 2218, 2226–27 (2015). "[A] speech regulation targeted at specific subject matter

25  is content-based even if it does not discriminate among viewpoints within that subject

26  matter." *Id.* at 2230. "Content-based laws—those that target speech based on its

27  communicative content—are presumptively unconstitutional and may be justified only if

28  the government proves that they are narrowly tailored to serve compelling state interests."

1    *Id.* at 2226–27.

2          Because it does not apply to those advocating for a candidate's nomination to public

3    office, the Strikeout Law is, on its face, a content-based restriction on political speech and

4    association. "There is no basis to conclude that petition circulation on behalf of a candidate

5    involves any less interactive political speech than petition circulation on behalf of a

6    proposed ballot initiative—the nature of the regulated activity is identical in each instance."

7    *Lerman v. Bd. Of Elections in City of New York*, 232 F. 3d 135 (2d Cir. 2000). In both

8    circumstances, the circulator engages with voters, persuades them that a given candidate or

9    issue should appear on the ballot for the public to vote upon, and encourages them to sign

10   a petition to enable that access. Miracle Decl. ¶ 5; Smallcanyon Decl. ¶ 4; Lord Decl. ¶ 5.

11   Because "the category of burdened speech is defined by its content," the Strikeout Law is

12   content-based. *Buckley*, 525 U.S. at 209 (Thomas, J., concurring); *see also id.* (concluding

13   circulator restriction was content-based where it applied to circulators of initiative but not

14   nomination petitions); *Goodall v. Williams*, 324 F.Supp.3d 1184, 1196 n.5 (D. Colo. 2018)

15   (discerning "no distinction between initiative . . . and candidate petitions in terms of the

16   importance of the speech involved or the impact of a circulator residency requirement on

17   free speech rights"); *see also Lux v. Judd*, 651 F.3d 396, 403 n.5 (4th Cir. 2011) (explaining

18   that initiative and nomination petitions are indistinguishable for First Amendment purposes);

19   *Gallivan v. Walker*, 54 P.3d 1069, 1095 (Utah 2002) (discerning no "cogent reason why a

20   different rule should apply to candidates on the one hand and to initiatives on the other").

21         Even among circulators of initiative petitions, the Strikeout Law targets and restricts

22   political speech based on the residency and employment status of the speaker.[9] "The First

23   Amendment protects speech and speaker, and the ideas that flow from each." *Citizens*

24   *United v. Fed. Election Comm'n*, 558 U.S. 310, 341 (2010). "[R]estrictions distinguishing

25

26         [9] Because it treats similarly-situated circulators differently on an arbitrary basis, the
     Strikeout Law is also unconstitutional because it violates the Circulator Plaintiffs' right to
27   equal protection of the laws. But, because this arbitrary burden is placed on speech rights,
     the equal protection claim "rise[s] and fall[s] with the First Amendment claim," analyzed
28   under the same framework. *OSU Student All. v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012).

among different speakers, allowing speech by some but not others" are "prohibited." *Id.* Here, only paid and out-of-state initiative circulators are subject to the law; in-state volunteer circulators are not. Arizona has accordingly not honored "its obligation to avoid arbitrary and disparate treatment of the members of its electorate." *Bush v. Gore*, 531 U.S. 98, 105 (2000).

The Secretary cannot meet her burden of showing that the Strikeout Law is narrowly tailored to further a compelling state interest. While it is true that Arizona's interest in fraud prevention is substantial, it is "only peripherally promoted" by the Strikeout Law, and in any event "could be sufficiently served by measures less destructive of First Amendment interests." *Vill. Of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 636 (1980). Similarly, while Arizona has an interest in ensuring that circulators are available for questioning under oath should there be a question regarding the integrity of their work, the Strikeout Law is superfluous and entirely unnecessary to serve this interest. Arizona already has subpoena power over residents and separately requires non-resident circulators, regardless of petition type, to be subject to its subpoena power. A.R.S. § 19-118(B)(1) (initiative petitions); A.R.S. § 16-315(B)(1) (nomination petitions).[10]

Any additional fraud-prevention interest is undermined by both the law's under-inclusivity and overbreadth: it applies to paid or out-of-state initiative circulators, but not to in-state volunteer circulators or *any* circulators of nomination petitions (paid, out-of-state, or otherwise). *Supra* at 3. If the State truly considered the Strikeout Law a necessary safeguard against fraud, it would presumably apply it across the board to all circulators regardless of employment status, residency, or the content of the petition itself. *Sanders Cty. Republican Cent. Comm.*, 698 F.3d at 748 (striking down statute that restricted political speech arbitrarily, noting that "[s]uch under-inclusivity "diminishes the credibility of the government's rationale for restricting speech") (quoting *City of Ladue v. Gilleo*, 512 U.S.

---

[10] The blanket invalidation of all of a paid or out-of-state circulator's signatures for no other reason than their inability to appear in person in response to a subpoena (that may be issued for no reason at all and on extraordinarily short notice), constitutes an unjustifiably excessive punishment, for the reasons discussed further *infra* at 13-14.

43, 52 (1994)). At the same time, it reaches every single one of the circulators who fall into the arbitrary categories that it *does* cover, even if there is no reason to suspect petition or signature fraud. Nor is it logical to presume that the types of circulators targeted by the law are more likely to commit fraud or disregard a subpoena if one is legitimately called for; if anything, as the Supreme Court has recognized, one might reasonably expect the opposite. *See Meyer*, 486 U.S. at 426 ("[W]e are not prepared to assume that a professional circulator—whose qualifications for similar future assignments may well depend on a reputation for competence and integrity—is any more likely to accept false signatures than a volunteer"); *Buckley*, 525 U.S. at 204 ("absent evidence to the contrary," court will not assume that paid circulators any more likely to commit fraud than volunteers).

Arizona could achieve its interest in fraud-prevention through far less constitutionally troubling means. For example, it could require an initiative opponent to demonstrate a legitimate need for a circulator's in-person testimony before issuing a subpoena, permit telephonic appearances, or penalize subpoena non-compliance with the type of penalties normally used to ensure subpoena compliance, rather than chilling (and in some cases silencing) core political speech.[11] *See* Ariz. R. Civ. P. 45(f) (typical penalty for subpoena non-compliance is contempt of court). No other state finds it necessary to impose requirements similar to Arizona's Strikeout Law. In fact, *Arizona itself* sees no need to require wholesale invalidation of all signatures that a circulator gathered when a volunteer circulator fails to appear in response to a subpoena, or when the petition at issue was circulated for the purpose of putting a candidate, rather than a citizen initiative, on the ballot. *C.f., Arizona Green Party*, 2010 WL 11681436, at *5 (observing that petition circulation

---

[11] These are key distinctions between the Strikeout Law and general subpoena-enforcement statutes, which Arizona already separately implements, A.R.S. § 19-118(B)(1), and which are discussed approvingly in *Nader v. Brewer*, 531 F.3d at 1037. The circulator callback provision upheld in *Independence Institute v. Gessler* is also distinguishable because that law invalidated the signatures submitted by absent circulators *only* in cases "that included an allegation of circulator fraud . . . pled with particularity . . . ." and the court expressly noted that it imposed no additional burden on out-of-state circulators because it expressly permitted telephonic appearance, rather than in person. 869 F. Supp. 2d 1289, 1304 (D. Colo. 2012).

restriction was evidently not necessary to prevent fraud where Arizona restricted some types of petitions but not others); *see also Schaumburg*, 444 U.S. at 620 (the First Amendment will not permit prophylactic rules prohibiting conduct that are only loosely related to state's interest in combating fraud). In similar circumstances, courts have not hesitated to find restrictions unconstitutional because they are not narrowly tailored. *See Chandler*, 292 F.3d at 1242–44 (holding city residency requirement "substantially broader than necessary" to ensure integrity of petition process); *Krislov v. Rednour*, 226 F.3d 851, 866 n.7 (7th Cir. 2000) (invalidating residency requirement because not narrowly tailored to prevent fraud).

Nor can the State justify the fact that its chosen punishment for subpoena non-compliance—striking each and every signature collected by a circulator who fails to appear in person—penalizes and silences initiative proponents and the voters who sign the petitions just as much as the circulator who fails to appear. There is no evidence to suggest that this result is necessary to serve some compelling state interest. *C.f.*, *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1030 (10th Cir. 2008) (noting Oklahoma found it "unacceptable" to punish absent circulators because it would "punish and disenfranchise . . . voters who had the misfortune of signing a non-resident circulator's petition").

Finally, because the Strikeout Law regulates speech based on its content and the identity of the speaker, "[t]he First Amendment requires that the Government's chosen restriction on the speech at issue be actually necessary to achieve its interest." *United States v. Alvarez*, 567 U.S. 709, 725 (2012); *see also Citizens United*, 558 U.S. at 340. For the same reasons discussed above, the State cannot meet that burden here. *Supra* at 12-13; *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) ("[T]he existence of content-neutral alternatives undercuts significantly any defense of such a statute") (quotation omitted). Arizona can only regulate political speech based on its content if it can show that content- and speaker-neutral options are insufficient to serve its compelling interest. Because it cannot do so, Plaintiffs are highly likely to succeed on their claim that the Strikeout Law violates the First Amendment.

**B.      The Strikeout Law Violates the Fourteenth Amendment.**

Plaintiffs are also highly likely to succeed on their claim that the Strikeout Law violates the Fourteenth Amendment. The Ninth Circuit has recognized that "the ballot initiative, like the election of public officials, is a 'basic instrument of democratic government,'" and may be reviewed under the same standard as laws that burden the right to vote. *Idaho,* 342 F.3d at 1077. That standard, referred to as the *Anderson-Burdick* balancing test, requires the court to "weigh 'the character and magnitude of the asserted injury to the rights … that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)); *see also Lemons v. Bradbury*, 538 F.3d 1098, 1105 (9th Cir. 2008) (applying balancing to claim challenging rejection of petition signatures).

Here, the Strikeout Law imposes severe burdens on the fundamental right of Arizona voters (including the Voter Plaintiffs individually, and the Organizational Plaintiffs who also seek to vindicate the rights of disenfranchised voters to obtain ballot access for an initiative) to meaningfully participate in the initiative process. The Voter Plaintiffs placed their signatures on initiative petitions as an expression of political support. Dornbrook Decl. ¶ 4; Arrington Decl. ¶ 4; Katz Decl. ¶ 4. Each had their otherwise valid signature rejected solely because the circulator who gathered their signature was subpoenaed but was unable to appear. Dornbrook Decl. ¶ 6; Arrington Decl. ¶ 5; Katz Decl. ¶ 6. None had knowledge that their signature may be invalidated if the circulator could not appear, and none personally knew the circulator such that they could have attempted to intervene had they been aware of the consequences of non-appearance. Dornbrook Decl. ¶ 6; Arrington Decl. ¶ 6; Katz Decl. ¶ 6. Because their right to meaningfully participate in the initiative process hinges solely on a factor outside their knowledge or control that is completely unconnected to any indication that their signature was not valid, these burdens are severe and the restriction must be evaluated under strict scrutiny.

The State can point to no interest that outweighs the heavy burden on voters and cannot show that its chosen means actually serve that interest. *Soltysik v. Padilla*, 910 F.3d 438, 447-48 (9th Cir. 2018). Under the operation of the Strikeout Law, valid signatures from lawful voters across Arizona are being discarded solely because the circulator who collected it was not able to comply with an eleventh-hour subpoena—a circumstance wholly unrelated to the signature's validity or the circulator's eligibility. Even if the State could show that a punishment for subpoena non-compliance directly serves its interest in preventing petition fraud (and it cannot), it is a "struggle to understand" how total signature invalidation "advances that goal." *Id.* at 447. No other state imposes such a requirement. Indeed, even Arizona itself does not impose it on all petition circulators. *Supra* at 13.

Assuming for argument's sake that these harms do not result in "severe" burdens— and they do—"ballot regulations that impose a lesser burden on speech rights still must be reasonably related to achieving the state's important regulatory interests" and "require an assessment of whether alternative methods would advance the proffered governmental interests." *Soltysik*, 910 F.3d at 445. Even under this more lenient standard, the State cannot demonstrate the means-end fit *Anderson-Burdick* requires. Arizona can (and in the case of exempted circulators, does) serve its goal of fraud prevention through less burdensome means. Because the burden on the Plaintiffs' rights outweighs the State's interest in applying the Strikeout Law, Plaintiffs are highly likely to succeed on their First and Fourteenth Amendment claims.

## II.    Plaintiffs Will Suffer Irreparable Harm Absent an Injunction.

Unless the Strikeout Law is enjoined, Plaintiffs will suffer severe and immediate irreparable harm. "It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "When, as here, a party seeks to engage in political speech in an impending election, a "delay of even a day or two may be intolerable." *Sanders Cty. Republican Cent. Comm.*, 698 F.3d at 748.

Here, each day that the Strikeout Law remains in effect is another day that the

constitutional rights of Plaintiffs are irreparably harmed. Individual circulators like Miracle likely will not circulate petitions in the upcoming cycle unless the Strikeout Law is enjoined, Miracle Decl. ¶ 15; *see also* Lord Decl. ¶ 15. Initiative proponents like NextGen and Arizonans for Fair Lending must choose whether to refrain from core political activity altogether or amass and divert significant resources to accommodate the effects of the Strikeout Law and factor it in to their operating plans and budgets. Robles Decl. ¶ 36; Goddard Decl. ¶ 22; Fadeff Decl. ¶¶ 28-29. These injuries are not speculative and do not depend on whether the Strikeout Law is deployed against Plaintiffs in 2020; they are accruing now. Absent an injunction, the Strikeout Law will continue to chill—and in some cases, silence altogether—Plaintiffs' constitutionally protected political activities.

## III.     The Equities and Public Interest Tip Sharply in Plaintiffs' Favor.

The balance of the equities and the public interest also strongly favor the issuance of the requested injunction. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (quotation marks and citation omitted). The Ninth Circuit has "consistently recognized the significant public interest in upholding free speech principles, as the ongoing enforcement of the potentially unconstitutional regulations would infringe not only the free expression interests of plaintiffs, but also the interests of other people subjected to the same restrictions." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (citation omitted). The Secretary, in contrast, is not harmed by an injunction. She "can derive no legally cognizable benefit from being permitted to further enforce an unconstitutional limit on political speech." *Sanders Cty. Republican Cent. Comm.*, 698 F.3d at 749. The Strikeout Law is chilling and outright silencing the political speech of initiative signers, circulators, and proponents, and the balance of the equities and the public interest tip sharply in favor of halting the unconstitutional intrusion.

## Conclusion

For the above reasons, the Strikeout Law should be enjoined.

1

Dated: July 18, 2019

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*/s  Sarah R. Gonski*

Sarah R. Gonski (# 032567)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788

Elisabeth C. Frost (WDC# 1007632)*
Uzoma N. Nkwonta (WDC# 975323)*
700 Thirteenth Street NW, Suite 600
Washington, D.C. 20005-3960

*Attorneys for Plaintiffs*

*Admitted pro hac vice*