# Exhibit 3

Sarah R. Gonski (# 032567)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: 602.351.8000
Facsimile: 602.648.7000
SGonski@perkinscoie.com
DocketPHX@perkinscoie.com

Elisabeth C. Frost (WDC# 1007632)*
Uzoma N. Nkwonta (WDC# 975323)*
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 600
Washington, D.C. 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211
EFrost@perkinscoie.com
UNkwonta@perkinscoie.com

*Admitted pro hac vice

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Jessica Miracle, et al., | No. CV-19-4694-PHX-SRB |
| Plaintiffs, | |
| v. | **DECLARATION OF TERRY GODDARD** |
| Katie Hobbs, in her official capacity as Arizona Secretary of State, | |
| Defendant. | |

Pursuant to 20 U.S.C. § 1746, I, TERRY GODDARD, declare as follows:

1.     My name is Terry Goddard. I am over the age of 18, have personal knowledge of the facts stated in this declaration, and can competently testify to their truth.

2.     I served as the Arizona Attorney General from 2003 to 2011. Prior to that, I served in a variety of public roles, including the Mayor of Phoenix from 1984 to 1990. I'm also a lawyer who has spent significant time in private practice.

3. I have long been engaged with direct democracy efforts in Arizona. In 1980, I managed a campaign for the first referendum that had been conducted in Arizona in 40 years. In 1982, I managed a petition drive that rearranged the Phoenix City Council members from at-large districts to single-member districts, a policy that was passed via initiative and is still in place today. From approximately 1982 to 1984, I co-managed a company that managed petition circulation efforts for initiative and recall drives. Since then, I have participated in a number of petition circulation efforts, both for candidate nomination and initiative petitions.

4. I have seen and experienced first-hand the many ways in which the Arizona State Legislature over time has made the petition process more restrictive and less available to grassroots groups trying to achieve access to the ballot. A.R.S. 19-118(C) (the "Strikeout Law") is one of those laws.

5. The Strikeout Law proved fatal to a 2018 ballot measure that I was heavily involved in, Outlaw Dirty Money, which would have created a new constitutional amendment requiring transparency in political donations. I co-chaired the initiative campaign, and served as the campaign manager and lead fundraiser.

6. During that campaign, we used a mix of paid and volunteer circulators to gather the required number of signatures. We submitted well above the statutory minimum number of signatures. Based on an incorrect determination of the number of valid signatures, the Secretary of State initially declined to certify our measure for inclusion on the ballot. We believed that the Secretary's determination was grounded in a number of legal errors, so Outlaw Dirty Money challenged the decision in Maricopa County Superior Court.

7. Opponents of the measure also sued the Secretary and, during the challenge, subpoenaed fourteen paid circulators. The targeted circulators, each of whom were among our most prolific signature gatherers, lived out of the state and appeared to have been chosen strategically to inflict maximum damage and expense on our campaign.

8.     Due to service issues, none of the subpoenaed circulators received actual notice of the hearing, and none appeared in court on the date commanded by the subpoena. The Strikeout Law doesn't require that the circulators or the petition sponsor receive actual notice of their subpoena. Instead, service is effected even if the subpoena is left "at the address designated by the circulator"—which must be a physical address within Arizona— "with a person of suitable age." A.R.S. § 19-118(B)(2). Because the out of state circulators couldn't designate their own homes under the Strikeout Law, they each designated the office of the firm who managed the petition circulation effort as the appropriate Arizona address for service of process. On the date the subpoenas were served, that office was vacant because the signature-gathering campaign had ended. I personally made several visits to the office to check to see if any new tenants were occupying the premises, to ensure that we would receive the subpoenas if they were served at the location, but it remained vacant. We later found out, to our surprise, that the court challengers left the subpoenas with a security guard at the building, who did not attempt to contact the committee or the individual circulators. Nonetheless, the court held that service had been effectuated under the terms of § 19-118(B)(2) and thus the Strikeout Law applied.

9.     As a consequence, the Strikeout Law required the Secretary to strike each signature gathered by the absent circulators—8,824 signatures in total. The challengers never had to show why the testimony of the absent circulators was needed.  The signatures were automatically invalidated once the circulators did not appear.

10.     The loss of these signatures was devastating. Other decisions by the court had reinstated enough signatures to place us approximately 4,000 signatures above the statutory minimum. Without the signatures gathered by the absent circulators, however, we fell below the minimum statutory requirement. Because of the Strikeout Law, the Outlaw Dirty Money initiative did not qualify for the 2018 ballot.

11.     Outlaw Dirty Money is now seeking to qualify a similar initiative for the 2020 ballot. The initiative, entitled the "Voters' Right to Know Amendment," seeks to secure the right to know the original sources of money spent to influence an Arizona election using

public communications. I am once again significantly involved and am serving as the co-chair of the initiative campaign. I personally filed the initiative with the Secretary of State on March 26, 2019 and received a serial number of C-04-2020. We began circulating petitions shortly thereafter.

12.     To ensure that the Strikeout Law doesn't again prove fatal to our measure, we have had to make a number of strategic decisions, each of which will make it more difficult for us to gather enough signatures to achieve ballot access.

13.     Most significantly, we are planning to use only in-state volunteer circulators to circulate the 2020 petitions because they are not subject to the Strikeout Law. To my knowledge, no statewide initiative has ever made it on the ballot in Arizona using only volunteer circulators. During the 2018 Outlaw Dirty Money campaign, we gathered approximately 150,000 signatures from our volunteer circulators, which was the highest number of signatures ever gathered by volunteers in a single campaign. To achieve ballot access in 2020, we will need to gather 356,467 signatures, which is more than double the previous high. We will have to mount the largest all-volunteer circulation effort ever organized in this state. It may well prove impossible. Nonetheless, the Strikeout Law makes using paid circulators so prohibitively expensive and risky that we feel this is our only choice.

14.     There are many reasons why it is more difficult to conduct a successful campaign using primarily volunteer circulators rather than paid professionals.

15.     First, the process is much more transparent and predictable when we use paid circulators. Professional circulators turn in their signatures daily and their work is subject to a variety of quality control measures. Their signatures are regularly sent for validation so that we can assess our validity rate and track progress toward our overall signature target. With volunteer circulators, we have no tracking mechanism. Volunteers "check out" a certain number of petition sheets for circulation, but we cannot meaningfully monitor their progress. We do our best to frequently check in with volunteers through phone calls and other status updates, but it's an imprecise science and at the end of the day the volunteer

has no obligation to respond accurately to our inquiries or to report back on a frequent basis. Many volunteers check out sheets that are never returned—some they never circulated at all, and others that they circulated but never turned in. Others collect many signatures but don't turn them in until the very end of the campaign, when we haven't been able to count on them and don't have time to validate the signatures. Because we are not able to accurately project how many signatures volunteers will gather or when they will turn them in, we lack crucial insight into our own operation. This directly inhibits our ability to make strategic decisions such as whether to divert resources, hire more staff, conduct more trainings, or raise our signature targets.

16.     Second, professional circulators can be held accountable in a way that volunteers cannot. Because we have frequent insight as to their work, we are able to identify circulators who aren't effectively helping us achieve our goals. For instance, if a certain circulator frequently has a low validity rate on their signatures, we can determine if they need additional training or if we should let them go. It's important to note that problems with ineffective circulators do not necessarily imply that circulators are intentionally committing malfeasance; there are a large number of small technical errors that can invalidate signatures, and a circulator may just not be careful or attentive enough.

17.     Third, professionals are often more knowledgeable about the petition circulation process. Their professional success depends on them paying attention in training and implementing best practices. They understand that their work is subject to scrutiny and that there are professional consequences for sloppy or incomplete work.

18.     Fourth, professionals gather signatures in much higher volume than volunteers typically do. In my experience, volunteer circulators typically turn in no more than a few dozen signatures, most of which come from their personal networks—friends, family, neighbors, co-workers, and others that they already know. Once they have exhausted their social circle, even prolific volunteers typically stop circulating, and volunteers only rarely solicit signatures from strangers. Professional circulators, on the other hand, often collect hundreds or thousands of signatures apiece and are trained to

interact directly with the general public. They typically work in public places at the kind of high-volume public events like community celebrations, farmer's markets, and other events where a circulator can interact with dozens or even hundreds of voters at a time.

19.     Fifth, successful professional circulators have a lower turnover rate than most volunteers. Even the most dedicated volunteers typically work no longer than one or two months at a maximum before they have tapped out their personal networks. This makes it impossible to "project" a volunteer's overall contribution to the campaign: one cannot simply multiply the initial number of signatures they gathered by the amount of time left in the campaign. A successful professional circulator, on the other hand, can stay with a campaign the entire duration of the signature-gathering effort and over time usually has a steady collection rate. This helps us project our targets accurately and allocate resources accordingly, and saves resources that would have been dedicated toward continually onboarding and training new circulators.

20.     For all these reasons, using an all in-state volunteer circulator team is risky and diminishes our chance of successfully achieving ballot access. We nonetheless believe that our chances of achieving the ballot are higher with our all-volunteer strategy than if we relied on circulators who are subject to the Strikeout Law.

21.     To combat these adverse effects, our 2020 campaign began gathering signatures far earlier than we would if we were to hire more dependable and productive professional circulators. We began circulating petitions for the 2020 ballot in April 2019, a full fifteen months before the signature deadline. If we were depending on paid circulators, we could likely gather all the signatures needed in as little as five months. Starting earlier translates to more sustained costs for the campaign. We must hire staff earlier, and pay salaries and rent office space for longer than we otherwise would.

22.     Using all in-state volunteer circulators severely compromises our ability to run a successful campaign, but we felt that we had no other choice. We simply cannot afford to experience the effects of the Strikeout Law, both in actual expenses and in risk. The costs of coordinating the in-person appearance of potentially hundreds of circulators is

1  prohibitively expensive. We cannot afford to devote millions of dollars to conducting a

2  professional signature-gathering campaign only to have it undone at the eleventh hour

3  because we couldn't afford to secure the appearance of enough circulators to overcome the

4  Strikeout Law.

5        23.    In 2018, the Strikeout Law kept us off the ballot and resulted in the blanket

6  invalidation of 8,824 signatures—each of which represents a registered Arizona voter who

7  was attempting to exercise their constitutional right to effect policy change in their

8  community by petition. As a direct result of the Strikeout Law, each of them was denied

9  their constitutional right to participate in the initiative process and have their views on this

10  issue impact public policy.

11        24.    In 2020, the Strikeout Law has drastically restricted the ability of the Voter's

12  Right to Know Initiative to recruit and retain circulators, and has reduced its chances of

13  gathering enough signatures to place the measure on the ballot.

14

15        I declare under penalty of perjury that the foregoing is true and correct.

16

17  DATED: July __14__, 2019

18

19  By _Terry Goddard_____

20      TERRY GODDARD

21

22

23

24

25

26

27

28