Mark Brnovich
Attorney General
Firm Bar No. 14000

Joseph E. La Rue (031348)
Senior Litigation Counsel
Kara Karlson (029407)
Assistant Attorney General
2005 North Central Avenue
Phoenix, AZ 85004-1592
Telephone (602) 542-4951
Facsimile (602) 542-4385
joseph.larue@azag.gov
kara.karlson@azag.gov
adminlaw@azag.gov

*Attorneys for Defendant Arizona Secretary
of State Katie Hobbs*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jessica Miracle; Rose Smallcanyon; Czaria Lord; Lonnie Arrington; Mendon Dornbrook; Mary Katz; NextGen Climate Action; and Arizonans for Fair Lending (Our Voice, Our Vote Arizona, LUCHA), | Case No:  2:19-cv-04694-SRB |
| Plaintiffs, | **DEFENDANT ARIZONA SECRETARY OF STATE'S MOTION TO DISMISS** |
| v. | |
| Katie Hobbs, in her official capacity as Arizona Secretary of State, | **(Oral Argument Requested)** |
| Defendant. | |

# TABLE OF CONTENTS

Table of Authorities..................................................................................................iii

INTRODUCTION .........................................................................................................1

LEGAL STANDARD ...................................................................................................2

BACKGROUND ...........................................................................................................3

    The Initiative and Related Regulations, Including A.R.S. § 19-118(C) ................3

    Prior Challenges ....................................................................................................4

    Plaintiffs' Allegations............................................................................................5

ARGUMENT .................................................................................................................6

I.    Plaintiffs' Challenges to Prior Applications of the Act
    Are Barred by *Rooker-Feldman* Doctrine .........................................................6

II.    The Constitution Provides States Substantial Discretion
    In Structuring Their Electoral Procedures...........................................................7

III.    The Act Does Not Violate the First Amendment .......................................................8

    A.   A.R.S. §19-118(C) Does Not Implicate the First Amendment.........................8

        1.   The Law Does Not Regulate Circulation or Advocacy ...............................8

        2.   Signature Disqualification Does Not Change the Result............................10

    B.   The Pool of Circulators Is Not Impermissibly Reduced .................................11

    C.   The Law Is Not Underinclusive ........................................................................12

    D.   The Law Is Not Overbroad ...............................................................................13

    E.   The Act's Impact On Ease With Which An Initiative May Qualify
       Is Not of Constitutional Dimension .................................................................14

    F.   The Act Does Not Regulate Based Upon Content of Viewpoint .....................15

IV.    The Act Does Not Unduly Burden the Right to Vote .............................................16

i

V.   The Act Does Not Violate Equal Protection .............................................................. 16

VI.  Plaintiffs' Facial Challenge Fails ............................................................................ 17

CONCLUSION ............................................................................................................ 17

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Celebrezze*,
460 U.S. 780 (1983) ....................................................................................... 7, 8

*Angle v. Miller*,
673 F.3d 1122 (9th Cir. 2012) ................................................................... 14, 15

*Arizona Chapter of the Associated General Contractors of*
*America v. City of Phoenix*, 445 P.3d 2 (Ariz. 2019) ...................................... 3

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................... 2

*Blankenship v. Blackwell*,
No. 04-4259, 2004 WL 2390113 (6th Cir. Oct. 18, 2004) ............................ 10

*Blankenship v. Blackwell*,
341 F. Supp. 2d 911 (S.D. Ohio 2004) .......................................................... 10

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) ......................................................................................... 13

*Brousseau v. Fitzgerald*,
138 Ariz. 453 (1984) .......................................................................................... 3

*Buckley v. American Constitutional Law*
*Foundation, Inc.*, 525 U.S. 182 (1999) ............................................... 7, 9, 12

*Buckley v. Valeo*,
424 U.S. 1 (1976) ....................................................................................... 12, 13

*Burdick v. Takushi*,
504 U.S. 428 (1992) ........................................................................................... 7

*Cave Creek Unified School District v. Ducey*,
233 Ariz. 1 (2013) ........................................................................................... 12

*Cooper v. Ramos*,
704 F.3d 772 (9th Cir. 2012) ............................................................................. 6

*Conservation Force v. Salazar*,
646 F.3d 1240 (9th Cir. 2011) ........................................................................... 2

*Dobrovolny v. Moore,*
126 F.3d 1111 (8th Cir. 1997) ................................................................. 15 n.4

*Initiative & Referendum Institute v. Walker,*
450 F.3d 1082 (10th Cir. 2006) ........................................ 8, 9, 14, 15 n.4, 16

*Intri-Plex Techs., Inc. v. Crest Grp., Inc.,*
499 F.3d 1048 (9th Cir. 2007) ........................................................................ 2

*Leach v. Reagan,*
245 Ariz. 430 (2018) ................................................................................. 3, 4

*Leach v. Reagan and Clean Energy for a Healthy Arizona Committee,*
No. CV2018-009919 (Maricopa Cty. Super. Ct., August 27, 2018) .......................... 1, 4

*Lee v. City of Los Angeles,*
250 F.3d 668 (9th Cir. 2001) ........................................................................ 2

*Lemons v. Bradbury,*
538 F.3d 1098 (9th Cir. 2008) ............................................................... 10, 16

*Lindsay v. Bowen,*
750 F.3d 1061 (9th Cir. 2014) ................................................................. 17 n.5

*McDonald v. Board of Election Commissioners,*
394 U.S. 802 (1969) .............................................................................. 13, 17

*Molera v. Reagan,*
245 Ariz. 291 (2018) ..................................................................................... 3

*Meyer v. Grant,*
486 U.S. 414 (1988) ...................................................................................... 9

*Munro v. Socialist Workers Party,*
479 U.S. 189 (1986) ................................................................................. 14 n.3

*Nader v. Brewer,*
531 F.3d 1028 (9th Cir. 2008) ....................................................................... 12

*Noel v. Hall,*
341 F.3d 1148 (9th Cir. 2003) ......................................................................... 6

*OSU Student Alliance v. Ray,*
699 F.3d 1053 (9th Cir. 2012) ....................................................................... 17

*Plyler v. Doe*,
  457 U.S. 202 (1982) ................................................................. 17 n.5

*Prete v. Bradbury*,
  438 F.3d 949 (9th Cir. 2006) ....................................................... 11

*Public Integrity Alliance, Inc. v. City of Tucson*,
  836 F.3d 1019 (9th Cir. 2016) ..................................................... 7, 8

*Semple v. Griswold*,
  ---F.3d---, No. 18-1123, 2019 WL 3926932 (10th Cir. Aug. 20, 2019) ............ 9, 15 n.4

*Sonoma Cty. Ass'n of Retired Employees v. Sonoma Cty.*,
  708 F.3d 1109 (9th Cir. 2013) ....................................................... 2

*Stanwitz v. Reagan*,
  245 Ariz. 344 (2018) ......................................................... 1, 3, 5, 12

*Stanwitz v. Reagan and Outlaw Dirty Money Committee*,
  No. CV2018-009789 (Maricopa Cty. Super. Ct., August 22, 2018) ........................ 1, 6

*Storer v. Brown*,
  415 U.S. 724 (1974) ................................................................. 7

*Taxpayers United for Assessment Cuts v. Austin*,
  994 F.2d 291 (6th Cir. 1993) ....................................................... 10

*United States v. Salerno*,
  481 U.S. 739 (1987) ................................................................ 17

*Voting for America, Inc. v. Steen*,
  732 F.3d 382 (5th Cir. 2013) ........................................................ 8

*Wellwood v. Johnson*,
  172 F.3d 1007 (8th Cir.1999) ................................................... 9, 15 n.4

**CONSTITUTIONAL PROVISIONS**

U.S. Const., amend. I ............................................. *passim*

U.S. Const., amend XIV ........................................... *passim*

Ariz. Const. art. IV, Pt. 1 §1 ...................................... 3

Ariz. Const. art. IV, Pt. 1 §1(6) ............................................................................... 12

Ariz. Const. art. VII, §12 .................................................................................... 3, 4

**STATUTES**

A.R.S. §19-112(A) .................................................................................................. 3

A.R.S. §19-112(B) .................................................................................................. 3

A.R.S. §19-114(A) .................................................................................................. 3

A.R.S. §19-118(A) .................................................................................................. 4

A.R.S. § 19-118(B) ................................................................................................. 4

A.R.S. § 19-118(C) ........................................................................................ *passim*

A.R.S. §19-118.01(A) ............................................................................................. 3

**MOTION**

Defendant Arizona Secretary of State Katie Hobbs (the "Secretary") moves to dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(6).   Because of substantial overlap in issues, the Secretary requests oral argument on this motion concurrent with the argument on Plaintiffs' motion for preliminary injunction (set for September 25, 2019, at 10:00 a.m.).   This motion is made on the basis of the accompanying memorandum, as well as any argument provided by counsel at any hearing the Court schedules.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

This case is a constitutional challenge to A.R.S. §19-118(C) (the "Act"), which specifies a specific remedy for a particular violation of state law:  specifically, the failure of registered initiative-petition circulators to comply with lawfully issued subpoenas regarding their signature-gathering efforts results in those signatures being disqualified. Very few of the issues here are new:  essentially the same arguments about the purported burden of the Act and its supposed lack of justification have recently been advanced in the Arizona courts.   To no avail.   Two Arizona superior court judges and the Arizona Supreme Court resoundingly rejected those arguments, the latter without a single dissent. *Stanwitz v. Reagan*, 245 Ariz. 344 (2018), *as amended* (Nov. 27, 2018); *Leach v. Reagan and Clean Energy for a Healthy Arizona Committee*, No. CV2018-009919, Under Advisement Ruling (Maricopa Cty. Super. Ct., August 27, 2018) ("*Leach* Ruling"); *Stanwitz v. Reagan and Outlaw Dirty Money Committee*, No. CV2018-009789, Ruling (Maricopa Cty. Super. Ct., August 22, 2018) ("*Stanwitz* Ruling").[1]   As *Stanwitz* unanimously concluded, the minimal burdens imposed by the Act were fully justified by the State's interests in fostering transparency, assisting judicial fact-finding, inducing compliance with subpoenas, and reducing threats to the integrity of the initiative process.

---

[1]  The *Leach* and *Stanwitz* Superior Court rulings are provided for the Court's convenience as Attachments 1 and 2, respectively, to this Motion.

*Id*. at 350 ¶21.  Because the Act did not unreasonably burden the initiative process, the court held the Act constitutional, both facially and as applied.  *Id*. at 346 ¶1.

This suit is now an attempted (and belated) *third* bite at the apple, and should meet the same fate as the first two.

To be sure, this case does involve novel elements:  principally, Plaintiffs allege that the Act violates the First Amendment.  But, as explained below, the Act does not regulate speech or implicate the First Amendment at all.  And, even if it did, the result would be that this Court would need to engage in an inquiry into the burden imposed by the Act and the governmental interests justifying that burden—*i.e.*, the *very same* inquiry that three Arizona courts and nine Arizona judges have already conducted, which led to a uniform conclusion that the Act is constitutional.  This Court should join this judicial consensus and dismiss Plaintiffs' Complaint.

## LEGAL STANDARD

Dismissal for failure to state a claim is proper when the complaint lacks a cognizable legal theory, or lacks sufficient facts to support a cognizable legal theory.  *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011).  To survive a Rule 12(b)(6) motion to dismiss, Plaintiffs must plead "'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Sonoma Cty. Ass'n of Retired Employees v. Sonoma Cty.*, 708 F.3d 1109, 1115 (9th Cir. 2013) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  This "accepted-as-true" principle, however, does not apply to legal conclusions or conclusory factual allegations.  *Iqbal*, 556 U.S. at 681.  Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 678.

When considering Rule 12(b)(6) motions, courts may consider judicially-noticeable documents.  *Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007).  This includes other courts' legal conclusions and orders.  *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).

2

## BACKGROUND

### *The Initiative and Related Regulations, Including A.R.S. § 19-118(C).*

Arizona's Constitution reserves to the people the power of the initiative.  Ariz. Const. art. IV, Pt. 1 §1.  The legislature, however, is to enact "laws to secure the purity of elections and guard against abuses of the elective franchise."  Ariz. Const. art. VII, §12.  Initiative proponents and petition circulators must "comply with appropriate regulation of the initiative process."  *Molera v. Reagan*, 245 Ariz. 291, 294 ¶ 10 (2018).  For example, A.R.S. §19-118.01(A) prohibits paying circulators by the signature.  This prophylactic measure lessening the financial incentive for paid circulators to forge signatures has been upheld by the Arizona Supreme Court.  *Leach v. Reagan*, 245 Ariz. 430 (2018); *Ariz. Ch. of the Assoc. Gen. Contractors of Am. v. City of Phoenix*, 445 P.3d 2 (Ariz. 2019).  Similarly, A.R.S. §19-112(A) requires initiative-petition circulators to personally witness each signature.  This requirement discourages those signing petitions from forging other electors' signatures on petition sheets.  A.R.S. §19-112(B), meanwhile, requires that petition sheets be attached to a "full and correct copy" of the initiative language when they are circulated for signatures.  This ensures that signers can see the proposed initiative for themselves.  And, A.R.S. §19-114(A) requires circulators to be qualified to register to vote in Arizona, which means they cannot be felons unless their civil rights are restored.  This helps ensure circulators have not been convicted of crimes that might call into question their trustworthiness.  Collectively, these "statutory circulation procedures are designed to reduce the number of erroneous signatures, guard against misrepresentations, and confirm that signatures were obtained according to law."  *Brousseau v. Fitzgerald*, 138 Ariz. 453, 456 (1984).

The Arizona Supreme Court explained that, when legal challenges to initiatives turn on circulators' qualifications and circulation activities, the best evidence is the testimony of circulators themselves concerning their compensation, compliance with statutory requirements for petition circulation, and applicable felony convictions.  *Stanwitz*, 245 Ariz. at 350 ¶23.  When circulators fail to appear to provide testimony, the

1   necessary fact-finding processes are "materially prejudiced." *Id.*

2        The regulations provided by the Act reduce the likelihood that circulators will be

3   unavailable to provide this crucial testimony.  First, the statute requires all professional

4   and out-of-state initiative-petition circulators to register before circulating petitions.

5   A.R.S. §19-118(A).  Second, it requires these circulators to submit to the jurisdiction of

6   Arizona's courts.  A.R.S. §19-118(B).  Third, it requires them to comply with subpoenas.

7   A.R.S. §19-118(C).  Although nothing in the Act prevents anyone from attempting to

8   quash or modify a subpoena under any grounds they might wish to assert, failure to

9   comply with an unchallenged or upheld subpoena results in signatures gathered by that

10   violator being disqualified.  The challenged law thus incentivizes compliance with

11   subpoenas, making it more likely that courts will have access to evidence they require to

12   adjudicate challenges to the validity of initiative signatures.

13        ***Prior Challenges***

14        Clean Energy for a Healthy Arizona (the "Committee") was the real party in

15   interest and cross-claimant in a challenge to its petition's placement on the November

16   2018 ballot.  *Leach* Ruling (Attachment 1).  Current Plaintiff NextGen Climate Action

17   was the nearly-exclusive funding source for the Committee. *See Leach*, 245 Ariz. at 450

18   (2018) (Gould, J., concurring) (from the Committee's "inception until the petitions were

19   filed . . . NextGen contributed $6,857,346.67 to the Committee; all other contributions

20   combined were $318.36").   In *Leach*, the Committee argued that the signature

21   disqualification remedy of A.R.S. § 19-118(C) was an unconstitutional "restriction on

22   the right to initiative."  *Leach* Ruling at 16 (citing the Committee's motion for partial

23   summary judgment at 8, 11) (Attachment 1).  The Superior Court rejected this argument,

24   holding the Act "provides an essential means of exposing signature fraud, thereby

25   promoting integrity in the initiative and referendum process—[and] is precisely the kind

26   of statute that the Constitution's framers envisioned when they directed the enactment of

27   'laws to secure the purity of elections and guard against abuses of the elective

28   franchise.'"  *Id*. at 18 (quoting Ariz. const. art. 7 § 12).

1    NextGen's Committee also filed an amicus brief challenging the Act on similar

2    grounds in *Stanwitz v. Reagan*, the contemporaneous litigation concerning the "Stop

3    Political Dirty Money Amendment" intended for the 2018 ballot.  There, petitioners

4    argued the Act was unconstitutional "because it improperly disqualifies otherwise valid

5    signatures merely because a circulator fails to appear when subpoenaed to testify as to a

6    petition challenge."  *Stanwitz*, 245 Ariz. at 349 ¶17.  Rejecting that challenge, the

7    Arizona Supreme Court explained the Act "reasonably supplements the initiative process

8    by deterring fraud" and rejected the contention that the Act was "unduly burdensome."

9    *Stanwitz*, 245 Ariz. at 350.  The court therefore unanimously upheld the Act against

10   petitioners' facial and as-applied challenges.  *Id.*

11   ***Plaintiffs' Allegations***

12   Plaintiffs' own submissions provide powerful evidence of why that incentive for

13   compliance provided by the Act is needed.  Plaintiff Lord, for example, explains that she

14   would have preferred to violate the subpoena issued to her, and only complied because

15   she did not want the signatures she had gathered to be disqualified.  (Complaint, Doc. 1,

16   ¶22.)  She also "would like to circulate petitions in the future," but "cannot commit to

17   doing so" if the Act remains in effect.  (*Id.*)  Plaintiff Smallcanyon acknowledged she

18   complied with her subpoena in part because she was afraid her signatures would be

19   stricken.  (*Id.* ¶21.)  She "would consider" circulating future petitions, but only if the Act

20   is enjoined.  She "is unwilling to" circulate otherwise.  (*Id.*)  Plaintiff Miracle,

21   meanwhile, admits she wants "to circulate petitions again in the future, but is reluctant to

22   do so if" A.R.S. §19-118(C) remains in effect. (*Id.* ¶20.)

23

24   Notably, all three Plaintiff-circulators are subject to what Plaintiffs called "normal

25   civil penalties" for noncompliance even if enforcement of the Act is enjoined.  (*Id.*

26   ¶102.)  Plaintiffs' own submissions explain that such "normal civil penalties" are

27   insufficient; only the Act will effectuate compliance with validly issued subpoenas.

28   Their averments indicate Plaintiffs want the ability to refuse to comply with subpoenas

1   without risking disqualification of the signatures they gathered.  As the Maricopa County

2   Superior Court explained, A.R.S. §19-118(C) "is a necessary and effective mechanism to

3   ensure that circulators of petitions will be available to respond to challenges that

4   signatures were not obtained in a legal manner."  *Stanwitz* Ruling at 8 (Attachment 2.)

5   Pursuant to the Act, the Secretary removes signatures collected by registered-

6   initiative circulators who have not complied with subpoenas when courts direct her to do

7   so.  This assists the Secretary in fulfilling her statutory duty to uphold the integrity of the

8   initiative process for everyone by only certifying for the ballot those initiatives that have

9   fully complied with applicable legal requirements and gathered sufficient signatures.

10  A.R.S. §§ 19-121.01 – 121.04.

**ARGUMENT**

12  Plaintiffs assert three different constitutional claims:  violations of the First

13  Amendment (Claim One), the right to vote (Claim Two) and the Equal Protection Clause

14  (Claim Three).  As explained below, each claim fails.

## I.   PLAINTIFFS' CHALLENGES TO PRIOR APPLICATIONS OF THE ACT ARE BARRED BY *ROOKER-FELDMAN* DOCTRINE.

17  It is helpful to begin by noting what this suit does not—and cannot—involve:  any

18  challenge to prior applications of the Act, including disqualifying signatures and refusing

19  to quash subpoenas.   Under *Rooker-Feldman* doctrine, "federal district courts are

20  without jurisdiction to hear direct appeals from the judgments of state courts" as well as

21  "the 'de facto equivalent' of such an appeal." *Cooper v. Ramos*, 704 F.3d 772, 777 (9th

22  Cir. 2012).  And it "is a forbidden de facto appeal under *Rooker–Feldman* when the

23  plaintiff in federal district court complains of a legal wrong allegedly committed by the

24  state court, and seeks relief from the judgment of that court."   *Noel v. Hall*, 341 F.3d

25  1148, 1163 (9th Cir. 2003).

26  Thus, to the extent that Plaintiffs are arguing that the Arizona state courts in

27  *Leach* should have quashed subpoenas, answered the phone when Plaintiff Lord called

28  the court (Doc. 1 ¶22), or declined to apply the Act's disqualification remedy, *Rooker-*

6

*Feldman* bars consideration of any alleged errors in those proceedings.  As a practical matter, this suit is therefore limited to prospective applications of the Act.

## II.  THE CONSTITUTION PROVIDES STATES SUBSTANTIAL DISCRETION IN STRUCTURING THEIR ELECTORAL PROCEDURES.

Although Plaintiffs assert a variety of constitutional violations, all of them involve a common framework established by the U.S. Constitution, which recognizes that states have substantial freedom in establishing their own electoral structures and associated regulatory regimes:  "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."  *Storer v. Brown*, 415 U.S. 724, 730 (1974).  This is true in the initiative context as well.  "States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally."  *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 191 (1999).  Because election regulations "invariably impose some burden upon individual voters," *Burdick v. Takushi*, 504 U.S. 428, 433 (1992), "not every voting regulation is subject to strict scrutiny," *Pub. Integrity Alliance, Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016).

"Instead, . . . a more flexible standard applies."  *Burdick*, 504 U.S. at 434.  Courts considering election law challenges "weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'"  *Id.* (*quoting Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).  Known as the *Anderson*/*Burdick* test, courts subject laws imposing "severe" burdens to strict scrutiny, requiring the law to be narrowly tailored to a compelling interest.  *Id.*  "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally

sufficient to justify' the restrictions." *Id.* (*quoting Anderson*, 460 U.S. at 788). *See also Pub. Integrity Alliance*, 836 F.3d at 1024 ("Applying these precepts, '[w]e have repeatedly upheld as 'not severe' restrictions that are generally applicable, evenhanded, politically neutral, and protect the reliability and integrity of the election process'").

As explained below, Plaintiffs' claims fail under this common *Anderson/Burdick* framework.

## III.   THE ACT DOES NOT VIOLATE THE FIRST AMENDMENT.

Plaintiffs allege the Act violates the First Amendment in three ways: (1) it restricts the pool of available circulators, (2) it makes it less likely that initiatives will qualify for the ballot, and (3) it is a content- or identity-based regulation of speech. (Doc. 1 ¶80.)  But A.R.S. §19-118(C) does not regulate petition circulation or advocacy. It applies only when subpoenas relating to compliance with circulation requirements have been violated—*i.e.*, only after all initiative-related speech has occurred.  The Act therefore does not implicate the First Amendment.  But even if it did, the minimal burden imposed is fully justified by the State's compelling interests in assuring compliance with subpoenas.

### A.   A.R.S. §19-118(C) Does Not Implicate the First Amendment.

Plaintiffs' First Amendment claims fail, first as a threshold matter, because the Act does not implicate the First Amendment at all.

#### 1.   The Law Does Not Regulate Circulation or Advocacy.

First Amendment jurisprudence recognizes a crucial distinction between "laws that regulate or restrict the communicative conduct of persons advocating a position in a referendum" and "laws that determine the process by which legislation is enacted" after initiative-related speech has occurred. *Init. & Ref. Inst. v. Walker*, 450 F.3d 1082, 1099-1100 (10th Cir. 2006).  The former implicate the First Amendment.  The latter generally do not.  *Id.*  So "not every procedural limit on election-related conduct automatically runs afoul of the First Amendment[,]" but only those that "restrict political discussion or burden the exchange of ideas." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 392 (5th Cir.

2013).  The test is whether the law interferes with the ability to circulate petitions and advocate for initiatives, or whether it concerns other aspects of the initiative process.

So, a law requiring signatures from 38% of local voters for initiatives to change whether a county allows alcohol sales, but only 15% for other subjects, did not raise First Amendment concerns.  *Wellwood v. Johnson*, 172 F.3d 1007, 1008–09 (8th Cir.1999).  The higher signature requirement did not prevent supporters from making their views heard, and so "did not violate the First Amendment because it did not infringe upon the ability to circulate petitions or otherwise engage in political speech[.]"  *Id.* at 1009 (internal quotation omitted).  Similarly, a Utah provision requiring a supermajority vote for wildlife-related initiatives, but only a majority vote for other subjects, "d[id] not implicate the freedom of speech" at all.  *Walker*, 450 F.3d at 1085.  Instead, it regulated only non-communicative aspects of the initiative process.  *Id.* at 1100, 1105.

The ban on paid circulators, invalidated on First Amendment grounds in *Meyer v. Grant*, was different: the actual "circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change."  486 U.S. 414, 421 (1988).  Indeed, it "involve[d] the type of interactive communication concerning political change that is appropriately described as 'core political speech.'"  *Id.* at 421-22.  The same was true for the ban on all circulators except Colorado-registered voters in *Buckley*.  That law "significantly inhibit[ed] communication with voters about proposed political change" by *inter alia* requiring petition circulators be registered voters and wear identification tags.  525 U.S. at 642.

Unlike the statutes in *Meyer* and *Buckley*, the Act does not restrict in any manner actual communication by petitions circulators.  Instead, it regulates only the non-communicative "process by which legislation is enacted."  *Walker,* 450 F.3d at 1100.  Thus, much like *Wellwood* and *Walker*, it does not implicate the First Amendment at all. *See also Semple v. Griswold*, ---F.3d---, No. 18-1123, 2019 WL 3926932, at *5-6 (10th Cir. Aug. 20, 2019) (holding that the First Amendment is not implicated just because state laws make it more difficult or expensive to pass a ballot initiative).  That conclusion

1   alone is fatal to Plaintiffs' First Amendment claim.

2   **2.   Signature Disqualification Does Not Change the Result.**

3   The conclusion is not altered because signatures may be disqualified if circulators

4   fail to comply with subpoenas—any more than it is altered by other remedies that the

5   State might provide for non-compliance with valid subpoenas, such as contempt.  States

6   may disqualify signatures because of circulators' failures to comply with governing law

7   without running afoul of the First Amendment.  For example, Ohio validly invalidated

8   signatures because of fraud committed by petition circulators.  *Blankenship v. Blackwell*,

9   341 F. Supp. 2d 911, 923 (S.D. Ohio 2004), *affirmed per curiam Blankenship v.*

10  *Blackwell*, No. 04-4259, 2004 WL 2390113 (6th Cir. Oct. 18, 2004).   Similarly,

11  Michigan permissibly disqualified 15,000 signatures because the petition sheets did not

12  include statutorily-required language, and disqualified another 2,000 signatures because

13  the circulators dated the petition sheets incorrectly.  *Taxpayers United for Assessment*

14  *Cuts v. Austin*, 994 F.2d 291, 298-99 (6th Cir. 1993).  The Ninth Circuit similarly upheld

15  the disqualification of signatures that did not appear to match the signature on the

16  electors' voter registration cards, even though the electors had requested to rehabilitate

17  their signatures with extrinsic evidence.  *Lemons v. Bradbury*, 538 F.3d 1098 (9th Cir.

18  2008).   The disqualification regulation had "uniform standards" with "sufficient

19  guarantees of equal treatment" and so did not offend the Constitution.  *Id*. at 1106-07.  In

20  each of these cases, the petitions were signed by presumably-qualified electors, who did

21  nothing wrong.  Yet, the signature disqualifications did not offend the First Amendment.

22  It is also worth comparing the Act's signature disqualification remedy with the

23  other remedies (*i.e.*, "normal civil penalties" in Plaintiffs' parlance (Doc. 1 ¶102)) for

24  violating subpoenas that are *not* challenged.  For example, courts may hold subpoena

25  violators in civil contempt and *imprison* them—followed by prolonged imprisonment

26  through criminal contempt if necessary.  But *none* of that is challenged.  And if

27  *imprisonment* as a remedy for non-compliance does not implicate/violate the First

28  Amendment (as Plaintiffs' silence concedes), it is difficult to apprehend how the *far*-less

1   burdensome remedy of disqualifying signatures does.  Moreover, as explained next, the

2   burdens advanced by Plaintiffs are more imagined than real—certainly not "severe"—

3   and readily justified by the State's substantial interests.

4   **B.      The Pool of Circulators Is Not Impermissibly Reduced.**

5        Plaintiffs allege that the Act impermissibly reduces the pool of available

6   circulators.  But Plaintiffs have not demonstrated that it does.  Plaintiff Smallcanyon is

7   the only Plaintiff to aver she will not circulate while the law remains in effect, (Doc. 1

8   ¶21), but elsewhere avers she is only "hesitant" to do so, (*id*. ¶8).  Regardless, all

9   regulations of petition circulation potentially reduce the pool of available circulators.

10   But that is not that the relevant question. Rather, the severity of a burden on speech is

11   crucial.  Statutes imposing "severe burdens" are subject to strict scrutiny.  *Prete v.*

12   *Bradbury*, 438 F.3d 949, 961 (9th Cir. 2006).  "Lesser burdens, however, trigger less

13   exacting review, and a State's important regulatory interests will usually be enough to

14   justify reasonable, nondiscriminatory restrictions."  *Id*.

15        In *Prete*, the Ninth Circuit upheld an Oregon ban on paying circulators by the

16   signature, even though it might reduce the pool of circulators.  438 F.3d at 962.  Unlike

17   the bans in *Meyer* and *Buckley*, the Oregon law did not prevent anyone from circulating,

18   but merely barred one payment method.  *Id*. at 961-63.  The court recognized that

19   "eliminating one method of payment" *might possibly* result in some circulators choosing

20   not to circulate.  *Id*. at 968.  But this potential impact was not a "severe burden" like in

21   *Meyer* and *Buckley*, *id*. at 961-62 and 967, because "anyone [could] serve as a petition

22   circulator" if they wanted to, *id*. at 963.  Instead, any burden was of only of the "lesser"

23   sort, subject to "less exacting review."  *Id*. at 968.  And because Oregon's per-signature

24   ban furthered the state's interest in preventing fraud, it was constitutional.  *Id*. at 969-71.

25        Just like the Oregon law upheld in *Prete*, the Act does not bar anyone from

26   circulating petitions.  Like *Prete*, any potential impact is at most a "lesser burden,"

27   subject to "less exacting review."   Here, the Act incentivizes paid initiative-petition

28   circulators' compliance with subpoenas, which furthers the important interest in

protecting the integrity of the initiative by administering an honest and fair initiative procedure. *See id*. at 953 (recognizing the interest). Several Plaintiffs admit that *all* other available compliance mechanisms would not be effective and *only* the Act would be effective. *Supra* at 5. The Ninth Circuit expressly explained that "[f]ederal courts have generally looked with favor" on petition-circulation regulations directed at "subpoena enforcement[.]" *Nader v. Brewer*, 531 F.3d 1028, 1037 (9th Cir. 2008). Indeed, the Supreme Court recognized States' "strong interest in policing lawbreakers among petition circulators … by ensuring that circulators will be amenable to the Secretary of State's subpoena power." *Buckley*, 525 U.S. at 184. That "strong interest," which is easily sufficient to sustain the Act, is directly advanced by incentivizing circulators' subpoena compliance, making it more likely courts hearing initiative challenges will have access to crucial evidence. *Stanwitz*, 245 Ariz. at 350 ¶23.

Moreover, the Act does not discriminate, but applies equally to all professional and out-of-state initiative-petition circulators, regardless of the subject matter of the initiatives for which they circulate. And, the law is reasonably directed at initiative-petition circulators because initiatives, once enacted, are nearly impossible to undo. They cannot be vetoed by the governor, repealed by the legislature, or amended in a way that does not further the initiatives' purpose. Ariz. Const. art. IV, Pt. 1 §1(6); *Cave Creek Unified Sch. Dist. v. Ducey*, 233 Ariz. 1, 4 ¶ 9 (2013).[2]

**C.    The Law Is Not Underinclusive.**

Plaintiffs suggest the law is unconstitutionally underinclusive because it does not apply to *all* petition circulators. (Doc. 1 ¶ 98.) But "a statute is not invalid under the Constitution because it might have gone farther than it did[.]" *Buckley v. Valeo*, 424 U.S. 1, 105 (1976) (quotation omitted). The State "need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to

---

[2]    Initiative-created law can only be changed by passing another initiative, which, as Plaintiffs attest, is an expensive and difficult process. (Doc. 1 ¶¶ 35-40.) Because of the near permanency of initiatives, the legislature enacted A.R.S. §19-118(C) to help ensure needed testimony is available when the eligibility of initiatives is challenged.

1   cover every evil that might conceivably have been attacked." *McDonald v. Board of*

2   *Election Comm'rs*, 394 U.S. 802, 809 (1969).  Rather, "a legislature need not 'strike at

3   all evils at the same time," but may take incremental steps, "addressing itself to the phase

4   of the problem which seems most acute[.]"  *Buckley*, 424 U.S. at 105.

5          The legislature limited the Act to paid and out-of-state initiative-petition

6   circulators because the legislature reasonably judged them to be a more likely source of

7   fraudulent signatures and more likely to need the additional incentive.   In-state

8   volunteers lack any financial incentive to add fraudulent signatures, and are likely

9   passionate about the initiative for which they circulate, and thus will be most eager to

10  testify in support of their initiative.   But professionals circulate petitions to earn a

11  paycheck.  True, they are not paid by the signature.  But if they consistently fail to meet

12  expectations regarding signature generation, they can hardly expect to remain employed

13  or be hired in the future.   And paid circulators may be less likely to comply with

14  subpoenas because they may have moved on to the next circulation job.

15         The Act also reasonably distinguishes between petitions for initiatives and for

16  candidates.   Candidates, even if elected, can be readily voted out of office.   But

17  initiatives, once enacted, are nearly unalterable.  The drastic difference in permanence

18  justifies that distinction.

19         **D.     The Law Is Not Overbroad.**

20         Plaintiffs also contend that A.R.S. §19-118(C) is overbroad because it disqualifies

21  all signatures collected by registered initiative-petition circulators who fail to comply

22  with subpoenas.  (Doc. 1 ¶¶ 103-105.)  Invalidation of statutes for facial overbreadth, as

23  Plaintiffs here request, is "strong medicine" that is "employed . . . sparingly and only as a

24  last resort."  *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).  To prevail on an

25  overbreadth challenge, "the overbreadth of a statute must not only be real, but substantial

26  as well, judged in relation to the statute's plainly legitimate sweep."  *Id.* at 615.

27         Plaintiffs cannot make this required showing.  The Act does not actually regulate

28  speech at all, but only circulator conduct after speech occurs.  *See supra* at 8-10.  The

13

overbreadth doctrine therefore has no application.  *See, e.g.*, *Walker*, 450 F.3d at 1105. In any event, Plaintiffs offer little more than a conclusory assertion that the Act is "*substantially* overbroad."  (Doc. 1 ¶103.)  They certainly do not demonstrate that its disqualification remedy is unconstitutionally burdensome in all or most circumstances in which it would be applied.  They thus have failed even to *allege* overbreadth.[3]

### E.    The Act's Impact On Ease With Which An Initiative May Qualify Is Not Of Constitutional Dimension.

Plaintiffs allege A.R.S. §19-118(C) violates the First Amendment by making it less likely that initiatives will qualify for the ballot.  (Doc. 1¶ 80.)  But the First Amendment does not mandate that ballot access be easy.  As the Ninth Circuit recognized, "[t]here is no First Amendment right to place an initiative on the ballot." *Angle v. Miller*, 673 F.3d 1122, 1133 (9th Cir. 2012).  "[T]here is a crucial difference between a law that has the 'inevitable effect' of reducing speech because it restricts or regulates speech, and a law that has the 'inevitable effect' of reducing speech because it makes particular speech less likely to succeed."  *Walker*, 450 F.3d at 1100.  The fact that a regulation makes it less likely that initiatives will be enacted is therefore not constitutionally determinative.  *Id*. at 1100-01.

In *Angle*, the Ninth Circuit considered a challenge to a requirement that initiatives have support in each of Nevada's congressional districts.  *Angle*, 673 F.3d at 1126-27. The challengers alleged that, because most of their circulators lived in Southern Nevada and were unable to travel, the requirement made it "more difficult *and expensive* to qualify an initiative for the ballot."  *Id*. at 1133-34 (emphasis added).  That did not suffice: "[r]egulations that make it more difficult to qualify an initiative for the ballot …

---

[3]   Plaintiffs also suggest that applying the law only to professional or out-of-state initiative-petition circulators is suspect because there is no evidence that those circulators are less likely to comply with subpoenas than volunteer or candidate-petition circulators. (Doc. 1 ¶100.)  But legislatures are not required to prove harm before enacting a remedy, so long as the remedy is reasonable and does not infringe constitutionally-protected rights.  *Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986).

do not necessarily place a direct burden on First Amendment rights." *Angle*, 673 F.3d at 1133. Even if some circulators were unable to travel, the challengers had not shown why circulators who *were* able to travel could not be recruited. *Id.* at 1134. The Ninth Circuit therefore upheld the all-districts requirement. *Id.* at 1134-36.[4]

Here, Plaintiffs similarly suggest that A.R.S. §19-118(C) makes initiatives more expensive and ballot access more difficult. But, like the *Angle* challengers, Plaintiffs have not demonstrated why they cannot recruit professional circulators who will comply with Arizona's subpoena requirements, or volunteer circulators who, because of their volunteer status, are not subject to the Act. That failure is equally fatal here.

## F. The Act Does Not Regulate Based Upon Content or Viewpoint.

Plaintiffs allege the Act is a content-based regulation of speech because it applies to circulators of initiative petitions but not candidate nomination petitions. (*Id.* ¶¶ 89-90.) They also allege the Act discriminates based on the identity of the speaker because it applies to professional and out-of-state circulators, but not to Arizona residents who volunteer to circulate initiative petitions. (*Id.* ¶ 96.) But as already explained, the law does not regulate speech. It only requires registered initiative-petition circulators to comply with subpoenas related to their circulation efforts; and even then, it only applies *after* all initiative-related advocacy has occurred. It therefore is not a content- or

---

[4]     The Eighth Circuit similarly upheld a requirement that initiatives receive signatures from 10% of those registered to vote *on the day signatures are submitted*. *Dobrovolny v. Moore*, 126 F.3d 1111 (8th Cir. 1997). This "made it difficult for appellants to plan their initiative campaign and efficiently allocate their resources[,]" *id.* at 1113, and "made it more difficult to get issues on the ballot[.]" *Wellwood*, 172 F.3d at 1009 (*discussing Dobrovolny*, 126 F.3d at 1112). But "the difficulty of the process alone is insufficient to implicate the First Amendment, as long as the communication of ideas associated with the circulation of petitions is not affected." *Dobrovolny*, 126 F.3d at 1113. The Tenth Circuit twice upheld challenges to laws that allegedly made it more difficult and expensive to qualify initiatives for the ballot. *Walker*, 450 F.3d 1082; *Semple*, ---F.3d---, 2019 WL 3926932. The *Semple* court held that, "even assuming [the challenged law] makes it more difficult and costly [to enact ballot initiatives] because it requires Plaintiffs to collect signatures from all districts in the state, that process requirement does not give rise to a cognizable First Amendment claim." *Id.* at *6.

1   identity-based speech restriction.  *See Walker*, 450 F.3d at 1104 (noting that "[t]o qualify

2   as a content-based regulation of speech, a statute must restrict speech or expressive

3   conduct in the first place").

4        Plaintiffs' argument also flouts established precedent and proves far too much.

5   The statutes in *Wellwood* and *Walker*, for example, had greater requirements for

6   initiatives addressing alcohol and wildlife, respectively—thereby "discriminating" based

7   on the "content" to be placed on the ballot.  But those First Amendment challenges

8   failed.  Plaintiffs offer no manner of reconciling their instant arguments with those

9   decisions.  Moreover, Plaintiffs' "content-based" arguments would similarly prevent the

10   State from requiring more signatures to qualify for governor than mine inspector or state

11   senate—since those too distinguish based on content.  But that has never been the law.

12   **IV.    THE ACT DOES NOT UNDULY BURDEN THE RIGHT TO VOTE.**

13        Plaintiffs' Count III alleges that the Act unduly burdens the right to vote.  But as

14   demonstrated above, the challenged law does not burden initiative-petition advocacy or

15   the signature-gathering process.  *See supra* at 8-10.  It has application only after all

16   signature gathering is done.  And even then, it does not restrict speech, but only provides

17   one additional tool for ensuring compliance with valid subpoenas by petition circulators.

18   Accordingly, it does not directly implicate the right to vote.

19        Plaintiffs allege, however, that the law burdens the right to vote of those who

20   signed petitions but subsequently had their signatures disqualified.  (Doc. 1 ¶¶114-16.)

21   The plaintiffs in *Lemons* made this same argument.  *Lemons*, 538 F.3d at 1102.  But the

22   Ninth Circuit held that any burdens on the right to vote imposed by the disqualification

23   of signatures are subject only to less exacting review, *id*. at 1103, which the

24   disqualification procedure survived, *id*. at 1104-05.  The same result should obtain here.

25   **V.    THE ACT DOES NOT VIOLATE EQUAL PROTECTION.**

26        Plaintiffs' Count II alleges that the Act violates equal protection by treating

27   "similarly-situated circulators differently[.]"  (Doc. 1 ¶109.)   Plaintiffs do not allege

28   discrimination against a protected class, or contend that the Act burdens any fundamental

1   rights other than speech and voting rights.  Accordingly, Plaintiffs correctly admit their
2   equal protection claim must rise and fall with their First Amendment claim.  (Doc. 1
3   ¶110).  *OSU Student All. v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012).

4           As already shown, the Act does not infringe the First Amendment.  *See supra* at
5   8-10.  Accordingly, it is evaluated under rational basis review.  *OSU Student All.*, 699
6   F.ed at 1067.  *See also McDonald*, 394 U.S. at 808 (recognizing "the wide leeway
7   allowed the States by the Fourteenth Amendment to enact legislation that appears to
8   affect similarly situated people differently" when fundamental rights, or protected
9   classes, are not involved).  Because the Act survives rational basis review, *see supra* at
10  11-12 (explaining the State's interest in the law), Plaintiffs' equal protection claim fails.[5]

11  ## VI.   PLAINTIFFS' FACIAL CHALLENGE FAILS.

12          Finally, it is clear that Plaintiffs' skeletally-developed facial challenge fails.
13  Under *United States v. Salerno*, a facial challenge to a statute fails unless "no set of
14  circumstances exists under which the [statute] would be valid."  481 U.S. 739, 745
15  (1987).  Neither Plaintiffs' Complaint nor preliminary injunction motion even *alleges*
16  anything of the sort.  Alternatively, the Supreme Court has permitted overbreadth facial
17  challenges in the First Amendment context.  *Supra* at 13-14.  But only a single paragraph
18  (¶103) mentions overbreadth at all, and it is little more than Plaintiffs' *ipse dixit*
19  allegation that the law is overbroad.   That falls far short of Plaintiffs' burden of
20  demonstrating substantial overbreadth.

21                                  **CONCLUSION**

22          As demonstrated above, Plaintiffs have not stated a cognizable claim upon which
23  relief can be granted.  This Court should grant the Secretary's Motion to Dismiss.

24

25

26  [5] Also, equal protection "does not require things that are different in fact or opinion to be
    treated in law as though they were the same.'" *Lindsay v. Bowen*, 750 F.3d 1061, 1064
27  (9th Cir. 2014) (*quoting Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  As explained above,
    the circulators to whom A.R.S. §19-118(C) applies are substantially different than other
28  circulators.  *Supra* at 12-13.  As a result, there is no equal protection violation.

Respectfully submitted this 23rd day of August, 2019.

Mark Brnovich
Attorney General


 s/ Joseph E. La Rue
Joseph E. La Rue
Kara M. Karlson

*Attorneys for Defendant Arizona*
*Secretary of State Katie Hobbs*

18

**CERTIFICATE OF SERVICE**

The foregoing was e-filed with the Clerk of the Federal Court for the District of Arizona using the CM/ECF System on August 23, 2019, which served the following counsel:

Sarah R. Gonski (# 032567)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: 602.351.8000
Facsimile: 602.648.7000
SGonski@perkinscoie.com

Elisabeth C. Frost (WDC# 1007632)*
Uzoma N. Nkwonta (WDC# 975323)*
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 600
Washington, D.C. 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211
EFrost@perkinscoie.com
UNkwonta@perkinscoie.com

  s/ Misty Keys

PHX-#8121138