Sarah R. Gonski (# 032567)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: 602.351.8000
Facsimile: 602.648.7000
SGonski@perkinscoie.com
DocketPHX@perkinscoie.com

Elisabeth C. Frost (WDC# 1007632)*
Uzoma N. Nkwonta (WDC# 975323)*
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 600
Washington, D.C. 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211
EFrost@perkinscoie.com
UNkwonta@perkinscoie.com

*Admitted pro hac vice*

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

Jessica Miracle, *et al.*,

Plaintiffs,

v.

Katie Hobbs, in her official capacity as Arizona Secretary of State,

Defendant.

No. CV-19-4694-PHX-SRB

**DECLARATION OF JOEL EDMAN**

Pursuant to 20 U.S.C. § 1746, I, JOEL EDMAN, declare as follows:

1. My name is Joel Edman. I am over the age of 18, have personal knowledge of the facts stated in this declaration, and can competently testify to their truth.

2. I have served as the Executive Director of the Arizona Advocacy Network ("AzAN") since January 1, 2017. AzAN is a non-profit, non-partisan organization devoted to defending and deepening Arizona's commitment to democracy, primarily by advocating

for meaningful voting rights and access to the ballot, political decisions driven by voters instead of money, and a fair and independent judiciary. Since its inception in 2002, AzAN has been involved in initiative efforts in Arizona.

3. AzAN is the sponsor of the ballot committee "Arizonans for Fair Elections (AzAN)," which is sponsoring an initiative for inclusion on the 2020 ballot. The initiative, entitled the "Fair Elections Act," would provide for a variety of improvements to Arizona's election laws, by expanding access to voting and registration and tightening restrictions on political donations and lobbyist influence. The Fair Elections Act has received a serial number from the Arizona Secretary of State of I-25-2020.

4. As the Executive Director of AzAN, I am intimately involved with strategizing, crafting, and promoting the Fair Elections Act.

5. I submit this declaration to explain the seriousness of the harm that the supporters and sponsors of the Fair Elections Act are presently suffering as a result of the continued validity of A.R.S. 16-502(E) (the "Strikeout Law"). As we attempt to move forward with our efforts to exercise our right to initiative in Arizona through the Fair Elections Act, which we hope to have placed on the ballot in the coming November election, the Strikeout Law presents a serious obstacle.

6. I have worked to shepherd the Fair Elections Act through all phases of the initiative process so far: researching and developing the initial policy proposals, drafting the initiative language, developing the coalition of local and national organizations to support it, and ensuring that the coalition has the resources it needs—both in people and money—to achieve ballot access. We are nearly ready to begin collecting signatures, but have not yet begun to do so because we cannot be sure that we are moving forward with the campaign until we can be confident that we can secure adequate funding. The cause of the uncertainty is the Strikeout Law, which makes it difficult for us to obtain solid and adequate commitments from donors.

7. One of the major issues that the Strikeout Law has caused for our donors is it makes it impossible for us to estimate the budget we need to wage a successful initiative

campaign with any certainty or accuracy. If the Strikeout Law remains in effect for the 2020 elections, then we will need to raise and set aside potentially millions of dollars more than we otherwise would have to, in order to ensure that we are ready and able to combat its effects, should it be used against us by a challenger.

8. Our need for certainty on this issue is increasingly urgent. The Strikeout Law is the largest obstacle that prevents us from placing our initiative on the 2020 ballot. It has become an effective tool for initiative opponents to kick otherwise qualified initiatives off the ballot. Because the Strikeout Law requires the Secretary of State to invalidate all signatures collected by a circulator who is subpoenaed but doesn't appear in court—regardless of their reason for not appearing or whether there is any reason to suspect that there is anything at all wrong with the signatures that are invalidated as a result—opponents have begun to issue subpoenas *en masse* to circulators in the hopes that the initiative sponsors won't be able to coordinate their appearances.

9. The Strikeout Law greatly increases the cost and complexity of qualifying an initiative to the ballot, because it requires us to budget and plan for the possibility that we will have to mount a large-scale—and very expensive—effort to coordinate personal, in-court appearances of hundreds or even thousands of circulators. It adds a potential additional several million dollars into the budget, and puts the ultimate success of our efforts in question, because there is no way to know in advance how many circulators will actually appear in court and how many signatures we will lose as a result of those who fail to appear.

10. Even without the Strikeout Law, initiative campaigns are expensive. To fund initiative campaigns, we typically work with both national and local donors. In my experience, these donors have many competing options available to them and must decide where their funds can be used most efficiently. This year, the Strikeout Law specifically is making it substantially more difficult to convince those donors to support an initiative effort in Arizona. This is because the Strikeout Law introduces a real and significant risk that all of the efforts in collecting signatures will be rendered pointless, if an opponent attempts to use the law to invalidate signatures *en masse*. This concern isn't speculative, but is based

on experience: since the Strikeout Law passed in 2014, organized opposition has increasingly wielded it as an offensive weapon in precisely this manner. To guard against this significant risk, initiative efforts must raise and budget substantial amounts of additional funds.

11. National donors are becoming increasingly less willing to support initiatives in Arizona as a result. Under the Strikeout Law, it has become significantly more appealing for fundraisers—in terms of managing both cost and risk—to support measures in other states. Additionally, funding an initiative effort in Arizona is likely to ultimately force donors to make the choice of either letting the measure be killed by the Strikeout Law (for reasons having nothing to do with statutory or constitutional eligibility), or diverting substantial resources from other activities in other states, simply to combat the Law's effects. It is worth emphasizing that no other state with the right to initiative has a law in place like the Strikeout Law. It is not surprising that our national donors have been unwilling to commit resources to our campaign until they know whether the Strikeout Law will remain in place.

12. In-state donors, on the other hand, must decide whether their funds are better spent on an initiative or whether, as a result of the significant risks and potentially exorbitant costs imposed by the Strikeout Law, their resources are more prudently used to attempt to promote their policy goals by instead contributing funds to a campaign, political party, or issue advocacy organization. Donors are always looking to make the most impact with their resources, and many conclude, after evaluating the risk versus the reward, that options other than initiatives are better returns on their investments than initiatives, which the Strikeout Law makes uncertain and expensive. This cycle, we have found that in-state donors have been unwilling to commit resources to our campaign until they know whether the Strikeout Law will remain in place.

13. Simply put, the Strikeout Law is the most significant obstacle that prevents us and other Arizona initiative sponsors from being able to raise the resources that we need to ensure that our initiative has a realistic chance of ultimately being placed on the ballot,

and is not disqualified at the eleventh hour, even if we have managed to gather all the required signatures and complied with all other applicable requirements, for reasons that have nothing to do with voter support for the measure, or any other legitimate substantive requirement for obtaining ballot access.

14. The donors that we've been in communication with are waiting to decide whether to commit resources to Arizona initiative campaigns until they know whether or not the campaigns have a reasonable chance of success—and that determination depends on whether the Strikeout Law remains in place. As a result, key operational decisions have necessarily been placed on hold pending the outcome of this litigation.

15. Because of this uncertainty and inability to lock down funding, there is a strong possibility that we will be unable to move forward with the Fair Elections Act at all if the Strikeout Law remains in place. With the Strikeout Law in place, many of our donors will choose to dedicate funds elsewhere, and we may not have the resources we need to move forward. Even if the Strikeout Law is ultimately struck down, it may not help our ability to bring our initiative unless the decision comes before mid-January, when we absolutely must make hard decisions about whether to move forward.

16. Our current state of limbo leads to all sorts of complications. For instance, we cannot begin a paid signature-gathering operation until we have secured funding. The longer we wait, the more expensive and complex the paid signature-gathering effort becomes, because we must hire more circulators to gather signatures in our compressed time frame, raise our hourly wage to compete with other signature-gathering campaigns that are ongoing at the same time, and dedicate more staff resources to recruiting, hiring, training, and overseeing a larger and more urgent signature-gathering effort. No modern initiative campaign has ever been successful using only volunteer circulators, so—even though volunteer circulators are not subject to the Strikeout Law—we consider the paid signature-gathering campaign a critical component of our ultimate success.

17. Nor can we begin a volunteer signature-gathering campaign in earnest. Our community partnerships are at the heart of AzAN's coalition, and we feel that it would

compromise trust—not just for this election cycle, but for all other organizational efforts moving forward—and make it difficult (and perhaps impossible) to successfully marshal those relationships to mount a successful campaign in the future, if our partners collected hundreds or thousands of signatures on our behalf and then we were forced to cancel the campaign for no other reason than we do not have the resources to survive a challenge under the Strikeout Law.

18. Additionally, every day that passes without certainty compromises our ability to conduct the kind of sustained, targeted community outreach that have been key to our success in past campaigns. Typically, we use the fall before the election to build community coalitions around our initiative, reach out to community leaders to get their buy-in, and begin to spread our message among voters. Because the campaign may very well not be able to proceed if the Strikeout Law remains in place, those efforts are currently stalled. We are already behind, and lag further behind schedule each day.

19. We feel that we've done everything in our power so far to ensure that the Fair Elections Act will successfully gain access to the 2020 ballot. The factor that has proven impossible to plan around is the Strikeout Law. Even if we gather enough signatures to otherwise qualify for the ballot, what happens when our paid circulators all get subpoenaed? How do we get them all to come to court on the same day? How expensive will it be? Even if we spend millions paying for travel and hotels and lost wages, will enough circulators turn out to ensure that we can keep our initiative on the ballot? Without a certain decision from this Court, we cannot answer these questions.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: December 6, 2019

DocuSigned by:

By: Joel Edman

23AF23F897724C4...

Joel Edman