1   Sarah R. Gonski (# 032567)
    PERKINS COIE LLP
2   2901 North Central Avenue, Suite 2000
    Phoenix, Arizona 85012-2788
3   Telephone: 602.351.8000
    Facsimile: 602.648.7000
4   SGonski@perkinscoie.com
    DocketPHX@perkinscoie.com
5
    Elisabeth C. Frost (WDC# 1007632)*
6   Uzoma N. Nkwonta (WDC# 975323)*
    PERKINS COIE LLP
7   700 Thirteenth Street NW, Suite 600
    Washington, D.C. 20005-3960
8   Telephone: 202.654.6200
    Facsimile: 202.654.6211
9   EFrost@perkinscoie.com
    UNkwonta@perkinscoie.com
10
    *Admitted pro hac vice
11
    Attorneys for Plaintiffs
12

13              **UNITED STATES DISTRICT COURT**

14                   **DISTRICT OF ARIZONA**

15

16   Jessica Miracle, *et al.*,                    No. CV-19-4694-PHX-SRB

17                     Plaintiffs,

18        v.                                        **SECOND DECLARATION OF**
                                                    **TOMÁS ROBLES**
19   Katie Hobbs, in her official capacity as
     Arizona Secretary of State,
20
                       Defendant.
21

22        Pursuant to 20 U.S.C. § 1746, I, TOMÁS ROBLES, declare as follows:

23        1.      My name is Tomás Robles. I am over the age of 18, have personal knowledge

24   of the facts stated in this declaration, and can competently testify to their truth.

25        2.      As discussed in the first declaration I gave in this matter, I am a member of

26   the steering committee for Arizonans for Fair Lending (Our Voice Our Vote, LUCHA)

27   ("Arizonans for Fair Lending"), which is sponsoring the 2020 ballot initiative "Arizonans

28

                                        1

1   for Fair Lending Act" ("Fair Lending Initiative"). I am also the co-Executive Director of

2   Living United for Change in Arizona (LUCHA), which is one of the two member

3   organizations that form Arizonans for Fair Lending. I have had extensive personal

4   experience with ballot initiative campaigns in Arizona, both with LUCHA and with other

5   organizations.

6       3.      In July 2019, we began circulating petitions to gather signatures in support of

7   the Fair Lending Initiative. We halted the signature-gathering campaign shortly thereafter

8   because the uncertainty caused by the Strikeout Law has made it difficult for us to obtain a

9   commitment from funders to provide adequate support for the initiative, should it become

10  subject to the types of challenges using the Strikeout Law that are becoming increasingly

11  common in Arizona. We have commitments from funders that would enable us to resume

12  and pursue our initiative campaign to obtain access to the ballot in 2020, but only if the

13  Strikeout Law is no longer a threat. This is because the Strikeout Law threatens every

14  initiative in Arizona, including our own, with the risk of wildly inflated costs, after millions

15  of dollars have already been sunk into extensive signature gathering efforts.

16      4.      In other words, if the Strikeout Law is not enjoined soon, it will almost

17  certainly have the effect of killing our initiative campaign, for nothing having to do with

18  the anticipated support of Arizona voters on its merits.

19      5.      Many major funders of initiative campaigns are national issue-advocacy

20  organizations that must allocate a finite pool of resources among several target states in

21  order to foster their goals nationwide. As any other organization would, these funders look

22  for ways to maximize the efficiency of their resources, and often prioritize their efforts in

23  states where it is less expensive to place an initiative on the ballot over states where it is

24  more expensive. As I am learning as a result of personal experience, the Strikeout Law is

25  quickly making Arizona a state where national funders are highly reluctant and in many

26  cases entirely unwilling to support initiative efforts.

27      6.      In-state donors are likewise uncertain. If the Strikeout Law remains in place,

28  initiative campaigns become comparatively more risky and expensive places to allocate

1    their political giving. In my experience, this is making donors hesitant to commit funds to

2    initiatives rather than a party, an advocacy organization, or a candidate's campaign

3    (importantly, nomination petitions are not subject to the Strikeout Law).

4           7.      If the Strikeout Law remains in place, or if there is no decision suspending

5    the effects of the law by this coming January, there is a very real possibility that we will not

6    be able to move forward with the campaign at all. Our funders will simply spend money

7    elsewhere, in other states with fewer impediments to ballot access, or on other efforts to

8    effect political change in Arizona aside from initiatives.

9           8.      Even if we are ultimately able to move forward with our campaign, waiting

10   to begin our campaign until February or March has a number of consequences for the

11   campaign.

12          9.      In my experience, we need to begin our signature gathering campaign no later

13   than the middle of January—but preferably earlier—to ensure that we have enough time to

14   gather the minimum number of signatures to qualify for the ballot. Initiating a signature-

15   gathering campaign after that time is more expensive and logistically complicated, which

16   significantly decreases our likelihood of achieving ballot access.

17          10.     First, we will have to move much faster. We will have to collect several

18   hundred thousand total signatures to ensure that we have the minimum number of valid

19   signatures to meet the threshold requirement. If we do not begin until February or March,

20   we will have to collect those signatures at an uncomfortably rapid pace and we may run out

21   of time to meet our goals.

22          11.     Second, the signature-gathering process itself will be more expensive because

23   of the compressed timing. Many professional circulators will have already committed to

24   other campaigns, and to ensure that we are able to hire the large number of circulators

25   necessary, we will have to raise the hourly wage that we offer. Because we have such a

26   short window to gather signatures, we will also need to hire many more circulators than we

27   would have otherwise. This increases transactional costs, because we have to spend

28   comparatively more resources recruiting, training and overseeing a large army of

1    circulators. With the Strikeout Law in place, each additional circulator that we hire adds to

2    our overall level of risk, because we will have to set aside resources to ensure that we can

3    get them all to comply with potential subpoenas down the road.

4        12.    Additionally, we are already behind on other aspects of the campaign, such

5    as outreach to voters, advocacy groups, and elected community leaders, which we typically

6    begin in the autumn before the election. These activities are key components of our ability

7    to ultimately be successful in passing the initiative, assuming it can make it on the ballot.

8    Like the signature-gathering campaign, these activities are stalled because we are not able

9    to secure funding commitments with the Strikeout Law in place. If we do not have a decision

10   by January, we risk beginning the process too late to ensure that we have the kind of

11   community buy-in that's necessary to ensure the success of our initiative.

12       I declare under penalty of perjury that the foregoing is true and correct.

13

14   DATED:  December 9, 2019

15

16                                 By: _____
                                          Tomás Robles

17

18

19

20

21

22

23

24

25

26

27

28