1 | Sarah R. Gonski (# 032567)
2 | PERKINS COIE LLP
   | 2901 North Central Avenue, Suite 2000
3 | Phoenix, Arizona 85012-2788
   | Telephone: 602.351.8000
4 | Facsimile: 602.648.7000
   | SGonski@perkinscoie.com
5 | DocketPHX@perkinscoie.com

6 | Elisabeth C. Frost (WDC# 1007632)*
   | Uzoma N. Nkwonta (WDC# 975323)*
7 | PERKINS COIE LLP
   | 700 Thirteenth Street NW, Suite 600
8 | Washington, D.C. 20005-3960
   | Telephone: 202.654.6200
9 | Facsimile: 202.654.6211
   | EFrost@perkinscoie.com
10 | UNkwonta@perkinscoie.com

*Admitted pro hac vice

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| Jessica Miracle; *et al.*, | No. 2:19-cv-04694-SRB |
| Plaintiffs, | |
| v. | **MOTION FOR RECONSIDERATION** |
| Katie Hobbs, in her official capacity as Arizona Secretary of State, | |
| Defendant. | |

# TABLE OF CONTENTS

**I.**      **INTRODUCTION**.................................................................................... 1

**II.**     **LEGAL STANDARD** ............................................................................. 2

**III.**    **ARGUMENT** ........................................................................................... 2

    A.   There is no temporal litmus test that separates restrictions on petition circulators that violate the First Amendment from ones that do not. .................................... 2

    B.   Plaintiffs alleged sufficient facts to support a claim that the Strikeout Law imposes a substantial burden to ballot access. ..................................................... 7

    C.   The Court's dismissal of Plaintiffs' Equal Protection claim (Count III), which is evaluated under *Anderson-Burdick*, cannot be squared with binding precedent in *Soltysik v. Padilla*. .......................................................................................... 11

    D.   The Court's dismissal of Plaintiffs' Equal Protection Claim (Count II), is contrary to binding precedent in *OSU Student Alliance*. ................................... 16

**IV.**    **CONCLUSION** ..................................................................................... 17

-i-

1

CASES

2

*ACLU v. Lomax*,
3
    471 F.3d 1010 (9th Cir. 2006) ........................................ 8

4

*Am. Constitutional Law Found., Inc. v. Meyer*,
5
    120 F.3d 1092 (10th Cir. 1997), *aff'd* 525 U.S. 182 (1999) ........................ 3

6

*Amarel v. Connell*,
    102 F.3d 1494 (9th Cir. 1996) ........................................ 2

7

*Angle v. Miller*,
8
    673 F.3d 1122 (9th Cir. 2012) ........................................ 5, 8

9

*Animal Legal Def. Fund v. Wasden*,
10
    878 F.3d 1184 (9th Cir. 2018) ........................................ 6

11

*Ariz. Green Party v. Reagan*,
    838 F.3d 983 (9th Cir. 2016) ........................................ 13
12

13

*Ariz. Right to Life Political Action Comm. v. Bayless*,
    320 F.3d 1002 (9th Cir. 2003) ........................................ 5, 6
14

*Bell Atl. Corp. v. Twombly*,
15
    550 U.S. 544 (2007) ........................................ 8

16

*Buckley v. Am. Constitutional Law Found.*,
17
    525 U.S. 182 (1999) ........................................ passim

18

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ........................................ 12
19

*Burdick v. Takushi*,
20
    937 F.2d 415 (9th Cir. 1991), *aff'd*, 504 U.S. 428 (1992) ........................ 14

21

*Chandler v. City of Arvada*,
22
    292 F.3d 1236 (10th Cir. 2002) ........................................ 2

23

*Citizens for Tax Reform v. Deters*,
24
    518 F.3d 375 (6th Cir. 2008) ........................................ 2, 5

25

*Cooper v. Harris*,
    137 S. Ct. 1455 (2017) ........................................ 15
26

27

*Crawford v. Marion Cty. Election Bd.*,
    553 U.S. 181 (2008) ........................................ 13, 14

28

*Hydranautics v. FilmTec Corp.*,
   306 F. Supp. 2d 958 (S.D. Cal. 2003) ............................................................ 2

*Idaho Coalition United for Bears v. Cenarrusa*,
   342 F.3d 1073 (9th Cir. 2003) .................................................................... 15

*In re Tracht Gut, LLC*,
   836 F.3d 1146 (9th Cir. 2016) ...................................................................... 8

*Italian Colors Rest. v. Becerra*,
   878 F.3d 1165 (9th Cir. 2018) ...................................................................... 7

*League of Women Voters v. Hargett*,
   No. 3:19-CV-00385, 2019 WL 4342972 (M.D. Tenn. Sept. 12, 2019)..................... 15

*Libertarian Party of Ohio v. Husted*,
   751 F.3d 403 (6th Cir. 2014) ........................................................................ 5

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803).................................................................... 15

*Meyer v. Grant*,
   486 U.S. 414 (1988)........................................................................... passim

*Nader v. Brewer*,
   531 F.3d 1028 (9th Cir. 2008) ................................................................ 2, 5

*OSU Student Alliance v. Ray*,
   699 F.3d 1053 (9th Cir. 2012) .............................................................. 16, 17

*Pub. Integrity All., Inc. v. City of Tucson*,
   836 F.3d 1019 (9th Cir. 2016) (en banc) ............................................... 13, 14

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
   487 U.S. 781 (1988).................................................................................. 6

*San Diego Cty. Gun Rights Comm. v. Reno*,
   98 F.3d 1121 (9th Cir. 1996) ........................................................................ 6

*Sanders County Republican Central Committee v. Bullock*,
   698 F.3d 741, 748 (9th Cir. 2012) ................................................................ 6

*Soltysik v. Padilla*,
   910 F.3d 438 (9th Cir. 2018) ............................................................... passim

*Stanwitz v. Reagan*,
   245 Ariz. 344, 429 P.3d 1138 (2018)....................................................... 12, 13, 14

*Timmons v. Twin Cities Area New Party*,
   520 U.S. 351 (1997) ........................................................................... 3

*United States v. Corinthian Colleges*,
   655 F.3d 984 (9th Cir. 2011) ............................................................. 8

*Va. v. Am. Booksellers Ass'n, Inc.*,
   484 U.S. 383 (1988) ........................................................................... 6

*Wolfson v. Brammer*,
   616 F.3d 1045 (9th Cir. 2010) ........................................................... 6

**STATUTES**

A.R.S § 19-118(E) ......................................................................... 7, 16

28 U.S.C. § 1292(b) ......................................................................... 18

## I.    INTRODUCTION

Plaintiffs respectfully move for reconsideration of the portion of the Court's December 16, 2019 Order (Doc. 36) ("Order") that granted Arizona Secretary of State Katie Hobbs's (the "Secretary") Motion to Dismiss (Doc. 16) ("MTD") in part—specifically its dismissal of Plaintiffs' First Amendment claims on two separate theories and their Equal Protection Claims in their entirety. The decision to dismiss these claims was based on manifest error and requires reconsideration for several important reasons. *First*, the Order erroneously dismissed Plaintiffs' claim that the Strikeout Law restricts the pool of potential circulators based on its conclusion that the "the Strikeout Law is distinct from" laws that impose restrictions on petition circulators that courts have found violate the First Amendment, "because the laws at issue in those cases implicated the communicative message associated with the physical act of circulation *at the time of circulation*." Order at 6. In doing so, it adopted a litmus test that no court has recognized and that cannot be squared with binding precedent. *Second*, it erroneously dismissed Plaintiffs' First Amendment claim based on the Strikeout Law's significant burdens on the ability of initiative proponents to gather the signatures necessary for ballot access. In this case, perhaps as a consequence of the fact that the Court was simultaneously ruling on the Secretary's MTD and the Plaintiffs' motion for a preliminary injunction ("PI Motion"), the Order appears to commingle the standards applicable to those different motions. Thus, rather than accepting as true the facts pled in the Complaint, the Order appears to conclude that this claim cannot survive because of what it viewed as a failure of proof. But Plaintiffs have no burden to come forth with any evidence to avoid dismissal at the MTD stage. Moreover, the Order's discussion of this claim failed to consider or address a number of significant—and more than *sufficient*—factual allegations in the Complaint that support this claim. *Next*, by prematurely dismissing Plaintiffs' *Anderson-Burdick* claim with prejudice and without conducting its own fact-intensive inquiry, the Order commits the same legal errors that the Ninth Circuit held reversible in *Soltysik v. Padilla*, 910 F.3d 438, 444 (9th Cir. 2018). *Lastly*, the Order's conclusion that Plaintiffs' alternative Equal Protection Claim

must be dismissed as duplicative of their First Amendment content-based claim (which the Court did not dismiss), was contrary to binding Ninth Circuit precedent.

## II.     LEGAL STANDARD

A "district court may reconsider and revise a previous interlocutory decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of controlling law." *Hydranautics v. FilmTec Corp.*, 306 F. Supp. 2d 958, 968 (S.D. Cal. 2003); *see also Amarel v. Connell*, 102 F.3d 1494, 1515 (9th Cir. 1996) ("[I]nterlocutory orders . . . are subject to modification by the district judge at any time prior to final judgment."). Here, manifest error requires reconsideration of the Court's Order.

## III.     ARGUMENT

### A.     There is no temporal litmus test that separates restrictions on petition circulators that violate the First Amendment from ones that do not.

Plaintiffs assert that the Strikeout Law violates the First Amendment because it effectively restricts the pool of available circulators, complicates the signature-gathering process, increases expenses, and ultimately makes it more difficult to successfully achieve ballot access. Each of these assertions are supported by multiple factual allegations in the Complaint and the Supreme Court and the Ninth Circuit (among many others) have repeatedly recognized that these types of injuries give rise to cognizable (and meritorious) First Amendment claims. *See, e.g.*, *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 184 (1999); *Meyer v. Grant*, 486 U.S. 414, 422–23 (1988); *Nader v. Brewer*, 531 F.3d 1028, 1036 (9th Cir. 2008); *Citizens for Tax Reform v. Deters*, 518 F.3d 375, 388 (6th Cir. 2008); *Chandler v. City of Arvada*, 292 F.3d 1236, 1243 (10th Cir. 2002). The Order correctly recognizes that laws that narrow the potential pool of circulators may violate the First Amendment, but then finds Plaintiffs failed to state a claim upon which relief may be granted because "[t]he Strikeout Law . . . does not implicate the physical act of circulation *at the time of circulation* because it . . . comes into play only *after* all initiative-related speech has occurred." Order at 6. This was manifest error, and it should be corrected.

As the Supreme Court wrote in *Buckley*: "We have several times said 'no litmus-

paper test' will separate valid ballot-access provisions from invalid interactive speech restrictions; we have come upon 'no substitute for the hard judgments that must be made.'" 525 U.S. at 192 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)); *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 359 (1997) ("No bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms."). The First Amendment *demands* that courts "be vigilant in making those judgments, to guard against undue hindrances to political conversation and the exchange of ideas." *Buckley*, 525 U.S. at 192. Nevertheless, the Order imposes a temporal litmus test—one that no court has ever endorsed, and which itself runs contrary to authoritative precedent in ballot initiative cases raising First Amendment claims.

That there is no such distinction is most evident from the Supreme Court's seminal decision in *Buckley*, in which it affirmed the invalidation of a Colorado law that infringed on initiative-related speech even *after* signature gathering was complete. That law required that paid circulators' names and wages be publicly disclosed in not only ongoing monthly reports, but also a final report to be issued *after* signature-gathering concluded. *Id*. at 201. If there was a temporal line to be drawn, this was the place to do it. Nonetheless, the Court held that these requirements not only implicated, but *violated* the First Amendment. *See id.* at 201–05. As a drafting matter, it would not have been difficult for the Supreme Court to write an opinion finding the monthly reports problematic, but concluding that the final report—issued after signature gathering was completed—was not. But it invalidated both.

It did so despite the fact that, as with the Strikeout Law, any impact on the circulator would not come until after the signature gathering was completed—and, if anything, the impact of the regulation on circulators was far less severe, requiring only the disclosure of the circulators' name and pay, not their meaningless physical appearance at the whim of a challenger, or the undoing of all of their efforts to support the measure. *See id.*; *see also Am. Constitutional Law Found., Inc. v. Meyer*, 120 F.3d 1092, 1105 (10th Cir. 1997) ("[C]ompelling the disclosure of the identities of every paid circulator chills paid circulation, a constitutionally protected exercise."), *aff'd* 525 U.S. 182 (1999). Moreover, in finding the

after-the-fact measure invalid, the Supreme Court emphasized that the disclosure requirement was imposed on only paid circulators, and not their volunteer counterparts. *Buckley*, 525 U.S. at 205. This, too, is a feature it shares with the Strikeout Law. Thus, based on *Buckley* alone, the dismissal of Plaintiffs' claim based on a newly created temporal litmus test should be reversed.

The same conclusion follows from *Meyer v. Grant*, 486 U.S. 414 (1988), in which the Supreme Court struck down a Colorado law that made it a felony to pay petition circulators. The Court explained that the law both "limits the number of voices who will convey [the sponsors'] message" and "makes it less likely that [the sponsors] will garner the number of signatures necessary to place the matter on the ballot." *Id.* at 422–23. Of course, Colorado could charge someone with a felony only *after* the circulator had already (1) circulated an initiative petition, and (2) received money in exchange. Thus, the unconstitutional limitation on circulators that "restrict[ed] political expression," by definition took place only *after* signature gathering occurred, and well after proponents would have made their decisions about whether to pursue a petition without paid circulators, and after circulators made their own decisions about their willingness to gather signatures without pay, or risk enforcement of the law. *See id.* at 422. Yet, the Supreme Court had little trouble concluding that the law both implicated and violated the First Amendment.

In both cases, the Supreme Court emphasized that the laws in question violated the First Amendment because their effects served to limit the pool of potential circulators. The Court has never made any distinction between restrictions that are triggered before, after, or during the signature gathering process. To the contrary, as these cases demonstrate, the Court has found that even laws that are not implicated until after signature gathering occurs may be unconstitutional restrictions on political speech. This is consistent with the Court's repeated admonition that there is no "litmus-paper test" that "separate[s] valid ballot-access provisions from invalid interactive speech restrictions." *Buckley*, 525 U.S. at 192. In every case, courts must make the hard judgments about whether the restrictions at issue significantly inhibit communication with voters about proposed political change, and

1   whether any such inhibition is warranted by the state interests alleged to justify those

2   restrictions. *Id*. This is a highly individualized factual inquiry. *See generally id.*; *see also*

3   *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 419–420 (6th Cir. 2014); *Angle v.*

4   *Miller*, 673 F.3d 1122, 1132–34 (9th Cir. 2012); *Nader*, 531 F.3d at 1034–35; *Citizens for*

5   *Tax Reform v. Deters*, 518 F.3d 375, 383 (6th Cir. 2008); *Ariz. Right to Life Political Action*

6   *Comm. v. Bayless*, 320 F.3d 1002, 1007–14 (9th Cir. 2003).[1]

7       Furthermore, neither the Supreme Court nor the Ninth Circuit have narrowly defined

8   First-Amendment-protected circulation activity as only the actual physical interaction

9   between circulator and signer. They have consistently recognized that the question is not

10  *when* in the process a restriction is imposed, but rather *whether* it imposes "*undue*

11  *hindrances* to political conversations and the exchange of ideas." *Buckley*, 525 U.S. at 192

12  (emphasis added). Courts must be "vigilant" in their examination of a challenged restriction,

13  to ensure that is not the case. *Id.* A temporal distinction that permits a state to impose

14  burdens on circulators with impunity, provided they are not effectively triggered until the

15  circulator has completed signature gathering, would open the floodgates to clever

16  restrictions that walk this line, with no mind to their actual impact on the pool of

17  circulators—whether because circulators who have been exposed to the law's burdens

18  become increasingly unwilling to participate, *see, e.g.*, Compl. ¶¶ 84–85, or because

19  proponents, in order to have a realistic chance of success, must substantially narrow the

20  pool of individuals who they will use to circulate petitions, *see, e.g.*, Compl. ¶¶ 26–27.

21      Elsewhere in its Order, the Court seemed to indicate that it did not view choices by

22  proponents or circulators sparked by the Strikeout Law to narrow the pool from which they

23  hired, or to decline, or be reluctant to circulate, as cognizable First Amendment harms.

24

25      [1] Moreover, courts look to the state's legal regime as a whole to determine whether
    any such restriction may be warranted. *See, e.g.*, *Buckley*, 525 U.S. at 192; *see also Nader*,
26  531 F.3d at 1037–38 (finding state's interest in subpoena compliance could be more
    narrowly met by having circulators agree to be bound by state's subpoena authority). Yet
27  the Court's Order also did not consider Plaintiffs' allegations that such registration is
    already required for paid and non-resident circulators in Arizona. Compl. at ¶¶ 43–45.

28

Order at 6 n.8 (disregarding Plaintiff Miracle's decision to decline a circulation job for a nomination petition because of her misapprehension about the reach of the Strikeout Law)[2]; *id.* at 15-16 (stating allegation that Plaintiffs NextGen and Arizonans for Fair Lending's choice between "whether to refrain from core political activity altogether or amass and divert significant resources" did "not constitute evidence of harm"). To the extent this application of the law colored the Court's view of Plaintiffs' claim that the Strikeout Law violated the First Amendment by narrowing the pool of circulators, it was manifest error.

It is well established that chilled speech and self-censorship establish cognizable harm. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 794 (1988); *Va. v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988); *San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1129 (9th Cir. 1996). The same is true of laws that make people more reluctant to engage in protected First Amendment activity, even if it is not prohibited outright (or there are *no* circumstances under which they would engage in such activity). *See, e.g.*, *Meyer*, 486 U.S. at 422-23 (striking down law banning paid circulators because it reduced overall pool of circulators, even though a circulators could still choose to work for free); *Buckley*, 525 U.S. at 192, 198 (striking down law requiring circulators to wear ID badges and have name and pay disclosed, even though they could still choose to work if they wore ID or did not object to their name and pay being disclosed, and relying on sponsor's assertion that restrictions limited number of people who would circulate); *Ariz. Right to Life Political Action Comm.*, 320 F.3d at 1006 (holding organization suffered First

---

[2] Plaintiff Miracle's decision to decline another petition-circulating job chilled even her protected First Amendment-protected activity because the signatures she would have collected for that candidate could not have been invalidated through the Strikeout Law's operation (which applies to only initiatives). The Order was incorrect to dismiss this fact as irrelevant to its First Amendment inquiry. As the Ninth Circuit recognized in *Sanders County Republican Central Committee v. Bullock*, the fact that a law may cause people to decline to engage in communications that are not actually within the law's reach is itself proof that the law "has thus had a 'chilling effect' radiating from the disfavored speaker to untargeted individuals and plainly protected speech." 698 F.3d 741, 748 (9th Cir. 2012); *see also Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1196–98 (9th Cir. 2018); *Wolfson v. Brammer*, 616 F.3d 1045, 1058-59 (9th Cir. 2010).

Amendment injury when it "was forced to modify its speech and behavior to comply with the statute" at issue); *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1174 (9th Cir. 2018) (holding businesses experienced "actual injury" when they "modified their speech and behavior based on" anticipation of law's enforcement).

In each instance, courts recognized that the First Amendment is violated when the reality of a restriction is it imposes unjustifiable "choices" upon speakers in the exercise of their core political speech rights. And those choices need not be harrowing. To take just a few examples from *Buckley*, the requirement that a circulator wear ID, *see* 525 U.S. at 198–200, or acquiesce to the publication of his name and pay after signature gathering is over, *id.* at 201–204, is far less burdensome than the Strikeout Law's requirement that he be able to travel hundreds or thousands of miles to physically appear (with no requirement that any testimony be actually sought from him) at the whims of a challenger at some unknown date in the future, or else have all of the signatures that he gathered "deemed invalid." A.R.S § 19-118(E); *see also, e.g.*, Compl. ¶¶ 20–21, 84.

Against this backdrop, the Complaint's extensive factual allegations as to why and how the circulator pool is reduced by the Strikeout Law more than adequately allege a First Amendment claim. *See, e.g.*, Compl. at ¶¶ 20-21, ¶¶ 84-85 (asserting "many circulators are . . . unwilling or unable to" circulate because of Strikeout Law); ¶ 86 (alleging proponents are reluctant to hire circulators from outside Phoenix, even though geographic distribution is important to a successful campaign, because of Strikeout Law); ¶¶ 26-27 (alleging Plaintiffs had and anticipate continued difficulty securing circulators and signatures).

**B.    Plaintiffs alleged sufficient facts to support a claim that the Strikeout Law imposes a substantial burden to ballot access.**

The Court's decision to dismiss Plaintiffs' First Amendment claim to the extent it relies on the theory that the Strikeout Law imposes a substantial burden to ballot access was also manifest error and should be reconsidered for several reasons. Here, the Court begins its discussion by agreeing with Plaintiffs that "ballot-access measures like the Strikeout Law can restrict political speech" by making it more difficult to access the ballot. Order at 7.

Indeed, the case law demands such a conclusion. *See, e.g.*, *Angle*, 673 F.3d at 1133 (noting Ninth Circuit "assume[s] that ballot access restrictions place a severe burden on core political speech, and trigger strict scrutiny, when they significantly inhibit the ability of initiative proponents to place initiatives on the ballot"); *see also Meyer*, 486 U.S. at 423 (1988) (finding statute that made it less likely that initiative would appear on the ballot violated First Amendment); *cf. ACLU v. Lomax*, 471 F.3d 1010, 1015 (9th Cir. 2006) (finding failure of an initiative to qualify for ballot constituted "real or immediate threat of an irreparable injury"). The Court also agreed that none of the cases that the Secretary relied upon to argue that the threat of signature disqualification cannot violate the First Amendment were "particularly apt." Order at 7. Nevertheless, the Order concludes: "at this juncture, Plaintiffs have simply failed to show facts or circumstances demonstrating such a restrictive effect." *Id*. On that basis, it dismissed Plaintiffs' claim.

As a threshold matter, in reaching this conclusion, the Order appears to impermissibly weigh the evidence submitted in support of the PI Motion to determine whether Plaintiffs adequately stated a claim on this theory in their Complaint. Such an approach is not appropriate on a Rule 12(b)(6) motion, where courts must accept the facts pleaded in the Complaint as true and may not rely upon allegations or facts outside the complaint or weigh the evidence. *See*, *e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007); *United States v. Corinthian Colleges*, 655 F.3d 984, 991 (9th Cir. 2011) (quoting *Schneider v. Cal. Dep't of Corrs.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998)); *see also In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016). The Order begins by acknowledging this, *see* Order at 2-3, but then appears to veer from this standard, performing an analysis more suited to evaluating the case on the merits.[3]

---

[3] This is not an isolated incident. The portion of the Order that pertains to the MTD references the Complaint's allegations only three times. Otherwise it conducts its analysis by almost exclusive reference to the PI Motion, and the evidence marshalled in support. And the Order does not just reference the evidence submitted in support of the PI Motion (itself inappropriate), it appears to weigh it and, finding it wanting, improperly grant the MTD. *See, e.g.*, Order at 6 (finding "*insufficient evidence of* a 'chilling' effect" to dismiss

This is particularly apparent in the discussion of Plaintiffs' claim that the Strikeout Law violates the First Amendment because it significantly burdens signature gathering efforts. *See id.* at 7-8. Indeed, the Order's conclusion that "Plaintiffs have simply failed to show facts or circumstances demonstrating such a restrictive effect" cites the PI Reply Brief, not the Complaint at all. *Id.* at 7. And its entire discussion of its reasoning for dismissing the claim refers only once to the Complaint, and then to no more than a single paragraph. In doing so, it ignores multiple other factual allegations pled by Plaintiffs in support of their claim that the Strikeout Law makes it substantially more difficult to gather the number of signatures required to obtain ballot access.

To wit, the Order considers *only* certain facts about Plaintiff Rose Smallcanyon's experience. It then rejects them as insufficient, concluding "[i]t requires several leaps of faith to say that if" a circulator who gathered as few signatures as the 43 that Smallcanyon gathered "was unable to comply with a subpoena, the invalidation of that relatively small number of signatures would precipitate a measure's failure to make the ballot, which would then chill statewide conversation concerning that measure." Order at 8. But the Complaint also contains allegations about Plaintiff Jessica Miracle, whose 2,604 signatures were invalidated by the Strikeout Law when she was unable to appear in person to respond to a subpoena because her children were sick. Compl. ¶ 20. The Court does not appear to have considered those allegations in concluding that Plaintiffs could not proceed with this claim.

The Order also does not discuss the Complaint's allegations about Plaintiff NextGen's experience, where 1,180 circulators were subpoenaed and the initiative only survived because of NextGen's extraordinary efforts in ensuring the presence of 913 of them. *Id.* ¶¶ 26; 59-68. Among other things, the Order does not appear to have considered

---

claim) (emphasis added). Because the Secretary largely addressed the PI Motion's arguments in her MTD instead of her response to the PI Motion, there was substantial overlap in the legal arguments across the motions. *See* Def.'s Opp. to PI Mot. at 2 (incorporating by reference the Secretary's MTD), Doc. 17; Pls.' Reply in Supp. of PI Mot. at 1 (noting the Secretary confines her merits arguments to the MTD), Doc. 23. But in doing so, the Secretary could not alter the standard by which the Court was required to evaluate the MTD.

the assertion that, in that instance, "[a]pproximately 300 circulators had their signatures stricken when they did not appear on the first day of trial" and "[a] further forty-six circulators who initially appeared at trial had their signatures stricken after they failed to return during a subsequent check-in." *Id*. ¶ 66. It does not require any leaps to conclude that, under such circumstances, the Strikeout Law could very well sound an initiative's death knell and keep it from obtaining ballot access.

The Order also does not discuss the allegations related to the experience of the Outlaw Dirty Money initiative in 2018, which *was* stricken from the ballot when a paltry 15 circulators who were subpoenaed failed to appear because of service issues and the Strikeout Law deemed all 8,824 signatures they gathered invalid. *Id*. ¶¶ 69-70, 74. Nor does the Order discuss the experience of Arizonans for Fair Wage and Healthy Families, another measure that was knocked below the signature threshold because of the Strikeout Law. *Id*. ¶¶ 75-78.

The Order also failed to consider the other ways in which the Complaint alleges that the Strikeout Law makes it substantially more difficult for initiative proponents to qualify for the ballot. Plaintiffs allege that the Law caused the proponents of the Arizonans for Fair Wage and Healthy Families initiative to suspend campaign operations for a month, divert resources, reduce fundraising activities, and turn away volunteers, all making it more difficult to qualify initiatives for the ballot. *See, e.g*., Compl. ¶ 75. NextGen and Arizonans for Fair Lending make similar allegations. *See, e.g.*, *id*. ¶ 26 (noting NextGen "anticipates that it will face a restricted pool of circulators because it must ensure that circulators are willing and able to comply with a subpoena"); *id.* ¶ 27 (alleging Arizonans for Fair Lending will be required to budget and divert additional resources to adequately defend against Strikeout Law in 2020); *id.* ¶ 87 (asserting Strikeout Law "significantly reduces the chances that an initiative can obtain the number of signatures necessary to achieve ballot access"); *id.* ¶ 88 (asserting Plaintiffs must "gather additional signatures, well in excess of the minimum constitutional threshold, to ensure that any signatures lost as a result of the Strikeout Law are not outcome-determinative"; if not for Strikeout Law, "initiative efforts

1   could gather far fewer signatures and still well exceed the constitutional minimum").

2        It was improper for the Court to disregard this significant quantum of factual

3   allegations, to assume at the motion to dismiss stage that "the plaintiff[s] will fail to find

4   evidentiary support for [their] allegations," or to conclude that the evidence cited in

5   Plaintiffs' PI Motion comprised the universe of all available evidence to prove Plaintiffs'

6   claims, and finding it unpersuasive, to dismiss the claim outright. Having stated a claim for

7   relief, Plaintiffs are entitled to present evidence to support their claims before a factfinder

8   at the appropriate stage of litigation, notwithstanding the Court's views on the strength of

9   the declarations submitted thus far in this preliminary stage of the case. Plaintiffs'

10   allegations are more than sufficient to state a claim under each of the First Amendment

11   theories asserted in the Complaint.

12
13
**C.**    **The Court's dismissal of Plaintiffs' Equal Protection claim (Count III), which is evaluated under *Anderson-Burdick*, cannot be squared with binding precedent in *Soltysik v. Padilla*.**

14        By prematurely dismissing Plaintiffs' Equal Protection claim alleged in Count III of

15   the Complaint, which is analyzed under the *Anderson-Burdick* balancing test, the Order

16   committed similar errors of law that the Ninth Circuit found reversible in *Soltysik*, 910 F.3d

17   at 444. Specifically, the Court failed to conduct the "context-specific analysis" that the test

18   requires, instead outsourcing its analysis to an inapposite decision by the Arizona Supreme

19   Court. *Id.* Further, the Order resolved factual issues crucial to the proper application of the

20   *Anderson-Burdick* test, again by looking to the decision of the Arizona Supreme Court, and

21   without the benefit of a fully developed evidentiary record *in this case*—the precise error

22   that the *Soltysik* court rejected.

23        In *Soltysik*, the plaintiffs alleged that a California ballot access law violated the First

24   and Fourteenth Amendments by requiring certain minor-party candidates to list their party

25   preference on the ballot as "none." *Id.* The district court properly articulated the *Anderson-*

26   *Burdick* test as requiring it to weigh the burden on plaintiffs' articulated First Amendment

27   rights against "'the precise interests put forward by the State as justifications for the burden

28   imposed by its rule,' taking into consideration 'the extent to which those interests make it

1    necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 445–46 (1992)

2    (*quoting Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). It then reviewed the

3    allegations in the complaint and dismissed the claim with prejudice, concluding—as a

4    matter of law—that the burdens were not severe and that California's purported interests

5    justified the law.

6         The Ninth Circuit reversed. In doing so, it emphasized that ultimate application of

7    *Anderson-Burdick* "rests on the specific facts of a particular election system, not on strained

8    analogies to past cases, as analogy and rhetoric are no substitute for evidence." *Id.* at 444

9    (citing *Ariz. Green Party v. Reagan*, 838 F.3d 983, 990 (9th Cir. 2016)). Accordingly, the

10   Ninth Circuit found that the district court's conclusion that the alleged burdens were not

11   "severe" and thus California's interests outweighed them were "premature" until "both

12   sides ha[d] developed their evidence." *Soltysik*, 910 F.3d at 450. Without "evidence

13   showing the true extent of the burden" or "the weightiness of California's interests in

14   imposing that burden," the court found itself "in the position of Lady Justice: blindfolded

15   and stuck holding empty scales." *Id.* at 444 (citing *Ariz. Libertarian Party v. Reagan*, 798

16   F.3d 723, 736 (9th Cir. 2015)). Here, the dismissal of Plaintiffs' *Anderson-Burdick* claim

17   echoes the errors detailed in *Soltysik*: like the district court there, the Court skipped its own

18   context-specific inquiry and prematurely weighed facts without an evidentiary record.

19        In fact, the Order's analysis of Plaintiffs' Equal Protection claim is even more

20   problematic than the district court's approach in *Soltysik*. Although the district court in

21   *Soltysik* attempted to conduct the balancing test using allegations in the plaintiffs'

22   complaint, here the Order disregards the Complaint altogether and instead focuses on the

23   Arizona Supreme Court's analysis in *Stanwitz v. Reagan*, 245 Ariz. 344, 348, 429 P.3d

24   1138, 1142 (2018), as amended (Nov. 27, 2018). Specifically, the Order holds that because

25   the *Stanwitz* court "has already held that the Strikeout Law does not hinder or restrict the

26   initiative process" under Article IV of the Arizona State Constitution, "the Strikeout Law

27   does not severely burden Plaintiffs' fundamental right to vote." Order at 12.

28        This is a problematic conclusion for several reasons. First, as the Order notes,

-12-

1   *Stanwitz* considered the question of whether the Strikeout Law violated "Article IV of the

2   *Arizona State Constitution*. *Id*. It did not consider whether it might violate the federal Equal

3   Protection Clause. These are not the same analyses: the federal question requires the Court

4   to balance the burdens that the Law imposes on the Plaintiffs based on a hard look at the

5   record before it against the specific justifications the state sets forth for the restriction.

6   *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008); *Soltysik*, 910 F.3d at 446.

7   The Ninth Circuit has been clear that at no point does this become a rational basis analysis:

8   even when the burden imposed by the law is miniscule, the Court must always consider

9   whether the justification offered by the state operates for the purpose asserted (the so-called

10   "means-fit") analysis. *Soltysik*, 910 F.3d at 446–47; *Arizona Green Party*, 838 F.3d 983;

11   *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016) (en banc). In

12   contrast, the state court considered, under its own line of state constitutional precedent,

13   whether the Law "unreasonably hinder[s] or restrict[s]," the initiative process, and whether

14   it "reasonably supplements the constitutional purpose" by fostering the integrity of the

15   process. *Stanwitz*, 245 Ariz. at 346. In other words, the state court was not required to (and

16   did not) conduct the same balancing test that the federal court must, nor was it required to

17   (and it did not) satisfy a means-fit requirement.

18       The state court was also contending with an entirely different record and a different

19   assertion of rights. For instance, the affected right at issue in *Stanwitz* was initiative

20   proponents' state constitutional right to participate in the initiative process. Here, it is the

21   right to vote of individual voters, whose otherwise valid signatures are being rejected under

22   the Strikeout Law. Compl. ¶¶ 112–19. In *Stanwitz*, the evidentiary record only reflected a

23   single trial in which fifteen circulators were subpoenaed—as the court emphasized, that was

24   fewer than 0.6% of circulators for that petition. Here, the Complaint alleges that subpoenas

25   are being indiscriminately issued *en masse* repeatedly and that the result has been a

26   substantial burden on Plaintiffs' rights. *Id*. ¶¶ 57-78. In *Stanwitz*, on the basis of the record

27   and arguments before it, the court reasoned that the Strikeout Law was reasonably related

28   to Arizona's stated interests in "deterring fraud." But such a generalized interest in fraud is

1   not sufficient to sustain a law that burdens Plaintiffs' fundamental rights under *Anderson-*

2   *Burdick* unless the state can show it somehow "fits" the purpose that it is purported to serve.

3   *Soltysik*, 910 F.3d at 445; *Pub. Integrity All.*, 836 F.3d at 1024–25. Yet, the Secretary has

4   failed entirely to explain why the Strikeout Law's severe penalty is a necessary supplement

5   to the general subpoena power it already exercises over all registered circulators.

6       For these reasons, the *Stanwitz* court's resolution of the state constitutional question

7   before it should have had no bearing on this Court's determination of the merits in this case,

8   let alone whether the allegations in Plaintiffs' Complaint, if taken as true, state a cognizable

9   claim under the First and Fourteenth Amendments to the U.S. Constitution. Indeed, even

10  the Secretary's counsel conceded that *Stanwitz* concerned the entirely different question of

11  whether the statute violated the Arizona Constitution's right to initiative under Article IV,

12  which is evaluated under a different legal standard. *See* Ex. 1, Oral Arg. Tr. 48:4-16 (counsel

13  for Secretary conceding Arizona state court decisions were not binding because they

14  focused on the state, rather than federal constitution, and "did not address federal First

15  Amendment issues  nor did they address the counterpart to the First Amendment in the

16  Arizona constitution").

17      These differences alone make the reliance on *Stanwitz* manifest error, but even if the

18  cases were more similar, a raft of precedent establishes that federal courts may not avoid

19  taking on the task of independently making the "hard judgments" that the *Anderson-Burdick*

20  test demands, *see, e.g.*, *Crawford*, 553 U.S. at 190; *see also Burdick v. Takushi*, 937 F.2d

21  415, 418 (9th Cir. 1991), *aff'd*, 504 U.S. 428 (1992), in favor of relying on a decision by

22  another court—including the highest court of a state. In fact, in *Meyer* itself, the Supreme

23  Court struck down the very same statute that the Colorado Supreme Court had partially

24  upheld. *Meyer*, 486 U.S. at 423 (citing *Urevich v. Woodard*, 667 P.2d 760, 763 (Colo.

25  1983)). Moreover, the U.S. Supreme Court has made clear that federal courts may not

26  abdicate their duty to engage in independent fact finding and apply the law, even when the

27  state courts have evaluated the *same law* under the *exact same federal* legal theory. Thus,

28  in *Cooper v. Harris*, 137 S. Ct. 1455, 1467 (2017), the Supreme Court rejected North

1    Carolina's assertion that a previous state supreme court decision that upheld a challenged

2    redistricting plan "should dictate (or at least influence) our disposition of this case," despite

3    the state court's consideration of the exact same federal challenge another set of plaintiffs

4    later raised in federal courts, and that a majority of the North Carolina state judges that

5    looked at the question (including on the North Carolina Supreme Court) concluded (unlike

6    the federal district court below) that the law did *not* violate the Constitution. *See id*. at 1467.

7    These decisions reflect the foundational principles of our government and legal

8    system: when Arizona joined the union in 1912, it voluntarily surrendered certain sovereign

9    prerogatives, including its right to enact laws that run afoul of the U.S. Constitution. *See*

10   U.S. Const., art. VI, cl. 2. (stating Constitution is the "supreme Law of the Land," the "Laws

11   of any State to the Contrary notwithstanding"); *see also League of Women Voters v.*

12   *Hargett*, No. 3:19-CV-00385, 2019 WL 4342972, at *20 (M.D. Tenn. Sept. 12, 2019)

13   (finding when a state "in its sovereignty, chose to bind itself to the Constitution," "it is no

14   affront to that sovereignty to hold the state to its commitments"). And while a state need

15   not give its people the power to enact direct legislation, if it does, it must abide by the U.S.

16   Constitution when it regulates that power. *Idaho Coalition United for Bears v. Cenarrusa*,

17   342 F.3d 1073, 1077 (9th Cir. 2003) (citing *Bush v. Gore* 531 U.S. 98, 104–05 (2000)).

18   Determining whether a state has upheld its commitment of fidelity to the Constitution is,

19   and always has been, squarely within the province of the federal courts. *Marbury v.*

20   *Madison*, 5 U.S. (1 Cranch) 137 (1803).

21   Had the Court conducted the context-specific inquiry into the sufficiency of the

22   allegations that *Soltysik* requires, *see* 910 F.3d at 444, it would have concluded that

23   Plaintiffs state a cognizable *Anderson-Burdick* claim. The Complaint alleges that Plaintiffs

24   Mary Katz, Mendon Dornbrook, and Lonnie Arrington (as well as thousands of other voters

25   who supported petitions circulated by Arizonans for Fair Lending and NextGen) each had

26   their otherwise valid signatures on initiative petitions rejected under the Strikeout Law.

27   Compl. ¶ 115. None personally knew the circulator, knew in advance that their signature

28   would be rejected, or had any opportunity to cure the rejection. *Id.* Under the Strikeout Law,

the harm will reoccur in the upcoming cycle. Against these burdens, the State "can offer no countervailing interests," and "cannot show that the Strikeout Law actually serves those interests." *Id*. ¶ 117; *see also id.* ¶¶ 117-18 (detailing why State's interests are not sufficient to outweigh burdens). Taken as true, these allegations are sufficient to state a claim. Under *Soltysik*, the ultimate weight of both the burden and the state's interests are "fact-intensive" issues that cannot be resolved at the motion to dismiss stage and should proceed for further factual development.[4]

### D. The Court's dismissal of Plaintiffs' Equal Protection Claim (Count II), is contrary to binding precedent in *OSU Student Alliance.*

Although the Court recognized that Plaintiffs have stated a cognizable claim that the Strikeout Law violates the First Amendment because it is a content-based restriction on speech, it simultaneously dismissed Plaintiffs' claim for differential treatment under the Equal Protection Clause—even though the Ninth Circuit has made clear that the two claims rise and fall together. Thus, the Court's characterization of Plaintiffs' Equal Protection

---

[4] To be clear, Plaintiffs maintain that the factual record developed in the PI proceedings also provides grounds for the Court to conclude that they are likely to succeed on the merits of their claims and to enjoin the Strikeout Law. And although the Order characterized Plaintiffs' desired injunction as "prevent[ing] state court judges from disqualifying signatures where they have found that paid and out-of-state initiative-petition circulators have failed to comply with subpoenas," Order at 18, that is not correct. Plaintiffs do *not* seek to restrain state court judges from exercising their sound judicial discretion in pre-election initiative challenges, including to strike signatures where they deem it warranted. The *opposite* is true; it is Plaintiffs' position that state court judges are more than capable of determining whether it is appropriate to invalidate a circulator's signatures in the face of non-appearance, based on the facts and context specific to the circumstances before them—particularly if there is objective indicia of possible fraud. Plaintiffs' objection is that the Strikeout Law removes discretion and mandates a selective (and severe) penalty—requiring that all such signatures be "deemed invalid," A.R.S § 19-118(E)—regardless of whether it is merited under the circumstances. That penalty penalizes not only initiative sponsors and circulators, but the voters who, through absolutely no fault of their own, have their support for a measure invalidated, even if there is no legitimate evidentiary basis for doing so. The proposed injunction would thus restore to the Arizona courts the discretion they have when evaluating challenges to signatures collected by all circulators in the nomination petition context, and even in-state volunteer circulators of initiative petitions. At no point has the Secretary argued, much less proffered any evidence, that those inherent judicial powers are in any way insufficient to serve its legitimate state interests.

claim as a "half-hearted attempt" to "transfer their First Amendment 'content-based restriction' argument to the equal protection context," Order at 12, is a quibble that properly lies not with Plaintiffs but the Ninth Circuit.

In *OSU Student Alliance v. Ray*, 699 F.3d 1053 (9th Cir. 2012), the Ninth Circuit reversed a district court's dismissal of a speech-based Equal Protection claim, and in doing so rejected the same reasoning used by the Court here. *Id.* at 1067. Because the *OSU* plaintiffs did not allege that the defendant's differential treatment "burdened any fundamental right other than their speech rights … the differential treatment of plaintiffs will draw strict scrutiny (as opposed to rational basis review) under the Equal Protection Clause [assuming that] it impinged plaintiffs' First Amendment rights." *Id.* The Ninth Circuit went on to reject the argument that "the equal protection claims' dependence on the First Amendment claims requires dismissal of the equal protection claims," firmly observing that "there is no authority for this proposition," and the Supreme Court has never "invoked the concept of duplicity or redundancy to find preclusion of a speech-based equal protection claim." *Id.* (collecting contrary cases). Instead, "[t]he equal protection claims rise and fall with the First Amendment claims." *Id.*; *see also Meyer*, 486 U.S. at 414.

Because the Court found that Plaintiffs had stated a claim that the Strikeout Law violates the First Amendment because it is a content-based restriction on speech, *OSU Student Alliance* requires it to also find that Plaintiffs have stated a claim that the same law violates their right to equal protection of the laws.

## IV.   CONCLUSION

Plaintiffs respectfully request that the Court reconsider its previous Order and deny the Secretary's Motion to Dismiss in its entirety, or, in the alternative, amend its previous Order to certify it for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) because the Order's dismissal of the above-referenced claims involves controlling questions of First and Fourteenth Amendment law, represents substantial grounds for disagreement, and an immediate appeal would materially advance the termination of this litigation.

1

2     Dated: January 3, 2020                              s/ Sarah R. Gonski

3                                                          Sarah R. Gonski (# 032567)
                                                          PERKINS COIE LLP
4                                                          2901 North Central Avenue, Suite 2000
                                                          Phoenix, Arizona 85012-2788
5
                                                          Elisabeth C. Frost (WDC# 1007632)*
6                                                          Uzoma N. Nkwonta (WDC# 975323)*
                                                          Perkins Coie LLP
7                                                          700 Thirteenth Street NW, Suite 600
                                                          Washington, D.C. 20005-3960
8

9                                                          *Admitted pro hac vice

10                                                         Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on January 3, 2020, I electronically transmitted the attached

3  document to the Clerk's Office using the CM/ECF System for filing.

4

5                                    s/ Michelle DePass

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28